UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ROBERT BERTUGLIA, JR., Individually, and as President of
LARO MAINTENANCE CORPORATION., LARO
MAINTENANCE CORPORATION, and LARO SERVICE
SYSTEMS,

                          Plaintiffs,

                                                    **AMENDED
COMPLAINT**

                                                 **11-CV-02141 (JGK**)

               -against-                         **JURY TRIAL DEMANDED**

                                                         **ECF CASE**

THE CITY OF NEW YORK, ADA ELYSE RUZOW,
ADA MICHAEL SCOTTO, PORT AUTHORITY
INSPECTOR GENERAL ROBERT E. VAN ETTEN, PORT
AUTHORITY DIRECTOR OF INVESTIGATIONS
MICHAEL NESTOR, PORT AUTHORITY INVESTIGATIVE
MANAGER EDWARD KENNEDY, PORT AUTHORITY
FORENSIC AUDITOR FRED FERRONE, PORT AUTHORITY
SUPERVISING INVESTIGATOR, JEFFREY SCHAFFLER, PORT
AUTHORITY CONTRACT ADMINISTRATOR BERNARD D'ALEO,
AND PORT AUTHORITY INVESTIGATORS JOHN AND
JANE DOE #1-5 (names and shield numbers whom are unknown
at present, and other unidentified members of the Port Authority),

                                 Defendants.
------------------------------------------------------------------------X

       Plaintiffs, ROBERT BERTUGLIA, JR., LARO MAINTENANCE CORPORATION and

LARO SERVICE SYSTEMS, by their attorney, Jon L. Norinsberg, complaining of the defendants,

respectfully alleges as follows:

<u>PRELIMINARY STATEMENT</u>

       1.     Plaintiffs bring this action for compensatory damages, punitive damages and

attorney's fees pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. § 1988 for violations

-1-

of his civil rights, as said rights are secured by said statutes and the Constitution of the United States and the laws of the State of New York.

## JURISDICTION

2.      This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 42 U.S.C. § 1988, and the Fourth and Fourteenth Amendments to the United States Constitution.

3.      Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

## VENUE

4.      Venue properly lies in the Southern District of New York under 28 U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6.      Plaintiff, ROBERT BERTUGLIA, JR., was at all relevant times a resident of the County of Suffolk, in the State of New York.

7.      Plaintiffs, LARO MAINTENANCE CORPORATION and LARO SERVICE SYSTEMS (collectively, "LARO") were at all relevant times New York Corporations with their principal places of business located in Bayshore, New York.

8.      Defendant, THE CITY OF NEW YORK, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

9.      Defendant, THE CITY OF NEW YORK, maintains the New York County District Attorney's Office, a municipal agency created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within the County and City of New

York.

10.     New York County Assistant District Attorneys' Elyse Ruzow ("ADA" Ruzow) and Michael Scotto ("ADA Scotto") are and were at all times relevant herein assistant district attorneys, employees, and agents of the New York County District Attorney's Office and defendant CITY OF NEW YORK.

11.     At all relevant times, ADA RUZOW was assigned to the Labor Racketeering Unit of the Manhattan District Attorney's Office, and was responsible for investigating the criminal allegations against plaintiff ROBERT BERTUGLIA, JR.

12.     At all relevant times, ADA SCOTTO was the Chief of the Labor Racketeering Unit of the Manhattan District Attorney's Office, and was responsible for supervising ADA Ruzow's investigation into the criminal allegations against plaintiff ROBERT BERTUGLIA, JR.

13.     The  PORT AUTHORITY OF NEW YORK AND NEW JERSEY ("PORT AUTHORITY"), was and still is a corporation duly organized and existing under and by virtue of the laws of the State of New York and New Jersey.

14.     The  PORT AUTHORITY maintains the Office of Inspector General of the PORT AUTHORITY of New York and New Jersey, a duly authorized public authority created and authorized under the laws of the State of New York and the State of New Jersey to investigate criminal misconduct, acting under the direction and supervision of the aforementioned corporation, PORT AUTHORITY OF NEW YORK AND NEW JERSEY.

15.      PORT AUTHORITY Inspector General ROBERT E. VAN  ETTEN ("VAN ETTEN"), was at all times relevant herein, an employee and agent of the PORT AUTHORITY of New York and New Jersey.

16.     Defendant VAN ETTEN is being sued in his individual capacity and in his official capacity.

17.     Defendant, PORT AUTHORITY Director of Investigations, MICHAEL NESTOR ("NESTOR"), was at all times relevant herein, an employee and agent of the PORT AUTHORITY Office of the Inspector General, and the PORT AUTHORITY of New York and New Jersey.

18.     Defendant NESTOR is being sued in his individual capacity and in his official capacity.

19.     Defendant, PORT AUTHORITY Investigative Manager, EDWARD KENNEDY ("KENNEDY"),was at all times relevant herein, an employee and agent of the PORT AUTHORITY Office of the Inspector General and the PORT AUTHORITY of New York and New Jersey.

20.     Defendant KENNEDY  is being sued in his individual capacity and official capacity.

21.     Defendant, PORT AUTHORITY Forensic Auditor FRED FERONE ("FERONE") was at all times relevant herein, an investigator, employee, and agent of the PORT AUTHORITY Office of the Inspector General and the PORT AUTHORITY of New York and New Jersey.

22.     Defendant FERONE is being sued in his individual capacity and official capacity.

23.     Defendant PORT AUTHORITY SUPERVISING INVESTIGATOR JEFFREY SCHAFFLER ("SCHAFFLER") was at all times relevant herein, a supervisor, investigator, employee, and agent of the PORT AUTHORITY Office of the Inspector General and the PORT AUTHORITY of New York and New Jersey.

24.     Defendant SCHAFFLER is being sued in his individual capacity and official capacity.

25.     Defendant PORT AUTHORITY CONTRACT ADMINISTRATOR BERNARD D'ALEO ("D'ALEO") was at all times relevant herein a contract administrator for the PORT AUTHORITY at the PORT AUTHORITY BUS TERMINAL, and was at all times an employee and agent of the PORT AUTHORITY Office of the Inspector General and the PORT AUTHORITY of New York and New Jersey.

26.     Defendant D'ALEO is being sued in his individual capacity and official capacity.

27.     PORT AUTHORITY Investigators John and Jane Does # 1-5 are and were at all times relevant herein officers, employees, and agents of the PORT AUTHORITY of New York and New Jersey.

28.     PORT AUTHORITY Investigators John and Jane Doe #1-5 are being sued in their individual capacities and official capacities.

29.     At all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York and/or the State of New Jersey.

30.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment with THE CITY OF NEW YORK and/or the PORT AUTHORITY of New York and New Jersey.

31.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting in furtherance of their employment with The City of New York and/or the PORT AUTHORITY of New York and New Jersey.

## FACTS

32.     At all relevant times, plaintiff ROBERT BERTUGLIA, JR., was the founder and President of LARO MAINTENANCE CORPORATION and LARO SERVICE SYSTEMS, INC. ("LARO").

33.      For over three decades, LARO was one of the leading providers of cleaning and maintenance services throughout the Northeast and Middle Atlantic states. LARO had been recognized by Crain's New York Business as one of the top 100  companies in New York City. Further, LARO had been voted one of the top one hundred companies in Long Island, and one of the top ten fastest-growing companies in Long Island.

34.     During this time period, LARO handled a large number of projects for well-known private and public organizations, and provided services at well-known public landmarks such as the Statue of Liberty, the Fulton Fish Market, the International Arrivals Building of Kennedy Airport, the Orlando International Airport, the United States Post Offices in Nassau and Suffolk County, and multiple colleges and universities throughout the Northeast.

35.     LARO was one of the leading providers of janitorial, cleaning and maintenance services and had an annual gross revenue of over $72,000,000.00 per year.

36.     LARO was based in Bayshore, New York and had over 3,000 New York employees on its payrolls.

37.     One of the public facilities serviced by LARO was the PORT AUTHORITY Bus Terminal ("PABT").

38.     LARO had done work for the PORT AUTHORITY since January of 1996, and it received multiple accolades for the outstanding quality of work it had performed at PABT and various other PORT AUTHORITY facilities.

39.     During this thirteen year period, PORT AUTHORITY had renewed its contract with LARO on several occasions, and had never once alleged any wrongdoing on the part of LARO or plaintiff ROBERT BERTUGLIA, JR.

**Plaintiffs Enter into a New Contract with the Port Authority in Late 2004**

40.     On or about December 9, 2004, the PORT AUTHORITY entered into another contract with LARO to clean the PABT.

41.     This contract, which consisted of 250 pages, contained a new one-line term that had never been in any of the previous contracts between LARO and the PORT AUTHORITY to wit: equipment had to be purchased to clean the Port Authority Bus Terminal.

42.     This provision was not included specifically for LARO, but rather, was included as boilerplate language in *all* PABT contracts a result of another vendor's deficient performance under a separate contract with defendant PORT AUTHORITY.

43.     In the newly modified contract – effective January 1, 2005 through December 31, 2007 –  the parties agreed that LARO would be reimbursed for the new equipment by the PORT AUTHORITY over the course of the contract.  Specifically, the parties agreed that LARO would bill the PORT AUTHORITY an additional $0.76 per hour on the invoices LARO submitted to Port Authority, to compensate for the new equipment to be purchased.

44.     At the beginning of the contract, LARO made efforts to procure the new cleaning equipment.  However, the two persons responsible for purchasing this new equipment at LARO – Stephen Davidson and Robert Vetter – subsequently left LARO, and no one else took over this responsibility.

45.     As a result of the departures of Davidson and Vetter, LARO purchased most, but not all, of the new equipment that had been agreed to under the contract. Nevertheless, the equipment

used by LARO to clean the PABT was in excellent working condition, and was still only two to three years old.  Hence, the quality of services provided by LARO to the PORT AUTHORITY was exactly the same as it would have been had the new equipment actually been purchased.

46.     Indeed, as the PORT AUTHORITY would later acknowledge, LARO provided excellent cleaning services to PORT AUTHORITY throughout the contract period, and in fact, the PORT AUTHORITY actually sent a letter in June 2008 praising LARO for its outstanding work in at the PABT,  recognizing LARO's "hard work and dedicated efforts," complimenting LARO's "dedicated staff", and thanking LARO for "delivering some *very impressive* customer service!" (Exhibit A) (emphasis supplied).

47.     Further, defendant PORT AUTHORITY was fully aware of the fact that LARO did not purchased new equipment, but never once complained to anyone at LARO, including plaintiff ROBERT BERTUGLIA, JR., about this issue throughout the contract period.

48.     In the past dealings between the parties, whenever there had been  any issues that arose under the contract, defendant PORT AUTHORITY would promptly notify LARO of any perceived problems that needed to be addressed.

49.     Despite the fact that the PORT AUTHORITY was fully aware of the fact that LARO had not purchased new equipment, the PORT AUTHORITY never once complained to anyone at LARO, and instead, continued to pay the invoices submitted by LARO which contained the $.76 charge for the new equipment.

50.     At no time was plaintiff ROBERT BERTUGLIA, JR.,  the President of a company with over 3,000 employees, ever aware that the invoices being submitted to defendant PORT AUTHORITY contained a $.76 overcharge.

51.     At no time did plaintiff ROBERT BERTUGLIA, JR.,  or anyone else at LARO, ever intend to defraud, steal or otherwise wrongfully take money from defendant PORT AUTHORITY.

**Lack Of  Motive To Defraud The Port Authority**

52.     Plaintiff ROBERT BERTUGLIA, JR.,  as President of LARO,  had built up a stellar reputation in the facility maintenance industry for over three decades, and would never have done anything that would have jeopardized this reputation.

53.     Further, LARO had enjoyed an excellent and mutually beneficial working relationship with the PORT AUTHORITY for over decade, and had every reason to expect that this relationship would continue for many years to come.

54.     There was no economic reason or incentive for ROBERT BERTUGLIA, JR., or LARO to attempt to steal money from the Port Authority.

55.     To the contrary, there was a liquidated damages provision in the contract which would cost LARO *far more* in monetary damages than LARO would ever have to pay for purchasing two new cleaners.  Specifically, under the agreement, LARO could be fined $250.00 *per day* by the PORT AUTHORITY for each piece of equipment that was not present or that was not operational. Lastly, the cost of the new equipment – less than $3,000 per month over the life of the contract – represented only a *de minimis* percentage of the total worth of the contract, as the PORT AUTHORITY was paying LARO over $7,000,000.00 per year under the contract.

56.     Notwithstanding LARO's failure to purchase the two new cleaners, throughout the course of the contract, the PORT AUTHORITY knowingly and willingly continued to pay the invoices  submitted invoices to the PORT AUTHORITY containing the $.76 charge for the new equipment.

-9-

57.     At no point in time did defendants ever posses any evidence that suggested that plaintiff ROBERT BERTUGLIA, Jr., was aware that his company was submitting invoices containing the $.76 charge.

**The Port Authority Opens up an Investigation, Despite the Lack of Any Evidence of Criminal Wrongdoing**.

58.    For reasons which will be set forth in more detail below, on or about 2007, employees of defendant PORT AUTHORITY of New York and New Jersey's Office of the Inspector General commenced an investigation regarding the failure of LARO to purchase all new equipment under the contract.

59.    Specifically, defendants FERONE, SHAFFLER and D'ALEO, and INVESTIGATORS JOHN AND JANE DOES #1-5, at the direction of defendants VAN ETTEN, NESTOR AND KENNEDY, investigated whether LARO had purchased the new equipment as required by the contract.

60.    Defendant SCHAFFLER was the lead investigator for the PORT AUTHORITY in this matter, and in this capacity, supervised the investigation conducted by defendant FERONE and defendant INVESTIGATORS JOHN AND JANE DOES 1-5.

61.    During this investigation, defendants FERONE, SCHAFFLER, D'ALEO and INVESTIGATORS JOHN AND JANE DOES #1-5 became aware that LARO had fully and completely provided the services that had been paid for, had received multiple commendations for their outstanding work under the contract, and had purchased most, if not all, of the "new and unused" equipment specified by the contract.

62.    Defendants FERONE, SCHAFFLER, D'ALEO and INVESTIGATORS JOHN AND JANE DOES #1-5 did not obtain *any* evidence that suggested that plaintiff ROBERT BERTUGLIA,

-10-

JR., was aware that his company was submitting invoices containing the $.76 charge.

63.    Defendants FERONE, SCHAFFLER, D'ALEO and INVESTIGATORS JOHN AND JANE DOES #1-5 did not contact plaintiff ROBERT BERTUGLIA, JR., or any employee of LARO to inquire why PORT AUTHORITY was being charged an additional $.76 per hour.

64.    Instead, for reasons which will be set forth in greater detail below, defendants FERONE, SCHAFFLER, D'ALEO, and INVESTIGATORS JOHN AND JANE DOES #1-5, at the direction of defendants VAN ETTEN, NESTOR AND KENNEDY, and/or with their express approval, falsely communicated to the New York County District Attorney's Office that plaintiff ROBERT BERTUGLIA, JR., had committed intentional criminal misconduct by knowingly submitting invoices containing the $.76 charge without having bought the new equipment.

65.    In their communications with the New York County District Attorney's Office defendants FERONE, SCHAFFLER, D'ALEO and INVESTIGATORS JOHN AND JANE DOES #1-5, at the direction of defendants VAN ETTEN, NESTOR AND KENNEDY, and/or with their express approval, grossly distorted the actual facts and circumstances of the dealings between the PORT AUTHORITY and LARO, transforming what was, in essence, a civil contract dispute into a false and misleading tale of criminal misconduct.

66.    As will be set forth in more detail below, these defendants took these actions to retaliate against plaintiff ROBERT BERTUGLIA, JR., who had recently challenged the integrity of the PORT AUTHORITY's bidding process and whose attorney had suggested, in writing, that the PORT AUTHORITY bidding process might be "rigged," as one of LARO's competitors appeared to have an "inside track" by consistently winning bids from the PORT AUTHORITY, despite being patently unqualified to perform such jobs.

67.     As a result of this complaint, defendants FERONE, SCHAFFLER, D'ALEO and INVESTIGATORS JOHN AND JANE DOES #1-5,  at the direction of defendants VAN ETTEN, NESTOR AND KENNEDY, and/or with their express approval, falsely told the New York County District Attorney's Office  that plaintiff ROBERT BERTUGLIA, JR. had "stolen a lot of money" from the Port Authority,  was a "thief" and a "crook", and should be arrested and prosecuted.

68.     In making such false representations, defendants expressly intended for  the New York County District Attorney's Office to arrest and prosecute plaintiffs.

69.     Even after the matter had been referred to the New York County District Attorney's Office  defendants FERONE, SCHAFFLER, D'ALEO and INVESTIGATORS JOHN AND JANE DOES #1-5,  at the direction of defendants VAN ETTEN, NESTOR AND KENNEDY, and/or with their express approval, continued to actively encourage and importune members of the New York County District Attorney's Office, including but not limited to, ADA RUZOW and ADA SCOTTO, to arrest and prosecute  plaintiff ROBERT BERTUGLIA, JR. and LARO, despite their knowledge that plaintiffs had committed no criminal wrongdoing whatsoever.

70.     Further, in their communications with the New York County District Attorney's Office  defendants FERONE, SCHAFFLER, D'ALEO and INVESTIGATORS JOHN AND JANE DOES #1-5,  at the direction of defendants VAN ETTEN, NESTOR AND KENNEDY, and/or with their express approval, intentionally withheld material exculpatory information from the New York County District Attorney's Office regarding LARO, including but not limited to, the following facts: i) the PORT AUTHORITY's had acknowledged, *in writing*,  that LARO's service under the contract had been excellent (Exhibit A); ii)  the PORT AUTHORITY was at all times *fully aware* of the fact that some new equipment had not been purchased by LARO, yet it continued to make monthly payments of $600,000.00, rather than exercise its contractual right to a penalty of $250.00 per day

– which would have far exceeded the costs of purchasing the new equipment, and which could have easily been subtracted from the $600,000.00 monthly payment as a set-off; and iii)  the PORT AUTHORITY had actually decided to *renew* its contract with LARO for another three years, despite its full knowledge of LARO's alleged "wrongdoing" in not purchasing the new equipment.

**Based on the False Allegations and Material Omissions of the Port Authority, the New York County District Attorney's Office Open up an Investigation.**

71.     As a result of the false and misleading information communicated by defendants FERONE, SCHAFFLER, D'ALEO and INVESTIGATORS JOHN AND JANE DOES #1-5 to the New York County District Attorney's Office, ADA RUZOW began a criminal investigation into the PORT AUTHORITY's allegations of misconduct  by  ROBERT BERTUGLIA, JR .and  LARO.

72.     From the outset, it was manifestly clear that the allegations made by defendants FERONE, SCHAFFLER, and INVESTIGATORS JOHN AND JANE DOES #1-5 did not rise to the level of criminal misconduct.

73.     Indeed, there was never *any* evidence at *any* time that plaintiff ROBERT BERTUGLIA, JR., was actually aware of the new equipment requirement in the voluminous contract, or that he knew that LARO had not complied with it.

74.     Nor, for that matter, was there ever any evidence that *any* employee at LARO ever *knowingly* intended to defraud, steal or otherwise wrongfully take money from defendant PORT AUTHORITY. Notwithstanding this fact, ADA RUZOW – for reasons which will be set forth more fully below – launched a "scorched earth" investigation into ROBERT BERTUGLIA, JR., and LARO, repeatedly and flagrantly exceeding the scope of her lawful authority as an Assistant District Attorney, and acting in furtherance of objectives wholly unrelated to the criminal investigation of plaintiffs herein.

-13-

**ADA Ruzow Questions LARO Employees About Matters That Are Palpably Irrelevant And Far Outside the Scope of the PORT AUTHORITY Investigation.**

75.    During the course of her investigation, ADA RUZOW interviewed several witnesses who were current or former LARO employees.

76.    During these interviews, ADA RUZOW made grossly improper, false and misleading statements to the employees about plaintiff ROBERT BERTUGLIA, JR., with the express goal of pressuring, intimidating and inducing these witnesses to provide false testimony against plaintiff.

77.    For example, in one such interview, ADA RUZOW falsely told a high-level LARO employee, Robert Kolakowski, that plaintiff ROBERT BERTUGLIA, JR. had tried to "sell him down the river" and had illegally deprived him of certain insurance benefits that Kolakowski was otherwise entitled to receive.

78.    As a result of such blatantly false and misleading statements, Kolakowski – who had, from the very outset, steadfastly denied that either LARO nor ROBERT BERTUGLIA, JR., had done anything wrong – became enraged against plaintiff ROBERT BERTUGLIA, JR., and thereafter, agreed to provide (patently false) testimony before the Grand Jury regarding alleged verbal communications (wholly undocumented and non-existent) made by the PORT AUTHORITY to LARO regarding LARO's failure to purchase new equipment under the contract. Kolakowski also falsely told the Grand Jury that Bertuglia was a "hands-on" manager and that no one could do anything unless he was notified, when in fact that was entirely false and misleading.

79.    Further, during these interviews, ADA RUZOW made grossly improper and highly unethical threats against these employees, implying that they themselves would be subject to criminal prosecution if they did not provide damaging information about plaintiff ROBERT BERTUGLIA, JR, despite the fact that ADA RUZOW knew that there was no evidence whatsoever

that these employees had engaged in criminal conduct.

80.    Further, during these interviews, ADA Ruzow grilled these witnesses over a wide variety of topics having *nothing at all* to do with the allegations made by the PORT AUTHORITY.

81.    For example, several witnesses were asked about  whether Bertuglia's mother received health insurance through LARO, whether Bertuglia's father was a salaried employee at LARO, whether Bertuglia's ex-wife received insurance through LARO as part of her divorce settlement, whether Bertuglia or any of his family members had use of company cars, and whether LARO was paying overtime to its workers who cleaned up Home Depot facilities.

82.    These questions were palpably improper and entirely irrelevant to the allegations made by the PORT AUTHORITY against plaintiffs ROBERT BERTUGLIA, JR., of LARO.

**Defendants Flood LARO and Other Third Parties With A Torrent of Subpoenas, Seeking Palpably Improper and Irrelevant Information.**

83.    Further, as part of her purported "investigation" into plaintiff – and in furtherance of her objective to "ruin" plaintiff ROBERT BERTUGLIA, JR.,  as set forth more fully below,  due to his alleged  failure to "cooperate" with ADA RUZOW – ADA RUZOW flooded LARO and other third parties with subpoenas seeking records relating to health benefits, employee payroll, overtime benefits, and  other palpably irrelevant subject matters.

84.    At the time these subpoenas were served, no grand jury had been convened.

85.    Notwithstanding this fact, defendant ADA RUZOW had also issued subpoenas to compel various witnesses to come to the Manhattan District Attorney's Office at 1 Hogan Place – *not* to testify before the grand jury, but rather, solely to get  interviewed by ADA RUZOW.

86.    ADA Ruzow served these subpoenas solely for the purposes of harassing, intimidating and threatening potential defense witnesses – and pressuring, intimidating and coercing

them to give false and  unfavorable testimony against plaintiff ROBERT BERTUGLIA, JR. – *not* to compel these witnesses to attend a judicial proceeding, *not* to obtain necessary information and *not* for any other legitimate investigative purpose.

87.     Among the witnesses who were compelled to appear in this manner were plaintiff's daughter, Stephanie Henninger, as well as several other employees of LARO, including but not limited to,  Robert Vetter, Greg Pulitano, Stephen Davidson, Robert Kolakowski, Patricia Burell, and Michelle King.

88.     All of the aforesaid actions were taken by ADA RUZOW  in her investigative capacity, either: i) prior to the commencement of any formal legal proceedings; and/or ii) during the time period between the first and second indictments, i.e., *after* the first indictment had been dismissed  (as discussed infra.) but  *before* the second grand jury had  been convened.

89.     All of the aforesaid actions  taken by ADA Ruzow in her investigative capacity, as set forth above, were expressly or impliedly approved by her supervisor, ADA SCOTTO.

**Defendants Contact LARO's Clients And Inform Them Of The Criminal Charges, Causing Several Contractors To Stop Doing Business With LARO.**

90.     Apart from threatening and harassing defense witnesses, and attempting to coerce them to give unfavorable testimony against plaintiff ROBERT BERTUGLIA, JR.,  defendants ADA RUZOW and defendant SHAFFLER also deliberately and maliciously contacted many of LARO's existing clients and informed them of the ongoing criminal investigation against plaintiffs.

91.     Specifically, defendants ADA RUZOW and defendant SHAFFLER visited a number of these entities in person, and informed them that plaintiff ROBERT BERTUGLIA, JR. and LARO had stolen large sums of money from the PORT AUTHORITY.

-16-

92.     At the time defendants RUZOW and defendant SHAFFLER made these statements to LARO's customers, they knew of the existence of valid contracts between LARO and these various third parties.

93.     At the time defendants RUZOW and defendant SHAFFLER made these statements to LARO's customers, they intended to cause these third parties to breach their contracts with LARO.

94.     As a result of the aforesaid unlawful and improper conduct, many of the customers contacted by defendants RUZOW and defendant SHAFFLER did, in fact, breach their contracts with LARO.

95.     Among the companies who were unlawfully and improperly contacted by defendants RUZOW and SHAFFLER were the following: the Fulton Fish Market, the Broadway Mall in Hicksville, St. John Baptist High School, the Bayshore Bright Waters Library and the New York City School Construction Authority.

96.     The loss of these contracts had a devastating financial impact on LARO, resulting in  millions of dollars in lost revenue for LARO.

**The Motive for Defendants' Malicious Conduct: A Completely Groundless Belief That Plaintiff Was Withholding Information From Prosecutors.**

97.     There was no lawful excuse or justification for the actions taken by defendants RUZOW and SHAFFLER when they contacted LARO's customers.

98.     There was no legitimate investigative reason why defendants RUZOW and defendant SHAFFLER *needed* to speak with any of these customers, much less inform them of the indictment against plaintiff ROBERT BERTUGLIA, JR. and LARO.

99.     Rather, defendant RUZOW and defendant SHAFFLER contacted LARO's customers with the sole, express and malicious purpose of causing permanent and irreparable damage to plaintiff ROBERT BERTUGLIA, JR. and LARO by inducing these customers to breach their contracts with LARO.

100.    In particular, defendant RUZOW wanted to teach plaintiff ROBERT BERTUGLIA, JR., a "lesson" because she believed – erroneously – that Mr. Bertuglia was holding back information about another criminal investigation with which Ms. Ruzow was involved.

101.    Specifically, ADA RUZOW, in her capacity as an Assistant District Attorney in the Labor and Racketeering Unit, had been investigating allegations made against one Vincent Grimaldi for charges that were completely unrelated to plaintiff ROBERT BERTUGLIA, JR. and LARO.

102.    As part of her investigation, ADA RUZOW had obtained a tape recording of a conversation between Vincent Grimaldi and ROBERT BERTUGLIA, JR.,  in which the name of Charles Gargano – the former head of the Empire State Development Fund and a member of the PORT AUTHORITY board, who himself had been the subject of an earlier criminal investigation by the New York County District Attorney's Office  – had been mentioned.

103.    On this tape, plaintiff ROBERT BERTUGLIA, JR. had not made any incriminating statements whatsoever, nor had he in any way implicated Mr. Grimaldi or Mr. Gargano.

104.    Mr. Bertuglia had stated simply,   in sum and substance,  that he wanted LARO to "get a fair shake" on an upcoming bid, since one of his chief competitors – a company known as "Guardian Maintenance" ("Guardian") – had consistently won bids with the PORT AUTHORITY, and had openly boasted that an upcoming project at the World Trace Center was already "in the bag", or words to that effect.

-18-

105.    There was nothing illegal or improper about Mr. Bertuglia's request to "get a fair shake."  In fact, one of Mr. Bertuglia's attorneys, Samuel Z. Gdanski, Esq., had actually *written letters* to the Inspector General of the PORT AUTHORITY, defendant Robert E. Van Etten, setting forth in substance the same complaint  that is heard on the tape, i.e. that Guardian seemed to have the "inside track" on PORT AUTHORITY jobs and was openly bragging about winning the World Trade Center job even before the bidding process had taken place. (Exhibit B)

106.    In retaliation for filing this complaint – which had suggested that there were multiple "improprieties occurring" in the way that the PORT AUTHORITY conducts its bidding process, that "the integrity of the bidding process appears to have been compromised", and that the PORT AUTHORITY had "violated the confidentiality provisions" of the bidding procedure when it disclosed certain confidential information to one of LARO's competitors, Guardian Maintenance (Ex.B) – defendant Inspector General Robert E. Van Etten, along with defendants Director of Investigations Michael Nestor and Investigative Manager Ed Kennedy, as well as defendants Shaffler and Ferrone, decided to selectively investigate and prosecute LARO and ROBERT BERTUGLIA, JR., leading to this matter being referred to the New York County District Attorney's Office and ADA Ruzow.

107.    Notwithstanding the innocuous content of the above conversation between plaintiff and Vincent Grimaldi – and the fact that there was actually written correspondence to the PORT AUTHORITY from Mr. Bertuglia's counsel on this very same topic –  defendant ADA RUZOW was convinced that Mr. Bertuglia was somehow "connected" with Mr. Grimaldi and/or Mr. Gargano in a criminal enterprise.

**ADA Ruzow Threatens To "Ruin" Plaintiff If He Does Not Cooperate With the Prosecution.**

108.    Based on this grossly unfounded and completely mistaken belief, ADA RUZOW became enraged when plaintiff ROBERT BERTUGLIA, JR. refused to provide information about Mr. Grimaldi and/Mr. Gargano.

109.    During one meeting with plaintiff ROBERT BERTUGLIA, JR., defendant ADA RUZOW shouted at plaintiff: "TELL ME WHAT YOU KNOW!! I WANT TO KNOW EVERYTHING THAT YOU KNOW!! IF YOU DON'T TELL ME EVERYTHING, I AM GOING TO RUIN YOU!!"

110.    When plaintiff ROBERT BERTUGLIA, JR. failed to provide the information that defendant ADA Ruzow was seeking, defendant ADA RUZOW then 'upped the ante' by threatening to prosecute Mr. Bertuglia's 80 year-old father, and his daughter Stephanie, if plaintiff did not tell ADA RUZOW "everything."

111.    However, plaintiff ROBERT BERTUGLIA, JR. – who had never been in trouble with the law before, and who simply did not *have* the underworld "connections" that defendant ADA Ruzow had imagined – had *no* information whatsoever to give to defendant ADA Ruzow regarding Mr. Grimaldi, Mr. Gargano or any other persons who might be engaging in criminal conduct.

112.    In fact, in October of 1995, Mr. Bertuglia and LARO had actually been *hand-selected* by Mayor Guiliani – after an exhaustive and comprehensive background investigation by the Department of Investigation – as the firm that would *clean up* the Fulton Fish Market, i.e., which would *rid* it of the "underworld" influence that had been present up until that time.

113.    When defendant ADA Ruzow realized that plaintiff ROBERT BERTUGLIA, JR. would not "cooperate" –  i.e., provide her with the (wholly non-existent) information which she believed he possessed – ADA RUZOW became enraged and took Mr. Bertuglia's "refusal to

cooperate" as a personal affront.

114.    Thereafter, defendant ADA Ruzow, fueled by her personal animus toward ROBERT BERTUGLIA, JR., engaged in grossly improper, highly unethical and utterly inappropriate conduct, all under the guise of conducting an "investigation" into ROBERT BERTUGLIA, JR. and LARO.

115.    As part of this investigation, defendant ADA Ruzow did everything in her power to make good on her promise to "ruin" plaintiff ROBERT BERTUGLIA, JR. and inflict maximum economic harm on his company by destroying his business relationships, turning his own employees against him, and bringing LARO to the brink of financial ruin, as detailed above and as described again more fully below.

116.    All of the above actions taken by defendant ADA RUZOW were approved by defendant ADA SCOTTO, who was not only aware of ADA RUZOW's "hardball" tactics, but expressly encouraged and approved of same.

**Plaintiffs Are Indicted on Baseless Criminal Charges**

117.    On or about August 7, 2008, plaintiffs were indicted for the alleged "crimes" committed against the PORT AUTHORITY.

118.    This indictment was procured as a result of the false and misleading evidence provided by the Port Authority defendants Office regarding plaintiff ROBERT BERTUGLIA, JR. and LARO.

119.    As a result of defendants' unlawful actions, plaintiff ROBERT BERTUGLIA, JR. and co-defendant LARO, were charged with one count of grand larceny in the first degree, three counts of falsifying business records in the first degree and three counts of offering a false instrument for filing in the first degree.

120.    On or about August 7, 2008, at the direction of ADA RUZOW and ADA SCOTTO, plaintiff was formally arrested and arraigned in Manhattan Supreme Court, and bail was set in the amount of $25,000.00

121.    Plaintiff BERTUGLIA posted bail, and after approximately seven (7) hours in custody, he was released. Thereafter, plaintiff was required to make multiple court appearances to defend himself against the baseless charges brought by defendants, and was subject to multiple restrictions on his liberty as a result of the bail conditions which had been set.

**Defendants Issue A False and Misleading Press Release, Which Generates a Torrent of Negative Publicity And Causes Plaintiff To Lose Several Contracts.**

122.    In connection with this arrest, defendant CITY OF NEW YORK, through the New York County District Attorney's Office, issued a press release boasting about the arrest of plaintiff ROBERT BERTUGLIA, JR.

123.    This press release contained blatantly false and misleading allegations concerning plaintiff ROBERT BERTUGLIA, JR. and LARO.

124.    Defendants ADA RUZOW and ADA SCOTTO were responsible for creating the contents of this press release.  Further, ADA RUZOW and ADA SCOTTO had  contacted members of the press to notify them of Mr. Bertuglia's arrest even *prior* to when it had occurred, so that there were photographers from the local tabloids already waiting outside the courthouse – and snapping pictures – when plaintiff ROBERT BERUGLIA, JR. arrived.   Lastly, defendants actually held a press conference on the steps of the courthouse to further publicize the false criminal charges which had been brought against plaintiff ROBERT BERTUGLIA, JR.

125.    The news of plaintiff ROBERT BERTUGLIA, JR.'s arrest and indictment – and in particular, the utterly false and misleading "facts" that the press, and in press release itself– set off

a torrent of highly damaging and prejudicial news coverage throughout the New York metropolitan region.

126.    In particular, the story received news repeated all-day coverage on 1010 News Radio, and was also published in the New York Times, The Daily News and The New York Post.

127.    As result of this highly prejudicial news coverage, several contractors immediately stopped doing business with LARO, resulting in substantial economic losses to plaintiffs.

**The Judge Dismisses The First Indictment, Ruling that The Evidence Is Legally Insufficient To Sustain Any Criminal Charges Against ROBERT BERTUGLIA, JR.**

128.    There was absolutely *no* evidence to support any of the charges that had been brought against Plaintiff ROBERT BERTUGLIA, JR.

129.    Thereafter, on February 26, 2009, after being required to make multiple and repeated court appearances, the Court dismissed the indictment against plaintiff ROBERT BERTUGLIA, JR., JR., because the evidence presented to the grand jury was legally insufficient to support *any* of the crimes charged.

**Defendants File A New Charge of Grand Larceny in the Second Degree, Dropping All of The Other Charges That Had Originally Been Filed.**

130.    On or about April 2009, ADA RUZOW and ADA SCOTTO, implicitly acknowledging that they did *not* have sufficient evidence to support any of the original crimes charged, elected not to re-charge plaintiff ROBERT BERTUGLIA, JR. with *any* of the following charges: grand larceny in the first degree, falsifying business records in the first degree and offering a false instrument for filing in the first degree.

131.    Instead, ADA RUZOW and ADA SCOTTO decided to proceed only with a single count of Grand Larceny in the Second Degree – against plaintiff ROBERT BERTUGLIA, JR. alone, and not LARO – charging him with stealing over $50,000 from the PORT AUTHORITY

because LARO's invoices for its cleaning services "implicitly misrepresented" that it performed the contract for cleaning services using new equipment.

**Defendants Engage In Multiple Acts of Prosecutorial Misconduct when Presenting Evidence to The Second Grand Jury, As Confirmed by Judge Zweibel.**

132.    ADA RUZOW and ADA SCOTTO then convened the grand jury a second time against plaintiff ROBERT BERTUGLIA, JR., despite knowing there was no probable cause to prosecute him for the alleged crime.

133.    During the course of this second grand jury proceeding,  ADA RUZOW and ADA SCOTTO repeatedly and brazenly engaged in prosecutorial misconduct – as later confirmed by the the Honorable Ronald Zweibel – which caused the grand jury to indict plaintiff ROBERT BERTUGLIA, Jr., without probable cause.

134.    Specifically, during this second grand jury proceeding,  ADA RUZOW and ADA SCOTTO, inter alia: improperly vouched for prosecution witnesses, impugned the integrity of witnesses who were favorable to the defense, and improperly introduced prior "bad act" evidence that was not only grossly misleading and highly prejudicial, but also, was completely irrelevant to the actual charges that had been brought against plaintiff.

135.    As a result of this prosecutorial misconduct, plaintiff  ROBERT BERTUGLIA, JR. was indicted for a second time, resulting in a further deprivation of liberty for plaintiff ROBERT BERTUGLIA, JR.

136.    Specifically, as a result of the second grand jury indictment, plaintiff  ROBERT BERTUGLIA, JR. was placed under arrest  for a second time, and  was thereafter subjected to restrictive post-arraignment conditions, including but not limited, restrictions on his ability to leave the state and country. Further, as a result of the second indictment, plaintiff ROBERT BERTUGLIA,

JR. was required to attend multiple court proceedings to defend himself against the baseless criminal charges filed by defendants for an additional fourteen months, resulting in further deprivations of liberty as recognized under the law of this Circuit.

137.    More importantly, the second indictment ended any hopes of LARO's survival. While the first indictment had been damaging to LARO and ROBERT BERTUGLIA, JR., the company was still operating and was still hopeful that it could "weather the storm" and survive, especially after the first indictment had been dismissed by Judge Zweibel.  However, after the second indictment, it became clear that criminal proceedings would continue against plaintiff ROBERT BERTUGLIA, JR., and as a result,  LARO lost several additional contracts  – including the 2008 contract with the PORT AUTHORITY, who abruptly terminated their contract with LARO, despite the fact that LARO had already purchased *all* of the new equipment that the PORT AUTHORITY had demanded before signing this new contract – causing an additional loss of tens of millions of dollars for LARO.

138.    These substantial economic losses, when combined with the multiple  lost contracts that had been caused by defendant ADA RUZOW's and SHAFFER's tortious interference with LARO's customers – which had also resulted in  millions of dollars of lost  revenue for LARO – made it impossible for LARO to survive, thus ending a highly successful 30-year-run, and causing the demise of a New York-based company with over 3,000 employees.

**The Judge Dismisses All Charges Against Plaintiff, Excoriating ADA Ruzow and ADA Scotto For Their Multiple Instances of Prosecutorial Misconduct.**

139.    On October 5, 2009, the Honorable Ronald Zweibel issued a forty-five page written decision dismissing the entire criminal case against plaintiff ROBERT BERTUGLIA, JR.

140.   In this opinion, the Judge carefully and methodically dissected the prosecution's entire case, exposing not only the grossly improper conduct of ADA's RUZOW and SCOTTO in the process, but also, the patent weaknesses in the prosecution's case.

141.   In his Decision and Order ("Decision"), dated October 5, 2009, Judge Zweibel squarely addressed the misconduct by ADA RUZOW and ADA SCOTTO : "The Court further feels need to comment on the *prosecutors' misconduct* in their presentation to the Grand Jury." (Decision at 29).

142.   In particular, the Court took issue with the prosecutors' brazen – and grossly improper – attempts to taint the grand jury with patently inadmissible "bad act" evidence:

> It is also clear that the prosecutor admitted inadmissible evidence and that the admission into evidence of *much, if not most of that inadmissible evidence*, was done so <u>*intentionally*</u>.

> (<u>Id</u>. at 34) (emphasis supplied).

143.   Indeed, "[t]he prosecutor admitted testimony with respect to acts that have *no relevance* to the alleged crime being investigated except to imply that LARO and Bertuglia committed other "bad acts," and therefore, must have intended to steal from the PA." (<u>Id</u>. at 34) (emphasis supplied).[1]

144.   The Court  believed that the prosecutors had introduced these "bad acts" for the sole purpose of having the grand jury conclude – based on such acts – that defendants were guilty of the charges here as well:

---

[1]For example, "[s]everal witnesses were asked about whether Bertuglia's mother received health insurance through LARO while she did not work there and about Bertuglia's father who was working at LARO without compensation as he was retired from the New York City Fire Department and whether Bertuglia's ex-wife received insurance through LARO as part of a divorce settlement.  They were also asked if Bertuglia and any of his family had use of company cars." (<u>Id</u> at 34).

> This line of questioning was *totally irrelevant* as to whether defendants intended to steal in excess of fifty thousand dollars from the PA by not adjusting their billing when they did not purchase the new equipment as required by the contract. *The only reason to ask these questions is to imply that there were other bad acts of fraud* on LARO and Bertuglia's part and therefore, defendants were more likely to be guilty of stealing in this case. This was improperly offered as evidence of prior bad conduct by the defendants.

Id. at 34 (citations omitted) (emphasis supplied).

145.    As the Court noted, "[t]he District Attorney is a public officer and as such owes a "duty" of fair dealing to the accused and candor to the courts." (see People v. Pelchat, 62 N.Y.2d at 105; C.P.L. 190.25(5), (6).)

146.    Yet, in this case, the Court found that the prosecution had flagrantly violated this "duty" of fair dealing:

> The aforesaid examination was *prejudicial, inflammatory and irrelevant*. These questions were only asked to reinforce the impression in the Grand Jurors' minds that the defendants had to have committed the crime. This line of questioning had no relevance to the Grand jury investigation and was in derogation of the prosecutor's duty to maintain an even-handed, balanced approach when soliciting the relevant facts.

Id. at 35 (citations omitted) (emphasis supplied).

147.    The Court also took issue with the manner in which the prosecutors conducted their cross-examination of two material witnesses, Stephanie Henninger (plaintiff's daughter) and Greg Pulitano: "The prosecutors committed errors throughout their cross-examination of Stephanie Henninger and Greg Pulitano, which was on the border of impairing the integrity of the Grand Jury proceedings." (Id. at 30).

148.    Specifically, the Court found that: "First, the prosecutors vouched for the evidence that supported their view of the evidence and bolstered the testimony that supported their views."

-27-

(Id. at 30).  See also id at 36 ("The Prosecutor assessed the witnesses credibility and drew inferences from the facts, a function solely in the Grand Jurors' unique province.") (citation omitted).

149.    In particular,  "[ADA] Ruzow during her questioning of Pulitano made herself into an unsworn witness" (Id. at 30).   Further, "This line of improper questioning was continued by Mr. Scotto ....," who was not only Ms. Ruzow's supervisor, but also, the Chief of the Labor Racketeering at the New York County District Attorney's Office. (Id. at 31).

150.    The Court found that the improper questioning was not limited to Greg Pulitano, but also continued with Stephanie Henninger:  "This improper line of questioning was not limited to Greg Pulitano. The People's questions to Henninger also were improper in that she questioned the professionalism of LARO and the veracity of Henninger's testimony on P.88 of the Grand Jury Minutes."  (Id. at 32).

151.    The Court was most disturbed by ADA Ruzow's threat of bringing perjury charges based on Ms. Henninger's refusal to agree with the (grossly improper) question being asked: "The People's implied threat of a perjury charge to this witness left the Grand Jury with the People's belief that she was not telling the truth." (Id. at 33).

152.    With respect to this implied threat of perjury, the Court stated as follows:

> It is *unprofessional and improper conduct* for a prosecutor to express his personal belief as to the truth or falsity of any testimony. To call the [defense] .... witness liars on the one hand and to improperly bolster the People's case by personally vouching for the truthfulness of his own witnesses on the other, is to make himself an unsworn witness, supporting his case by his own veracity and position. *This should be condemned in the strongest terms.*

Id. at 33 (quotations and citations omitted) (emphasis supplied).

153.    The Court further concluded that the above misconduct had resulted in significant prejudice to Mr. Bertuglia: The "prejudicial effect of this testimony – that the defendant was predisposed to the charged conduct and deserving of punishment is *substantial* ..." (Id. at 35) (emphasis supplied).

154.   The Court noted further that the impact of this prejudice was compounded by the fact that "no curative or limiting instructions were given to the grand jury." (Id. at 35).

155.   Given the "weak nature" of the prosecution's case, the Court concluded that the dismissal was warranted based on the prosecutors' misconduct:

> [T]he cummulative effect of the prosecution's errors, given the insufficiency of the evidence, further justifies dismissals of the entire indictment. It is clear that the Prosecutor's conduct was *improper and not an isolated incident*, and given the weak nature of the People's case, the Court believes it rendered the presentation so defective that the indictment must be dismissed on this ground as well.

(Id. at 36)

**The Court Exposes The Patent Weaknesses in the Prosecution's Case: No Proof of "Intent" or "Reliance."**

156.   Apart from finding prosecutorial misconduct, the Court also commented extensively on the utter lack of proof supporting the prosecution's claims.

157.   In particular, the Court focused on the complete absence of proof regarding the necessary element of "intent" to defraud.

158.   Specifically, the Court held as follows:

> There is *no* direct evidence that *anyone* at LARO intended to deprive or defraud the PA of money it was not entitled to recoup. No witness testified that anyone at LARO told anyone there not [to] purchase the equipment, nor is there any evidence that anyone at LARO said to file a false invoice.

(Id. at 24) (emphasis supplied).

See also id. at 29 ("there is no evidence on LARO's part of an intent to defraud the PA.")

159.   Indeed, the Court believed that the People's "evidence" in this case was nothing more than sheer speculation about LARO's financial condition:

> The problem this Court has with the People's argument is that aside from speculation as to LARO's financial health, there is *no real evidence* who, if anybody, at LARO or the PA, was actually aware that the amount being sought in the invoices was incorrect or that there was a false representation of a past or present fact in any given

> invoice or intended to make such statement. The mere fact that the
> invoices were submitted is insufficient in this case for the Grand Jury
> to infer an intent to deprive or defraud.  *If no one at LARO realized
> there was a false statement in the invoice, there could be no intent to
> defraud or deprive the PA of their money.*

(Id. at 25) (emphasis supplied).

160.     The Court further questioned whether or not there was any evidence to support the

element of "reliance," as the PORT AUTHORITY unquestionably *knew* that LAROs equipment was

not new and therefore could *not* have relied on any false representations, records or instruments:

> There is *no evidence of reliance* on the invoices by the PA as the PA
> *knowingly authorized payment*, nor was the alleged misrepresentation
> material as evidenced by the PA's payment of the invoices with *full
> knowledge of the breach*.

(Id. at 26) (emphasis supplied).

161.     Thus, the Court concluded that "the People's evidence is insufficient as to the

elements of intent to deprive and defraud and on reliance on the false statement." (Id. at 28).

**The Court Confirms The Lack of Any Evidence Against Mr. Bertuglia Personally.**

162.     In its Decision, the Court repeatedly stressed the lack of evidence of any wrongdoing

by Mr. Bertuglia personally.

163.     Indeed, the "evidence" relied upon by the prosecution overwhelmingly established

that Mr. Bertuglia, in fact, had *no* knowledge of the "new and unused" equipment clause of the

PABT contract and never had any criminal intent to defraud, steal or conceal a crime.

164.     Thus, the Court concluded as follows: "[t]here is *no evidence* before the Grand Jury

that Bertuglia was actually aware of the new equipment requirement or that he knew that LARO had

not complied with it." (Id. at 39).

165.     Based on the complete lack of evidence of criminal wrongdoing, the Court concluded

that the second indictment against Mr. Bertuglia – just like the first indictment – had to be

dismissed:

> In the absence of evidence that Bertuglia knew that the new equipment had not been bought but was being billed for, it is clear that the indictment against him personally should be dismissed.

> (Id. at 29) (citation omitted).

166.    Since "[t]here *is no evidence* that anybody at LARO ever ordered anyone not to purchase the equipment" – and since there is *"no evidence* before the Grand Jury that Bertuglia [himself] was actually aware of the new equipment requirement or that he knew that LARO had not complied with it" – "the minutes are *legally insufficient as to Bertuglia and as to LARO*." (Id. at 29)(emphasis supplied).

**The Court Decries The Filing of Criminal Charges Over A Mere Contract Dispute**.

167.    In its Decision, the Court also repeatedly stated that this case was essentially a *civil* dispute over a contract, *not* a criminal case:

> [T]he evidence in this case seems *more like a breach of contract* situation than an intent to steal money from the PA.  Indeed, given LARO's long-standing successful relationship with the PA, it seems *highly unlikely to this Court that LARO or Bertuglia would endanger this relationship by intentionally stealing from the PA.*

(Id. at 39).

See also id at 37 ( "this case reflects a quintessentially civil transaction gone awry.")

168.    As the Court noted,  "[t]he courts and the Legislature have been reluctant to elevate civil wrongs to the level of criminal larceny, particularly when the conduct arises out of legitimate business activities where there are often close questions as to whether the defendant acted intentionally or was merely incompetent." (Id. at 22-23) (citations omitted).

169.    Indeed, as a result of cases such as this –  which blur the otherwise clear lines between civil and criminal matters – there are several adverse consequences for the criminal justice system:

> To obscure the central demarcation, that for centuries has marked the boundary between civil and criminal matters in the myriad of ordinary commercial transactions, *trivializes true criminality, diverts attention and resources away from victims of true crimes against*

> "the People", and *engenders opportunistic manipulation of the*
> *criminal processes* by unhappy civil suitors for redress of private
> wrongs and harms.

(Id. at 40) (emphasis supplied).

170.     For these reasons, "in this Court's view, this case *does not merit prosecutorial*

*cognizance* in the criminal hemisphere." (Id. at 40) (emphasis supplied).

**The Court Questions Whether  The Alleged "Victim" In This Case, The Port Authority, Was**
**Actually Damaged By Laro's Failure to Purchase New Equipment.**

171.     Apart from the fact that this was a civil dispute – and *not* a criminal matter – the

Court further questioned whether the alleged "victim" in this case, the Port Authority, actually

suffered any damages as a result of LARO's non-performance under the contract:

> The lack of new equipment apparently *did not affect LARO's ability*
> *to do the job* they were contracted to do.  In fact, the PA was ready
> to exercise their option to extend the contract for another three years.

(Id at 40) (emphasis supplied).

172.     Indeed, "[r]epresentatives from the PA admitted that LARO had successfully done

the job for which it was hired, namely, cleaning the PA ..." (Id. at 44).  In fact, in a letter dated June

8, 2008 – just *six weeks* prior to plaintiff's arrest and indictment – the Port Authority effusively

praised LARO for its job performance at the PABT, recognizing LARO's "hard work and dedicated

efforts," complimenting LARO's "dedicated staff", and thanking LARO for "delivering some *very*

*impressive* customer service!" (Exhibit A) (emphasis supplied).

173.     In fact, based on LARO's outstanding performance, "the PA was ready to extend the

contract knowing that the two pieces of equipment had not been purchased during the course of the

initial contract period." (Decision at 44).

174.     Most telling,  "the fact that the PA has not sued civilly to recover the money allegedly

stolen *speaks volumes*." (Id. at 44)(emphasis supplied).

**The Court Recognizes The Devastating Financial Impact That This Criminal Prosecution Had On Plaintiffs Bertuglia and Laro.**

175.    The unlawful conduct of the defendants in this action, as set forth above, had a devastating impact on plaintiff ROBERT BERTUGLIA, JR., and LARO.

176.    Indeed, in its Decision and Order, the Court recognized the enormous damage that had been caused by this utterly baseless prosecution.

> Bertuglia has *lost the business he built up from nothing* and *LARO has closed its doors*.  It has ceased to do business. The people basically conceded that it is insolvent, stating that 'LARO it is unable to pay its creditors or discharge its liabilities.'  *There can be no greater retribution*.

(Id. at 42-43).

177.    Further, the Court expressly recognized that this criminal prosecution – which had now been dismissed *twice* – had caused LARO to lose millions of dollars in contracts, thus leading to its demise.  (Id at 45, n.7) (acknowledging "the millions in business contracts that LARO lost as a direct result of this prosecution"); id at 43 ("[T]his prosecution has already resulted in the loss of numerous contracts, causing defendants business to close as a result.")

178.    Lastly, the Judge expressly rejected the prosecution's specious claim – supported only by a blatantly false and misleading affidavit from defendant SHAFFLER – that plaintiff ROBERT BERTUGLIA, JR., through his son-in-law- Kevin Henninger, had somehow managed to start a new "spin-off" cleaning company that was using LARO employees and equipment.  See id. at 45, n.7 ("These facts do *not* form the basis for a reasonable inference that Bertuglia is somehow a silent partner in LBS or that he intends to restart LARO and somehow re-acquire the millions in business contracts that LARO lost as a direct result of this prosecution.") (emphasis supplied)

**The Damages In This Action.**

179.    As a result of an utterly baseless prosecution – which was plagued by gross prosecutorial misconduct, and doomed from the outset by the "weak nature" of the People's case

(Id. at 36) –  plaintiff ROBERT BERTUGLIA, JR., and LARO suffered permanent and irreparable damage.

180.    Prior to this criminal prosecution, plaintiff ROBERT BERTUGLIA, JR., had earned an annual compensation package of approximately $1,200,000.00 per year, and was actually featured in a New York Times article entitled "Loving the Boom; The Blue Collar Millionaire."

181.    As a result of defendants' misconduct, plaintiff ROBERT BERTUGLIA, JR., lost the company that he worked so hard to build over thirty years, and has been decimated financially.

182.    Since the prosecution has ended, plaintiff ROBERT BERTUGLIA, JR. has been able to find work only as a business consultant, and is now earning a mere *fraction* of what he used to earn when he was President of LARO.

183.    In addition to his lost income, plaintiff ROBERT BERTUGLIA, JR., was forced to expend an enormous sum of money to mount legal defenses for both himself and for LARO, which required separate legal counsel.

184.    In total, the combined legal costs for defending this matter exceeded $500,000.00 for Mr. Bertuglia and LARO.

185.    Prior to this criminal prosecution, plaintiff LARO had earned annual gross revenues in excess of $72,000,000.00 per year.

186.    As a result of defendants' misconduct, LARO – a large and successful company with over 3,000 employees on its payroll – lost tens of millions of dollars in business contracts, causing LARO's business to close down as a result.

187.    Among many other contracts, LARO lost its contract with defendant PORT AUTHORITY.

188.    Under this contract – which defendant PORT AUTHORITY had entered into in 2008 – LARO actually *purchased the new cleaners* that it had allegedly failed to provide under the previous contract.

189.    Specifically, in June 2009, LARO purchased two new cleaners for an approximate cost of several hundred thousand dollars.

190.    Yet, in August 2009, defendant PORT AUTHORITY – after learning that defendant ROBERT BERTUGLIA, JR., had been indicted for a second time, but prior to the dismissal of that indictment – terminated its contract with LARO.

191.    Thus, apart from the loss of the contract itself, LARO suffered an additional loss of several hundred thousand dollars that it had spent for new equipment that had been purchased solely for the benefit of the PORT AUTHORITY.

192.    As a result of defendants' aforementioned conduct, plaintiff LARO was subjected to an utterly baseless and selective criminal prosecution, suffered massive economic losses, had all of its property taken away, had its professional reputation permanently destroyed, and was forced to close down, without ever being afforded due process, including but not limited to, a hearing, an opportunity to be heard, an opportunity to confront adverse witnesses and an opportunity to present exculpatory evidence, all without probable cause.

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

193.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "192" with the same force and effect as if fully set forth herein.

194.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a violation of the Constitution of the United States.

195.    All of the aforementioned acts deprived plaintiffs ROBERT BERTUGLIA, JR, and LARO of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

196.     As a result of defendants' aforementioned conduct, plaintiff ROBERT BERTUGLIA, JR.'s liberty was restricted for an extended period of time, he was subjected to an utterly baseless and selective criminal prosecution,, his personal and professional reputation was permanently destroyed, he suffered massive economic losses, he was forced to incur substantial legal expenses, his company was permanently destroyed,  his present and future earning capacity was substantially impaired, he was publicly embarrassed and humiliated, he was caused to suffer severe emotional distress, he was held in custody against his will on two separate occasions, he was subjected to onerous and restrictive bail conditions, and he otherwise suffered a deprivation of his constitutional and civil rights.

197.     As a  result of defendants' aforementioned conduct, plaintiff LARO, which is a "person" within the meaning of 42 U.S.C. § 1983,  was subjected to an utterly baseless and selective criminal prosecution, had  its professional reputation permanently destroyed, suffered massive economic losses, had all of its properties taken away, and was forced to close down, without ever being afforded due process, including but not limited to, a hearing, an opportunity to be heard, an opportunity to confront adverse witnesses and to present exculpatory evidence, all without probable cause.

### SECOND CLAIM FOR RELIEF
### FALSE ARREST UNDER 42 U.S.C. § 1983

(Defendants Ruzow, Scotto, Van Etten, Nestor, Kennedy, Shaffler and Ferrone)

198.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "197" with the same force and effect as if fully set forth herein.

199.     As a result of defendants' aforementioned conduct, plaintiff ROBERT BERTUGLIA, JR. was taken into custody by "John Doe" defendants from the Port Authority, in accordance with the express directives, guidance, and advice of ADA RUZOW and ADA SCOTTO, and was subjected to an illegal, improper and false arrest by the defendants on two separate occasions, and

was caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the defendants in criminal proceedings, without any probable cause, privilege or consent.

200.    As a result of the foregoing, plaintiff ROBERT BERTUGLIA, JR. was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, lost his company, and lost his livelihood as President of LARO.

### THIRD CLAIM FOR RELIEF
### MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983

(Defendants Van Etten, Nestor, Kennedy, Shaffler, Ferrone and D'Aleo)

201.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "200" with the same force and effect as if fully set forth herein.

202.    Defendants, individually and collectively, manufactured false evidence and forwarded this false evidence to prosecutors in the New York County District Attorney's Office, grossly distorting what was, at most,  a civil contract dispute into a tale of grave criminal misconduct, which they *knew* at the time was wholly untrue.

203.    Further, in filing their complaint with the New York County District Attorney's Office, defendants falsely told ADA RUZOW and ADA SCOTTO that plaintiff ROBERT BERTUGLIA, JR., was a "crook," a  "thief", and had "stolen a lot of money from the Port Authority."

204.    In providing such false and misleading information to prosecutors, the individually named PORT AUTHORITY defendants influenced the decision of ADA RUZOW and ADA SCOTTO to pursue criminal charges against  LARO and plaintiff ROBERT BERTUGLIA, JR.. Such false information was also a substantial factor in influencing  the Grand Jury's decision to indict plaintiffs herein.

205.    Defendants also  withheld material and exculpatory evidence regarding plaintiffs LARO and ROBERT BERTUGLIA, JR., and failed to make a full and complete statement of the material facts, both  to prosecutors at the New York County District Attorney's Office and to the Grand Jury, as they were required to do under New York State Law.

206.    Specifically, the above PORT AUTHORITY defendants failed to disclose to prosecutors and to the Grand Jury the following material exculpatory facts: i) the PORT AUTHORITY *knew* that LARO's equipment was not "new and unused" but nonetheless continued to pay the full invoiced amount.; ii) the PORT AUTHORITY *never once* complained about the lack of "new and unused" equipment to LARO, despite its custom of regularly communicating perceived contractual breaches or deficiencies to LARO;  iii)  the PORT AUTHORITY never imposed any penalties against LARO for failure to provide new and unused equipment, despite having an absolute right to do so under the "liquidated damages" provision of the contract; iv) the PORT AUTHORITY had *admitted* – in writing – that LARO had successfully done the job for which it was hired, and  in fact,  just *six weeks prior* to the first indictment, the PORT AUTHORITY had written a letter of commendation praising the outstanding job that LARO had done. (Exhibit A); v) even *after* the criminal charges had been filed – and even after the PORT AUTHORITY was fully aware that the two pieces of equipment had not been purchased during the course of the initial contract period – the PORT AUTHORITY was *still* ready to extend the contract with LARO, and in fact, *did* renew its contract with LARO; and vi) the PORT AUTHORITY did not  sue civilly to recover the money allegedly stolen – a failure which Judge Zweibel, the judge presiding over the criminal proceedings, felt "speaks volumes" about the   alleged damages suffered by the PORT AUTHORITY.  (Decision and Order, infra., at 44)

207.    The failure of the individually named PORT AUTHORITY defendants  to present this exculpatory evidence to  prosecutors was a substantial factor in influencing the decision of ADA RUZOW and ADA SCOTTO to pursue criminal charges against  LARO and plaintiff ROBERT

BERTUGLIA, JR. Further, the failure of defendants to present such exculpatory information to the Grand Jury was also a substantial factor in influencing the Grand Jury's decision to indict plaintiffs herein.

208.     In forwarding false evidence to prosecutors, and in withholding material exculpatory evidence from prosecutors, defendants acted with malice and with the express purpose of securing an indictment against plaintiffs ROBERT BERTUGLIA, JR. and LARO.

209.     In providing false testimony to the Grand Jury, and in withholding material exculpatory evidence from the Grand Jury, defendants acted with malice and with the express purpose of securing an indictment against plaintiffs ROBERT BERTUGLIA, JR. and LARO.

210.     As a result of the foregoing, defendants were directly and actively involved in the initiation of criminal proceedings against plaintiffs.

211.     Defendants lacked probable cause to initiate criminal proceedings against plaintiffs.

212.     Defendants acted with malice in initiating criminal proceedings against plaintiffs.

213.     Defendants were also directly involved in the *continuation* of criminal proceedings against plaintiffs, as they actively participated in the unlawful and improper investigation being conducted by ADA RUZOW and ADA SCOTTO.

214.     Defendants lacked probable cause to continue criminal proceedings against plaintiffs.

215.     Defendants acted with malice in continuing criminal proceedings against plaintiffs.

216.     Defendants misrepresented and falsified evidence throughout all phases of the criminal proceedings, and withheld material exculpatory evidence throughout all phases of the criminal proceedings.

217.     Notwithstanding the unlawful and fraudulent conduct of defendants, the criminal proceedings were terminated in plaintiffs' favor on October 5, 2009, when the Honorable Ronald Zweibel dismissed all criminal charges, and no further criminal charges were ever re-filed against plaintiff ROBERT BERTUGLIA, JR. and/or LARO.

218.    As a result of the foregoing, plaintiff ROBERT BERTUGLIA, JR. was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, lost his company, and lost his livelihood as President of LARO.

219.    As a  result of defendants' aforementioned conduct, plaintiff LARO was subjected to an utterly baseless and selective criminal prosecution, its professional reputation was permanently destroyed, it suffered massive economic losses, all of its properties were taken away, and it was forced to close down, without ever being afforded due process, including but not limited to, a hearing, an opportunity to be heard, an opportunity to confront adverse witnesses and to present exculpatory evidence, all without probable cause.

**FOURTH CLAIM FOR RELIEF**
**DENIAL OF CONSTITUTIONAL RIGHT TO**
**FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO FABRICATION OF EVIDENCE**

(Defendants Van Etten, Nestor, Kennedy, Shaffler, Ferrone and D'Aleo)

220.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "219" with the same force and effect as if fully set forth herein.

221.    In creating false evidence against plaintiffs and in providing false and misleading testimony with respect thereto, defendants violated plaintiffs' constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

222.    As a result of the foregoing, plaintiff ROBERT BERTUGLIA, JR. was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had

his personal and professional reputation destroyed, lost his company, and lost his livelihood as President of LARO.

223.    As a  result of defendants' aforementioned conduct, plaintiff LARO was subjected to an utterly baseless and selective criminal prosecution, its professional reputation was permanently destroyed, it suffered massive economic losses, all of its properties were taken away, and it was forced to close down, without ever being afforded due process, including but not limited to, a hearing, an opportunity to be heard, to an opportunity confront adverse witnesses and to present exculpatory evidence, all without probable cause.

## FIFTH CLAIM FOR RELIEF
## MALICIOUS ABUSE OF PROCESS UNDER 42 U.S.C.§ 1983

(Defendants Ruzow,  Scotto and Schaffler)

224.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "223" with the same force and effect as if fully set forth herein.

225.    Defendant issued legal process by serving supboenas on various witnesses, on LARO, and on multiple third parties, compelling these witnesses and/or entities to appear at the District Attorney's office and/or produce documents to the District Attorney's Office.

226.    At the time these subpoenas were issued, no Grand Jury had been convened.

227.    The information sought by these subpoenas were palpably irrelevant, and were not in furtherance of any legitimate investigation being conducted into the allegations of the PORT AUTHORITY.

228.    Defendants issued these subpoenas  to obtain collateral objectives outside the legitimate ends of the legal process, including but not limited to: 1) harassing, threatening, intimidating witnesses who were favorable to the defense; 2) discovering "bad act" evidence against

plaintiff ROBERT BERTUGLIA, JR., and then using such inadmissible evidence  as leverage to force plaintiff to provide information to prosecutors regarding other, unrelated criminal investigations; and 3) making good on the  promise to "ruin" plaintiff and  inflict maximum economic damage on him by serving subpoenas on LARO's customers and/or contractors – thereby notifying them of the ongoing criminal investigation – in order to retaliate against him for failing to "cooperate" with the District Attorney's Office.

229.    Defendants acted with intent to do harm to plaintiff ROBERT BERTUGLIA, JR. without any excuse or justification for doing so.

230.    As a result of the foregoing, plaintiff ROBERT BERTUGLIA, JR. was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed,  lost his company, and lost his livelihood as the President of LARO.

231.    As a  result of defendants' aforementioned conduct, plaintiff LARO was subjected to an utterly baseless and selective criminal prosecution, its professional reputation was permanently destroyed, it suffered massive economic losses, all of its properties were taken away, and it was forced to close down, without ever being afforded due process, including but not limited to, a hearing, an opportunity to be heard, to an opportunity confront adverse witnesses and to present exculpatory evidence, all without probable cause.

## SIXTH CLAIM FOR RELIEF
### INDUCEMENT OF FALSE TESTIMONY IN VIOLATION OF 42 U.S.C. § 1983

(Defendants Ruzow, Scotto and Shaffler)

232.    Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs "1" through "232" as if the same were more fully set forth at length herein.

233.    Defendant Ruzow, acting in an investigative capacity, met with and interviewed several witnesses during her pre-trial investigation.

234.    Defendant Ruzow, acting in an investigative capacity, instructed defendant Schaffler to meet with and interview several witnesses as part of her pre-trial investigation.

235.    At these meetings, and continuing thereafter, defendant Ruzow, at the direction of defendant Scotto and/or with his express  approval,  harassed, threatened, pressured, intimidated, manipulated and coerced these witnesses to give false "bad act" evidence against plaintiff ROBERT BERTUGLIA, JR.

236.    Defendant SHAFFLER, acting on behalf of defendant RUZOW and  under her direct supervision, likewise harassed, threatened, intimidated, manipulated, and coerced these witnesses to give false "bad act" evidence  against plaintiff ROBERT BERTUGLIA, JR., which in fact they did, resulting in Plaintiff's indictment and subsequent loss of liberty.

237.    At least one of these witnesses, Robert Kolakowski, did in fact give false testimony to the Grand Jury as a direct result of the pressure and coercion of ADA RUZOW.

238.    Specifically, Robert Kolakowski – who had  steadfastly denied that either LARO nor ROBERT BERTUGLIA, JR., had done anything wrong – became enraged with plaintiff ROBERT BERTUGLIA, JR. when ADA RUZOW told him (falsely) that Bertuglia was trying to "sell him down a river" and had illegally denied Kolakowski  insurance benefits that he was otherwise entitled to receive.

239.    As a result of such false claims by ADA SCOTTO, Robert Kolakowski agreed to provide (patently false) testimony before the Grand Jury regarding alleged verbal communications (wholly undocumented and non-existent) made by the PORT AUTHORITY to LARO  regarding

LARO's failure to purchase new equipment under the contract.  Such false testimony was material to the indictment, as there was no other person from LARO who even *remotely* acknowledged the possibility of communications from the PORT AUTHORITY regarding LARO's failure to purchase new equipment.

240.     As a result of the foregoing, plaintiff ROBERT BERTUGLIA, JR., was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed,  lost his company, and lost his livelihood as the President of LARO.

**SEVENTH CLAIM FOR RELIEF**
**CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS**

(Defendants Ruzow, Scotto, Van Etten, Nestor, Kennedy, Shaffler, Ferrone and D'Aleo)

241.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "240" as if the same were more fully set forth at length herein

242.     Defendants conspired and acted in concert to do whatever was necessary, lawful or not, to cause the arrest, prosecution, pretrial detention, conviction and imprisonment of plaintiff ROBERT BERTUGLIA, JR.

243.     Throughout the period of the conspiracy, the defendants pursued their objectives with actual malice toward plaintiff, with utter and deliberate indifference to and disregard for plaintiff's rights under the Constitution and laws of  the United States, without probable or reasonable cause to believe plaintiff guilty of any crime.

244.     Pursuant to the conspiracy, the conspirators, and their employees, agents and servants, intentionally, recklessly, negligently, and/or with complete indifference to the rights of

-44-

plaintiff ROBERT BERTUGLIA, JR.: (a) manufactured false evidence; (b) pressured, intimidated, threatened, coerced and induced witnesses to give untruthful, erroneous, incomplete and/or misleading statements and testimony; (c) failed to correct such false statements and testimony; and (d) withheld from the Grand Jury and trial judge evidence favorable to the accused on the issue of guilt or innocence.

245.    The aforesaid conduct of defendants operated to deprive plaintiff ROBERT BERTUGLIA, JR. of important and well-established rights under the Constitution and the laws of the United States including, but not limited to, his rights:

(a)    Not to be deprived of his liberty or to be arrested, detained or imprisoned except upon probable cause to believe him guilty of a crime, under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution;

(b)    Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon evidence fabricated by a government official;

(c)    Not to be deprived of his liberty or to be arrested, indicted, prosecuted or imprisoned based upon the testimony of witnesses who had been illegally bribed or influenced for their testimony; and

(d)    To timely disclosure of all evidence favorable to the defense on the issues of guilt or innocence and/or punishment, pursuant to the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

246.    As a result of the foregoing, plaintiff ROBERT BERTUGLIA, JR., was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had

his personal and professional reputation destroyed,  lost his company, and lost his livelihood as the

President of LARO.

### EIGHTH CLAIM FOR RELIEF
### "STIGMA PLUS" CLAIM UNDER 42 U.S.C. § 1983

(Defendants Ruzow, Scotto, Van Etten, Nestor, Kennedy, Shaffler, Ferrone and D'Aleo)

247.    Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs "1" through "246" as if the same were more fully set forth at length herein.

248.    The information provided by defendants to the press was materially false and

misleading.

249.    As a  result of false and misleading information provided to the press, plaintiff

ROBERT BERTUGLIA, JR. was the subject of extensive and highly prejudicial news coverage,

including stories in the New York Times, the Daily News, the New York Post and 1010 News

Radio.

250.    As a result of defendants' statements to the press, plaintiff ROBERT

BERTUGLIA, JR.'s reputation was severely and permanently damaged.   To this day, the story

of plaintiff's arrest and indictment *still* is the first story that appears when doing a Google search

of his name on the Internet.  Yet, there is *no* mention of the fact that the charges against plaintiff

ROBERT BERTUGLIA, JR., were actually thrown out – two times –  by the presiding judge.

251.    ROBERT BERTUGLIA, JR. was never afforded an opportunity for a name-

clearing hearing at any time before, during or after his criminal prosecution.

252.    As a result of defendants' statements to the press, plaintiff ROBERT BERTUGLIA,

JR. was deprived of his liberty, was denied fundamental constitutional rights, was publicly

embarrassed and humiliated, was caused to suffer severe emotional distress, was deprived of his

right to a name-clearing hearing, was forced to incur substantial legal expenses, had his personal and

professional reputation destroyed, lost his company, and lost his livelihood as President of LARO.

## EIGHTH CLAIM FOR RELIEF
## SELECTIVE PROSECUTION UNDER 42 U.S.C. § 1983

(Defendants Van Etten, Nestor, Kennedy)

253.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "252" as if the same were more fully set forth at length herein.

254.    Prior to the institution of criminal proceedings in this matter, plaintiff  ROBERT BERTUGLIA, JR. had made a written complaint  to the PORT AUTHORITY.

255.    Specifically, in a letter from plaintiff's counsel, Samuel Gdanski, Esq., dated  April 19, 2007, plaintiff had complained about the PORT AUTHORITY's bidding process, challenging the fairness of the proceedings and suggesting that there were multiple "improprieties occurring", that "the integrity of the bidding process appears to have been compromised", and that the PORT AUTHORITY "violated the confidentiality provisions" of the bidding procedure when it disclosed confidential information to one of LARO's competitors, Guardian Maintenance. (Ex.B).

256.    In making this complaint, plaintiff ROBERT BERTUGLIA, JR. was exercising his rights, as guaranteed by the First Amendment to the United States Constitution, to freely and openly express his views on a matter of significance to him and his company, LARO.

257.    In making this complaint, plaintiff ROBERT BERTUGLIA, JR. was challenging the integrity of the PORT AUTHORITY bidding process, suggesting that the PORT AUTHORITY had allowed  multiple "improprieties" to occur which had threatened the  "integrity of the procurement system", and had thus violated well-established principles of federal law regarding government contracting at the federal level.  (Ex. B).

-47-

258.    In direct retaliation for this complaint – and as a "preemptive" strike intended to silence plaintiff ROBERT BERTUGLIA, JR. and prevent him from making any future complaints regarding the PORT AUTHORITY's bidding process to law enforcement officials and/or the media – defendant Inspector General Robert Van Etten, together with defendants Michael Nestor and Ed Kennedy, decided to initiate criminal proceedings against plaintiff ROBERT BERTUGLIA, JR. and LARO by referring this matter to the New York County District Attorney's office.

259.    The decision to investigate and prosecute ROBERT BERTUGLIA, JR. and LARO was based solely on plaintiff ROBERT BERTUGLIA JR.'s exercise of his First Amendment rights to free speech in complaining about the integrity of the PORT AUTHORITY'S bidding process.

260.    As a direct result of plaintiff ROBERT BERTUGLIA JR.'s exercise of his First Amendment rights, defendants selectively targeted, investigated and prosecuted plaintiff ROBERT BERTUGLIA, JR., and did so more vigorously than ordinary police practices would dictate under similar circumstances.

261.    Defendants, individually and collectively, engaged in this conduct as retaliation for ROBERT BETUGLIA, JR.'s exercise of free speech, and as a deterrent from preventing him from making future complaints to law enforcement officials and/or the media regarding the PORT AUTHORITY's bidding process.

262.    As a result of defendants' unlawful conduct, plaintiff ROBERT BERTUGLIA, JR. was denied fundamental constitutional rights as guaranteed by the First, Fifth and Fourteenth Amendments of the United States Constitution, was subjected to an utterly baseless and selective criminal prosecution, publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, lost his company, and lost his livelihood as President of LARO.

-48-

263.    As a result defendants' unlawful conduct, plaintiff LARO was subjected to an utterly baseless and selective criminal prosecution, suffered massive economic losses, had all of its property taken away, had its professional reputation permanently destroyed, and was forced to close down, without ever being afforded due process, including but not limited to, a hearing, an opportunity to be heard, an opportunity to confront adverse witnesses and an opportunity to present exculpatory evidence, all without probable cause.

### NINTH CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER SECTION 42 U.S.C. § 1983

### (City of New York – Deliberate Indifference to Training)

264.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "263" as if the same were more fully set forth at length herein.

265.    Defendants initiated and continued criminal proceedings against plaintiff ROBERT BERTUGLIA, JR., despite a lack of credible evidence against him, and notwithstanding their knowledge that said proceedings would jeopardize plaintiff's liberty, well-being, safety and constitutional rights.

### I.    Failure to Train Prosecutors Regarding Impermissible Conduct.

266.    Defendant CITY OF NEW YORK exhibited a deliberate indifference toward the training and supervision of assistant district attorneys of in the New York County District Attorney's Office regarding the ethical boundaries of presenting evidence against the accused.

267.    Specifically, defendant CITY OF NEW YORK exhibited a deliberate indifference by failing to give district attorneys proper training on the following subject matters: 1) the need to avoid introducing inadmissible "bad act" evidence against the accused; 2)  the need to avoid impugning the integrity of witnesses who testify on behalf of the accused;  3) the need to avoid

-49-

vouching for the credibility of witnesses who testify on behalf of the prosecution;  4) the need to

avoid threatening witnesses with perjury charges if they do not give the desired testimony; and

5) the need to avoid becoming a fact witness and/or interjecting one's own personal beliefs into

criminal proceedings.

268.    Further, as evidenced from the conduct of ADA RUZOW and ADA SCOTTO in

the grand jury proceedings in this matter, defendant CITY OF NEW YORK exhibited a

deliberate indifference toward the training and supervision of assistant district attorneys  in the

New York County District Attorney's Office regarding prosecutorial misconduct during the

grand jury presentation, in that defendant CITY OF NEW YORK:

    a)    Intentionally and/or recklessly failed to properly instruct, train and/or
          supervise assistant district attorneys with regard to their obligations to
          avoid prosecutorial misconduct in the grand jury as required by People v.
          Huston, 88 N.Y.2d 400 (1996);

    b)    Intentionally and/or recklessly failed to properly instruct, train and/or
          supervise assistant district attorneys with regard to their obligations to not
          introduce evidence in the grand jury of prior bad acts in accordance with
          People v. Molineux, 168 N.Y. 264 (1901);

    c)    Intentionally and/or recklessly failed to properly instruct, train and/or
          supervise assistant district attorneys with regard to their obligations not to
          undermine the credibility of witnesses in the grand jury by threatening
          said witnesses with perjury charges as required by People v. Jaime, 84
          A.D. 2d 696 (1st Dept. 1981);

    d)    Intentionally and/or recklessly failed to properly instruct, train  and/or
          supervise assistant district attorneys with regard to their obligations to act
          as an officer of the public, and of the duty of fair dealing owed to the
          accused. People v. Pelchat, 62 N.Y.2d at 105; C.P.L. 190.25(5), (6); and

    e)    Intentionally and/or recklessly failed to properly instruct, train and/or
          supervise assistant district attorneys with regard to their obligations to not
          vouch for the evidence by substituting their own testimony for the
          testimony of the witnesses in the grand jury.  People v. Jaime, 84 A.D. 2d
          696 (1st Dept. 1981); People v. Rivera, 75 A.D.2d 544 (1st Dept. 1980).

269.     The aforesaid deliberate indifference to the training and supervision of assistant district attorneys by defendant CITY OF NEW YORK  may be inferred from the fact that the prosecutorial misconduct in this case was *not* an isolated incident, but rather, occurred on *multiple* occasions throughout the grand jury proceedings.  See Decision at 36 ("It is clear that the Prosecutor's conduct was improper and *not an isolated incident*.") (emphasis supplied). Further, the prosecutorial misconduct was committed not just by ADA RUZOW, but also, by her *supervisor*, ADA SCOTTO, who was the *Chief* of the Labor Racketeering Unit in the New York County District Attorney's Office.  See Decision at 31 ( "This line of improper questioning was continued by Mr. Scotto ....").

**II.     Failure to Discipline Prosecutors Who Engage in Misconduct**.

270.     The aforesaid deliberate indifference to the training and supervision of assistant district attorneys by defendant CITY OF NEW YORK  may further be inferred from  the fact that, upon information and belief: 1) ADA's Ruzow and Scotto were *not*  punished or disciplined in any way for their acts of prosecutorial misconduct, despite the Court's finding that these acts had been done "intentionally" (Decision at 34); 2) no official actions were taken against ADA Ruzow or ADA Scotto by the New York County District Attorney's Office; 3)  no record of prosecutorial misconduct was ever placed in the personnel files of ADA Ruzow or ADA Scotto; 4) no notification was ever made to the Appellate Division First Department's  Disciplinary Committee, despite Judge Zweibel's finding that the misconduct committed by ADA RUZOW and SCOTTO was intentional; 5) no additional training was given by the New York County District Attorney's Office to ADA Ruzow and ADA Scotto to avoid future instances of prosecutorial misconduct by either of these prosecutors; and 6) no additional training was given by the New York County District Attorney's Office to other assistant district attorneys to avoid

future instances of prosecutorial misconduct of the nature identified by Judge Zweibel.

271.    In light of the Court's finding that "*much, if not most* of that inadmissible evidence, was [introduced] *intentionally*" (Decision at 34) (emphasis supplied), defendants' failure to punish or discipline ADA Ruzow and ADA Scotto in any way – and their failure to implement any remedial training sessions to prevent similar instances of prosecutorial misconduct from occurring again in the future – is proof of constructive acquiescence by the policy makers at the New York County District Attorney's Office of the unconstitutional conduct and practices alleged herein.

272.    The aforesaid deliberate indifference to the training and supervision of assistant district attorneys by defendant CITY OF NEW YORK  may further be inferred from  the fact that, upon information and belief: 1) numerous other Assistant District Attorneys in the New York County District Attorney's Office have engaged in similar  misconduct as engaged in by ADA RUZOW and ADA SCOTTO, but have not been  punished or disciplined for their acts of prosecutorial misconduct; 2) no official actions were taken against the other prosecutors who engaged in similar acts of prosecutorial misconduct, just as no official actions were taken against ADA RUZOW or ADA SCOTTO; 3)  no record of prosecutorial misconduct was ever placed in the personnel files of the other prosecutors who engaged in similar acts of prosecutorial misconduct, just as no such record was ever placed in the personnel files of  ADA RUZOW or ADA SCOTTO; 4) no notification was ever made to the Appellate Division First Department's Disciplinary Committee regarding the prosecutorial misconduct of any Assistant District Attorney working in the New York County District Attorney's Office –  even where the Court has found that such misconduct was intentional – just as no such notification was made regarding the misconduct of ADA RUZOW or ADA SCOTTO; and 5) no additional training was

given by the New York County District Attorney's Office to other prosecutors who engaged in similar misconduct, just as no such additional training was given to ADA Ruzow and ADA Scotto, to avoid future instances of prosecutorial misconduct.

273.    The aforesaid deliberate indifference to the training and supervision of assistant district attorneys by defendant CITY OF NEW YORK may further be inferred from an analysis of other reported decisions which have documented similar instances of prosecutorial misconduct by other prosecutors in the New York County District Attorney's Office involving the same type of improper conduct committed by ADA RUZOW and ADA SCOTTO, including but not limited to i) improperly vouching for prosecution witnesses; ii) impugning the integrity of witnesses who were favorable to the defense; iii) improperly introducing prior "bad act" of uncharged crimes against the accused; and iv) improperly questioning and/or cross-examining witnesses by asking them questions that misstate the evidence and/or deliberately mislead jurors regarding the facts at issue in the case.

274.    Specifically, the following reported court decisions reflect similar acts of prosecutorial misconduct as committed by ADA RUZOW and ADA SCOTTO in the instant matter, and as summarized more fully above:

●People v. Moye, 12 N.Y.2d 743 (2009);

●People v. Colon, 13 N.Y.3d 343 (2009);

●People v. Moye, 52 A.D.3d 1 (1st Dept. 2008);

●People v. Gibbons, 15 A.D.3d (1st Dept. 2005);

●People v. Cunningham, 21 AD.3d 746 (1st Dept. 2005);

-53-

- People v. Napolitano, 282 A.D.2d 49 (1st Dept. 2001);

- People v. Crawford, 256 A.D.2D 141 (1st Dept. 1998);

- People v. Griffin, 242 A.D.2d 70 (1st Dept. 1998);

- People v. Hampton, 211 A.D. 2d 464 (1st Dept. 1995);

- People v. Colas, 206 A.D.2d 183 (1st Dept. 1994);

- People v. Tolbert, 198 A.D.2d 132 (1st Dept. 1993);

- People v. Smays, 594 N.Y.S.2d 380 (1st Dept. 1993);

- People v. Ardale, 173 A.D.2d 307)(1st Dept. 1991);

- People v. Conlon, 146 A.D.2d 319 (1st Dept. 1989);

- People v. Blake, 139 A.D.2d 110 (1st Dept. 1988);

- People v. Bendell, 111 A.D.2d 87 (1st Dept. 1985); and

- People v. Cerda, New York Law Journal, Nov. 15, 1993.

275.    The aforesaid reported decisions regarding prosecutorial misconduct by prosecutors in the  Manhattan D.A.'s Office  – which, upon information and belief,  represent but a small sample of the total number of cases involving prosecutorial misconduct by members of the New York County District Attorney's Office – are proof of defendant CITY OF NEW YORK's deliberate indifference toward the training of its prosecutors regarding the scope and

limits which must be adhered to when questioning witnesses, and are also proof of defendant
CITY OF NEW YORK's longstanding, *de facto* policy of *never* punishing or disciplining
prosecutors who engage in prosecutorial misconduct, even when such actions are found to have
been done intentionally and/or repeatedly by the same prosecutors.

276.    Apart from the above cases, upon information and belief, there are many
additional  *unreported* decisions – such as Judge Zweibel's decision in <u>People v. Bertuglia</u>,
Indictment No.1582/09,  which is not published and cannot be accessed online – which likewise
have been dismissed  based on the prosecutorial misconduct of district attorneys in the New
York County District Attorney's Office.

277.    Such unreported decisions, which are currently within the exclusive possession of
the New York County District Attorney's Office – and which will only become available to
plaintiff during discovery – will  provide further evidence that defendant CITY OF NEW YORK
has a policy of "lax discipline"[2] toward its prosecutors which is so widespread, persistent and
long-standing, that it indicates constructive acquiescence of policy-making officials toward
prosecutorial misconduct, and supports the conclusion that there exists an unwritten, *de facto*
policy to *never* punish or discipline prosecutors who engage in prosecutorial misconduct, and to
not properly train prosecutors regarding  the proper scope and limits of questioning witnesses,
including but not limited to, the need to avoid:  i) improperly vouching for prosecution
witnesses; ii) impugning the integrity of witnesses who are favorable to the defense;  iii)
improperly introducing prior "bad act" of uncharged crimes against the accused and/or iv) asking
questions that misstate the evidence and/or deliberately mislead jurors regarding the facts at

---

[2]<u>Gentile v. County of Suffolk</u>, 129 F.R.D. 435, 446 (E.D.N.Y. 1990), *aff'd* , 986 F.2d 142
(2d Cir. 1991).

issue in the case.

278.    Defendant CITY OF NEW YORK's policy of "lax discipline", as implemented by the New York County District Attorney's Office,  has created an atmosphere which encourages line assistant district attorneys to engage prosecutorial misconduct, as such prosecutors know that they will *not* be punished and/or disciplined in any way,. no matter how egregious their acts of prosecutorial misconduct might be.

279.    The foregoing unlawful policy of defendant CITY OF NEW YORK, as implemented by the New York County District Attorney's Office, is the direct and moving force behind the constitutional violations suffered by plaintiff ROBERT BERTUGLIA, JR. and LARO, and is  substantially certain to result in the violation of the constitutional rights of other citizens in the future.

280.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as assistant district attorneys and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York, the New York County District Attorney's Office,  and the Labor Racketeering Unit, all under the supervision of ranking officers of said department.

281.    As a direct and proximate result of the foregoing practices and policies of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit, plaintiffs ROBERT BERTUGLIA, JR. and LARO were denied fundamental constitutional rights, were subjected to grossly improper and repeated instances of prosecutorial misconduct, were deprived of their liberty, were forced to incur substantial legal expenses, had their reputations destroyed, and were otherwise deprived of their constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

282.   The aforesaid deliberate indifference to the training and supervision of assistant district attorneys was done by policymaking officials for defendant CITY OF NEW YORK including, but not limited to, the District Attorney of New York County Robert Morgenthau and/or defendant ADA Scotto, as Chief of the Labor Racketeering Unit,  who knew that:

(a)     to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)     that such issues either present assistant district attorneys  with difficult choices of the sort that instruction, training and/or supervision will make less difficult, or that the need for further instruction, training and/or supervision was demonstrated by a history of assistant district attorneys mishandling such situations; and

(c)     Despite their knowledge of said policies, procedures, regulations, practices and/or customs, the supervisory and policymaking officers and officials of the defendant CITY OF NEW YORK, as a matter of policy, perpetuated, or failed to take steps to terminate, said policies, procedures, regulations, practices and/or customs, did not discipline or otherwise properly supervise the employees engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the policies, procedures, regulations, practices and/or customs described above, with a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New York.

283.   All of  foregoing customs, policies, usages, practices, procedures and deficiencies in training by the CITY OF NEW YORK,  as implemented by the New York County District

Attorney's office and the Labor Racketeering Unit, constituted a deliberate indifference to the safety, well-being and constitutional rights of all defendants, including but not limited to, plaintiff ROBERT BERTUGLIA, JR.

284.    The foregoing customs, policies, usages, practices, procedures and deficiencies in training by the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit City of New York, were the direct and proximate cause of the constitutional violations suffered by ROBERT BERTUGLIA, JR. and LARO, as alleged herein.

285.    The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and Labor Racketeering Unit City of New York, were the moving force behind the constitutional violations suffered by plaintiff ROBERT BERTUGLIA, JR. as alleged herein.

286.    As a direct and proximate result of the foregoing practices and policies of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit, plaintiffs ROBERT BERTUGLIA, JR. and LARO were denied fundamental constitutional rights, were subjected to an utterly baseless and selective criminal prosecution, were forced to incur substantial legal expenses, had their reputations destroyed, and were otherwise deprived of their constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

**III.    Additional Deficiencies in The Training of Prosecutors.**

287.    Apart from the foregoing deficiencies, defendant CITY OF NEW YORK further exhibited a deliberate indifference toward the training and supervision of assistant district attorneys of in the New York County District Attorney's Office, in that defendant CITY OF

NEW YORK:

a)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to discontinue a criminal prosecution when evidence is discovered which negates probable cause and exonerates the accused;

b)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to discontinue a criminal prosecution when it becomes apparent that a criminal complaint is not valid;

c)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to timely disclose all evidence favorable to the defense on the issues of guilt or innocence and punishment, pursuant to the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny;

d)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid threatening, intimidating and/or coercing potential defense witnesses and prevent them from testifying on behalf of the accused;

e)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid interfering with a defendant's constitutional right to a fair trial by instructing potential defense witnesses to not speak with defense counsel or investigators for the defense team;

f)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid pressuring potential defense witnesses to give untruthful, erroneous, incomplete and/or misleading statements; and

g)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid pursuing a criminal prosecution as a "vendetta" against a witness who is believed to holding back material information from prosecutors; and

h)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to properly instruct grand jurors with regard to evidence which has been admitted solely for a limited purpose, including but not limited to, "prior bad act" evidence which falls within one of the narrow exceptions set forth in People v. Molineux, 168 N.Y. 264 (1901).

288.    The aforesaid deliberate indifference to the training and supervision of assistant district attorneys by defendant CITY OF NEW YORK  may also be inferred from an analysis of convictions obtained by the New York County District Attorney's office which have been reversed on appeal based upon:  (1) the prosecution's failure to disclose evidence favorable to the defense, pursuant to its obligations under Brady v. Maryland, 373 U.S. 83 (1963); (2) the prosecution's failure to comply with well-established constitutional obligations; (3) the prosecution's use of improper and/or misleading questions during cross-examination of witnesses; 4) the prosecution's misstatement of evidence during grand jury proceedings; and 5) the prosecution's use of improper, inflammatory and prejudicial evidence to secure an indictment and/or conviction.

**Brady Violations in the Instant Matter**

289.    In the instant matter, upon information and belief, defendants ADA RUZOW and ADA SCOTTO secretly tape recorded hundreds of hours of telephone conversations between plaintiff ROBERT BERTUGLIA, JR. and multiple third parties.

290.    None of these tape recordings contained any inculpatory information, as evidenced by the fact that they were never used by ADA RUZOW or ADA SCOTT – nor even *attempted* to be used – at any time during the criminal court proceedings.

291.    To the contrary, upon information and belief, many of the  conversations were, in fact, entirely *exculpatory* in nature and should have been turned over by the prosecution pursuant to its obligations under Brady v. Maryland, 373 U.S. 83 (1963).  Had such exculpatory information been properly disclosed, it would have resulted in the termination of criminal proceedings at a much earlier stage than what eventually occurred.

292.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as assistant district attorneys and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York, the New York County District Attorney's Office,  and the Labor Racketeering Unit, all under the supervision of ranking officers of said department.

293.     As a direct and proximate result of the foregoing practices and policies of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit, plaintiffs ROBERT BERTUGLIA, JR. and LARO were denied fundamental constitutional rights, were subjected to an utterly baseless and selective criminal prosecution, were forced to incur substantial legal expenses, had their reputations destroyed, and were otherwise deprived of their constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

294.     The aforesaid deliberate indifference to the training and supervision of assistant district attorneys was done by policymaking officials for defendant CITY OF NEW YORK including, but not limited to, the District Attorney of New York County Robert Morgenthau and/or defendant ADA SCOTTO, as Chief of the Labor Racketeering Unit,  who knew that:

(a)     to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)     that such issues either present assistant district attorneys  with difficult choices of the sort that instruction, training and/or supervision will make less difficult, or that the need for further instruction, training and/or supervision was demonstrated by a history of assistant district attorneys mishandling such situations; and

(c)      Despite their knowledge of said policies, procedures, regulations, practices and/or customs, the supervisory and policymaking officers and officials of the defendant CITY OF NEW YORK, as a matter of policy, perpetuated, or failed to take steps to terminate, said policies, procedures, regulations, practices and/or customs, did not discipline or otherwise properly supervise the employees engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the policies, procedures, regulations, practices and/or customs described above, with a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New York.

295.    All of foregoing customs, policies, usages, practices, procedures and deficiencies in training by the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit, constituted a deliberate indifference to the safety, well-being and constitutional rights of all defendants, including but not limited to, plaintiff ROBERT BERTUGLIA, JR.

296.    The foregoing customs, policies, usages, practices, procedures and deficiencies in training by the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit City of New York, were the direct and proximate cause of the constitutional violations suffered by ROBERT BERTUGLIA, JR. and LARO, as alleged herein.

297.    The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and Labor Racketeering Unit City of New York, were the moving force behind the constitutional

violations suffered by plaintiff ROBERT BERTUGLIA, JR. as alleged herein.

298.    As a direct and proximate result of the foregoing practices and policies of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit, plaintiffs ROBERT BERTUGLIA, JR. and LARO were denied fundamental constitutional rights, were subjected to an utterly baseless and selective criminal prosecution, were forced to incur substantial legal expenses, had their reputations destroyed, and were otherwise deprived of their constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

**IV.  Failure To Train Prosecutors on The Limits of Their Investigative Powers**.

299.    Apart from the foregoing deficiencies, defendant CITY OF NEW YORK further exhibited a deliberate indifference toward the training and supervision of assistant district attorneys of in the New York County District Attorney's Office, in that defendant CITY OF NEW YORK regarding the lawful scope of investigative powers.

300.    During the investigative phase of the proceedings, defendants RUZOW and SCOTTO repeatedly and flagrantly exceeded the boundaries of a lawful and proper investigation into the allegations made by the PORT AUTHORITY.

301.    Defendants RUZOW and SCOTTO flooded LARO and other third parties with subpoenas, seeking palpably improper and irrelevant information having nothing to do with the actual subject matter of the criminal matter being investigated.

302.    Defendants RUZOW and SCOTO served these subpoenas *not* to obtain information relating to the PORT AUTHORITY's allegations and *not* for any other legitimate investigative purposes, but rather, for wholly improper and unlawful purposes, including but not limited to: 1) harassing, threatening, intimidating witnesses who were favorable to the defense;

2) discovering  "bad act" evidence against plaintiff ROBERT BERTUGLIA, JR., and then using

such inadmissible evidence  as leverage to force plaintiff to provide information to prosecutors

regarding other, unrelated criminal investigations; and 3) making good on the  promise to "ruin"

plaintiff ROBERT BERTUGLIA, JR.,  by  inflicting maximum economic damage on him to

retaliate against him for failing to "cooperate" with the District Attorney's Office.

303.    Further, Defendants RUZOW and SCOTTO also issued subpoenas to compel

various witnesses to come to the New York County District Attorney's Office at 1 Hogan Place

for interviews, and *not* to compel these witnesses to attend a judicial proceeding, *not* to obtain

necessary information and *not* for any other legitimate investigative purpose.

304.    At the time the foregoing subpoenas were served, there was no grand jury

convened.

305.    Defendants Ruzow and Scotto issued these  subpoenas to witnesses for improper

and unlawful purposes, including: 1) harassing, intimidating and threatening potential defense

witnesses; 2) coercing potential defense witnesses to give false and  unfavorable testimony

against plaintiff ROBERT BERTUGLIA, JR.; and 3) digging up "dirt" on plaintiff ROBERT

BERTUGLIA, JR. as leverage to force plaintiff to provide information to prosecutors regarding

other, wholly unrelated criminal investigations, including but not limited to, investigations into

Vincent Grimaldi and/or Charles Gargano.

306.    The foregoing unlawful actions of defendants Ruzow and Scotto's actions, were

the direct and proximate result of defendant CITY OF NEW YORK's deliberate indifference

toward the training and supervision of assistant district attorneys of in the New York County

District Attorney's Office in general, and in the Labor Racketeering Unit of the New York

County District Attorney's Office in particular, regarding: 1) abuse of subpoena authority; 2)

-64-

abuse of investigative powers; 3) misuse of compulsory process; and 4) misuse of investigative authority.

307.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as assistant district attorneys and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York, the New York County District Attorney's Office,  and the Labor Racketeering Unit, all under the supervision of ranking officers of said department.

308.    As a direct and proximate result of the foregoing practices and policies of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit, plaintiffs ROBERT BERTUGLIA, JR. and LARO were denied fundamental constitutional rights, were subjected to an utterly baseless and selective criminal prosecution, were forced to incur substantial legal expenses, had their reputations destroyed, and were otherwise deprived of their constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

309.    The aforesaid deliberate indifference to the training and supervision of assistant district attorneys was done by policymaking officials for defendant CITY OF NEW YORK including, but not limited to, the District Attorney of New York County Robert Morgenthau and/or defendant ADA Scotto, as Chief of the Labor Racketeering Unit,  who knew that:

(a)      to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)      that such issues either present assistant district attorneys  with difficult choices of the sort that instruction, training and/or supervision will make less difficult, or that the

need for further instruction, training and/or supervision was demonstrated by a history of assistant district attorneys mishandling such situations; and

(c)      Despite their knowledge of said policies, procedures, regulations, practices and/or customs, the supervisory and policymaking officers and officials of the defendant CITY OF NEW YORK, as a matter of policy, perpetuated, or failed to take steps to terminate, said policies, procedures, regulations, practices and/or customs, did not discipline or otherwise properly supervise the employees engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the policies, procedures, regulations, practices and/or customs described above, with a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New York.

310.    All of  foregoing customs, policies, usages, practices, procedures and deficiencies in training by the CITY OF NEW YORK,  as implemented by the New York County District Attorney's office and the Labor Racketeering Unit, constituted a deliberate indifference to the safety, well-being and constitutional rights of all defendants, including but not limited to, plaintiff ROBERT BERTUGLIA, JR and LARO.

311.    The foregoing customs, policies, usages, practices, procedures and deficiencies in training by the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit City of New York, were the direct and proximate cause of the constitutional violations suffered by ROBERT BERTUGLIA, JR. and LARO, as alleged herein.

312.     The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and Labor Racketeering Unit City of New York, were the moving force behind the constitutional violations suffered by plaintiff ROBERT BERTUGLIA, JR. as alleged herein.

313.     As a direct and proximate result of the foregoing practices and policies of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Labor Racketeering Unit, plaintiffs ROBERT BERTUGLIA, JR. and LARO were denied fundamental constitutional rights, were subjected to an utterly baseless and selective criminal prosecution, were forced to incur substantial legal expenses, had their reputations destroyed, and were otherwise deprived of their constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

### PENDENT STATE LAW CLAIMS

314.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "313" as if the same were more fully set forth at length herein.

315.     In addition to the claims set forth above under federal law, pursuant to 42 U.S.C. § 1983, plaintiff also alleges multiple claims under New York State law in this action.

316.     As specified below, two claims under New York State law are brought against individually named defendants, while another is brought solely against the CITY OF NEW YORK.

### FIRST CLAIM UNDER NEW YORK STATE LAW
### TORTIOUS INTERFERENCE WITH CONTRACT

(Defendants Ruzow, Scotto and Schaffler)

317.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "316" as if the same were more fully set forth at length herein.

318.    Plaintiff ROBERT BERTUGLIA, JR., in his capacity as President of LARO,  had entered into multiple valid, legally enforceable contracts with various  third parties.

319.    Defendants Ruzow and Schaffler knew that plaintiffs had entered into valid, legally enforceable contracts with multiple third party entities.

320.    Defendants Ruzow and Schaffler either personally visited and/or contacted by phone several of these entities with whom plaintiffs had contracts.

321.    During these visits and/or phone calls, defendants Ruzow and Schaffler falsely told these business entities that plaintiffs ROBERT BERTUGLIA, JR., and LARO had stolen a large sum of money from the PORT AUTHORITY, and that plaintiffs might be doing the same thing to their companies as well.

322.    Defendants Ruzow and Schaffler made these statements for the sole, express and malicious purpose of inducing these business entities to breach their contracts with LARO.

323.    There was no lawful excuse or justification for the actions taken by defendants Ruzow and Schaffler.

324.    Defendant Scotto, as Chief of the Labor Racketeering Unit and as the supervisor of ADA Ruzow, was at all times aware of the foregoing unlawful actions being taken by ADA Ruzow and defendants Schaffler, and expressly authorized, directed and approved of same.

325.    As a direct result of the false statements made by defendants Ruzow and Schaffler, numerous business entities breached their contracts with LARO, including but not limited to, the Fulton Fish Market, the Broadway Mall in Hicksville, St. John Baptist High School, the Bayshore Bright Waters Library and the New York City School Construction Authority.

326.   The loss of these contracts had a devastating financial impact on LARO, resulting in tens of millions of dollars in lost revenue for LARO.

## SECOND CLAIM UNDER NEW YORK STATE LAW
## TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE

(Defendants Ruzow, Scotto and Schaffler)

327.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "326" as if the same were more fully set forth at length herein.

328.   Plaintiff ROBERT BERTUGLIA, JR., in his capacity as President of LARO,  had business relationships with multiple  third parties, including suppliers, vendors, customers, subcontractors and financing companies.

329.   These business relationships were a vital component of LARO's business operations, allowing LARO to consistently deliver top-rate cleaning and maintenance services under its contractual agreements.

330.   During the course of her investigation, ADA Ruzow learned of the business relationships that plaintiffs ROBERT BERTUGLIA, JR. and LARO had with other business entities, and allowing it to continually procure new and profitable work projects.

331.   After learning of these business relationships, defendants Ruzow and Schaffler either personally visited and/or contacted by phone several of these entities with whom plaintiffs had existing business relationships, or with whom plaintiffs had recently placed public bids in order to get new work projects.

332.   During these visits and/or phone calls, defendants Ruzow and Schaffler falsely told these business entities that plaintiffs ROBERT BERTUGLIA, JR., and LARO had stolen a large sum of money from the PORT AUTHORITY, and that plaintiffs might also be engaging in improper conduct with respect to their companies as well.

333.     Defendants Ruzow and Schaffler made these statements solely out of malice, with the express purpose of interfering with plaintiffs' business relationships with these third parties.

334.     Defendants Ruzow and Schaffler made these with the intention of inflicting severe harm on plaintiffs ROBERT BERTUGLIA, JR., and LARO.

335.     Defendant Scotto, as Chief of the Labor Racketeering Unit and as supervisor for ADA Ruzow, was at all times aware of the foregoing unlawful actions by ADA Ruzow and defendant Schaffler, and expressly directed, authorized and approved of same.

336.     As a result of defendants' unlawful actions, several of these business entities did, in fact, decide to cease doing business with plaintiffs, or rejected plaintiffs' bids out-of-hand.

337.     As a result of defendants' unlawful actions, plaintiffs' relationships with these business entities were irreparably damaged, plaintiffs' ability to perform their contractual obligations with several of their clients was severely impaired, plaintiffs were prevented from bidding on public projects that they otherwise had an excellent chance to win – as they had done many times in their past – based on their exemplary track record and extremely competitive bids, and plaintiffs suffered substantial economic losses and permanent damage to their reputations.

**THIRD CLAIM FOR RELIEF UNDER NEW YORK STATE LAW**
**MALICIOUS PROSECUTION**

**(City of New York)**

338.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "337" as if the same were more fully set forth at length herein.

339.     On January 6, 2010, plaintiff ROBERT BERTUGLIA, JR., a Notice of Claim was served on defendant   CITY OF NEW YORK, advising defendant CITY OF NEW YORK of the claims that he intended to pursue against this defendant under New York State law.

340.    More than 90 days have elapsed since the date that said Notice of Claim was served and defendant CITY OF NEW YORK has failed to settle or adjust said Notice of Claim

341.    No hearing has yet been held pursuant to General Municipal Law § 50-h, but it is expected that such hearing will be held in the near future.

342.    This claim is being filed within one year and ninety days of the date of the accrual of said cause of action, as defined by CPLR § 215 (8) and CPL § 1.20 of New York law.

343.    Defendant CITY OF NEW YORK, through its agents, servants and employees, was directly and actively involved in the initiation of criminal proceedings against plaintiffs.

344.    Defendant CITY OF NEW YORK lacked probable cause to initiate criminal proceedings against plaintiffs.

345.    Defendant CITY OF NEW YORK acted with malice in initiating criminal proceedings against plaintiffs.

346.    Defendant CITY OF NEW YORK was also directly and actively involved in the continuation of criminal proceedings against plaintiffs.

347.    Defendant CITY OF NEW YORK lacked probable cause to continue criminal proceedings against plaintiffs.

348.    Defendant CITY OF NEW YORK acted with malice in continuing criminal proceedings against plaintiffs

349.    Defendant CITY OF NEW YORK, through its agents, servants and employees, misrepresented and falsified evidence throughout all phases of the criminal proceedings.

350.    Notwithstanding the unlawful conduct of defendants herein, the criminal proceedings were terminated in plaintiffs' favor on October 5, 2009, when the Honorable Ronald Zweibel dismissed all criminal charges, and no criminal charges were ever re-filed

against plaintiff ROBERT BERTUGLIA, JR. and/or LARO.

351.   As a result of the foregoing, plaintiff ROBERT BERTUGLIA, JR. was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, lost his company, and lost his livelihood as President of LARO.

352.   As a  result of defendants' aforementioned conduct, plaintiff LARO was subjected to an utterly baseless and selective criminal prosecution, its professional reputation was permanently destroyed, it suffered massive economic losses, all of its properties were taken away, and it was forced to close down, without ever being afforded due process, including but not limited to, a hearing, an opportunity to be heard, to confront adverse witnesses and to present exculpatory evidence, all without probable cause.

**WHEREFORE**, plaintiffs ROBERT BERTUGLIA, JR.and LARO demand judgment in the sum of one hundred million dollars ($100,000,000.00) in compensatory damages, one hundred million dollars  ($100,000,000.00) in punitive damages, plus attorney's fees, costs, and disbursements of this action.

Dated:  New York, New York
       June 30, 2011

                                    _____/S/_____
                                      JON L. NORINSBERG (norinsberg@aol.com)
                                      Attorney for Plaintiffs
                                      225 Broadway, Suite 2700
                                       New York, N.Y. 10007
                                      (212) 791-5396

**Exhibit A**

**THE PORT AUTHORITY** OF NY & NJ

June 25, 2008

Stephen R. Napolitano
General Manager, Port Authority Bus Terminal & Lincoln Tunnel

Mr. Robert Kolakowski
Manager
Laro Maintenance Corporation
625 8th Avenue
New York, NY 10018

Dear Bob,

I am very pleased to share with you a sampling of the preliminary results of the 2007 Port Authority Bus Terminal Customer Attitude Tracking Study. As you may know, these bi-annual studies are ongoing tracking programs designed to measure the attitudes and perceptions of PABT interstate bus customers. The objectives are to monitor changing perceptions over time, identify customer-driven priorities for improvement, gauge effectiveness of facility programs, and provide results to customers. Some 2,870 interstate bus travelers who use the terminal during typical weekdays were surveyed by our consultant in the late fall of 2007.

As a result of a lot of hard work and dedication by the entire PABT community, including the dedicated staff from Laro, customer satisfaction has increased across the board since 2005. Customer ratings of their experience traveling through the PABT, experience traveling door-to-door and bus carrier service were up vs. 2005 levels. Safety and security ratings have also increased, some to all time highs. Ratings for the physical and social environment have also increased across the board from 2005 levels, as we continue our efforts to improve the physical assets and provide social service alternatives to those in need. Of special note is that satisfaction ratings for cleanliness of public areas increased by 6% to 58%, and cleanliness of restrooms increased by 7% to 44% in 2007. This is directly attributable to the hard work and efforts from you and your staff! As our partners, you are the key to the success we are experiencing. There's a lot more work to be done, but the findings are certainly encouraging as they indicate that our collective efforts are directed at what our customers are looking for in their door-to-door trip experience.

As always, I look forward to our combined efforts to make the PABT a first class facility. Congratulations and thank you to you and your staff for their hard work and dedicated efforts in delivering some very impressive customer service! I am available to discuss any aspect of the survey results, so please don't hesitate to call if you'd like even more information.

Sincerely,

Stephen R. Napolitano
General Manager
Port Authority Bus Terminal & Lincoln Tunnel

Copy to: J. Lindenmeier

625 Eighth Avenue
New York, NY 10018

snapolitano@panynj.gov

**Exhibit B**

# Gdanski & Gdanski, LLP

Attorneys At Law
3 Rockwood Lane
Suffern, New York 10901
Tel 845 362-4800
Fax 845-362-4700

E mail samgdanski@gdanski.com

April 19, 2007

Purchasing Services Division
One Madison Avenue, Seventh Floor
New York, New York 10010

Re:          Request for Proposals No. 11222
Attention:   Kathy Leslie Whelan
 Fax:        (212) 435-3959
Email:       kleslie@panynj.gov
cc:          trahman@panynj.gov

LGA Central Terminal Janitorial Services
Laro Service Systems, Inc.
271 Skip Lane
Bay Shore, NY 11706

Dear Ms. Whelan:

Please be advised that the undersigned represents Laro Service Systems, Inc., hereinafter referred to as ("Laro").

This office's practice is focused primarily in the field of government contracts and does so on an international, federal, state, municipal, governmental and commercial level i.e. disputes between prime contractors and subcontractors.

While we practice in the field of government contracts we have a specific focus on issues of "integrity" and "responsibility" and served as counsel in the precedent-setting case of *Impresa Construzioni Geom. Domenico Garufi v. U.S.*, 238 F.3d 1324, Jan 3, 2001, at the United States Court of Appeals for the Federal Circuit which set the standards for "responsibility" in government contracting at the federal level and led to a revision of the General Accountability Office's rules on bid protests concerning issues of "responsibility" and integrity. Since then we have been involved in a number of sensitive matters involving these issues.

The undersigned also previously served as a legislator and is quite familiar with the provisions of the General Municipal Law and other state and federal requirements governing

procurements. I mention this because we are concerned that there may be improprieties occurring with respect to evaluations of the current procurement.

This is premised in part by a prior procurement the Port Authority of New York and New Jersey hereinafter referred to as the "Port Authority" had for the World Trade Center Site & Operations contract on which Laro bid on. During the site visit for that job a representative of Laro was told by one of the employees of Guardian Service Industries ("Guardian"), that Laro should not be wasting its time taking notes because "this job was his." We are concerned about such an occurrence and the fact that the following circumstances have occurred.

On Monday, April 9, 2007, Laro's Site Manager for the LGA contract, Dorothy Sepulveda, found over 50 vacation requests on her desk when she came in. When she asked her employees what was going on, she was told that during the weekend three people identifying themselves as Guardian employees told Laro's staff that they were the new vendor. These individuals from Guardian asked questions about how the project work was done, whether scaffolding was used, et cetera.

We believe the integrity of the procurement system is paramount and should be protected and what has occurred to date appears both to have violated the confidentiality provisions as well as called into question any possible preliminary recommendations or internal committee recommendations.

Obviously the vacation requests have created a difficult workload but more importantly the integrity of the bidding process appears to have been compromised. Although a phone conversation ensued between representatives of Laro and the Port Authority, Laro was told that while the committee was still evaluating the bid submissions, for which decision would be finalized at the end of April, a recommendation would go to the Port Authority Board. Laro was advised that the process is highly confidential and vendor interview teams are in a separate room and members of the committee are required to sign a confidentiality agreement.

With respect to the instant LGA Central Terminal Building, Laro is the incumbent contractor and Laro has been besieged by inquiries by employees asking to exercise vacation and other fringe benefits. Representatives of Guardian were on site interviewing Laro's staff. This was communicated to a Laro representative which seems to be an indication that there has been a disclosure before formal award to Guardian that award is to be made.

This would be at odds with Port Authority requirements and procedures as well as various statutes and while we have not been formally advised that award has been made to Guardian it would also appear there were improprieties and disclosure of private confidential information to Guardian. Aside from this any such award to Guardian in light of the fact that Laro has the most experience servicing airport terminals both as the incumbent, as well as other sites in the United States, which raises question as to such a decision should one have been made to award to Guardian.

*United States of America v. Robert M. Wohlfarth*, 1993 U.S. App. LEXIS 1371 Prior to the award of a contract, government employees are not to release information as to a contractor's bid either to other contractors or to the public. Thus, a criminal conviction was upheld on appeal. Note, although an unpublished opinion is not citable as precedent, it certainly provides useful information in the context of guiding principles involved in public procurements.

In the case of *United States v. McCausland*, 979 F.2d 970 (1992) a conviction was upheld, where marketing executives who obtained procurement information, which they then sold to each other, were convicted of conspiracy to defraud the United States, conversion or unauthorized conveyance of government property and wire fraud.

In light of the above actions, we would also ask your office to investigate these circumstances surrounding the procurement actions of the Award given at the World Trade Center site to Guardian. *See Lord Electric Company v. Litke, Commissioner of the Department of General Services*, 122 Misc. 2d 112, 469 N.Y.S.2d 846, 1983 N.Y. Misc. LEXIS 4083 where a responsibility hearing was held after Award. This case involved a rescission of a contract after circumstances came to light as to whether the awardee possessed the requisite "responsibility." (1983).

We are quite concerned and would request your specific response to the information imparted to you today. In light of these circumstances, I request the opportunity to immediately meet with your office and a representative of the Counsel's office advising Port Authority.

Very Truly Yours

Sam Z Gdanski