UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————

ROBERT BERTUGLIA, ET AL.,
                    **Plaintiffs,**
          - against -                        11 Civ. 2141 (JGK)

THE CITY OF NEW YORK, ET AL.,               <u>OPINION AND ORDER</u>
                    **Defendants.**
——————————————————————————

JOHN G. KOELTL, District Judge:

     This case arises out of the initiation, investigation and
prosecution of criminal charges brought against plaintiff Robert
Bertuglia ("Bertuglia"), and his companies, plaintiffs Laro
Maintenance Corporation and Laro Service Systems (collectively
"Laro"), and the subsequent demise of Laro.  The plaintiffs
assert claims against six named employees of the Port Authority
of New York and New Jersey (collectively, the "PA defendants")
and two New York County assistant district attorneys
(collectively, the "ADA defendants"), for numerous alleged
violations of the plaintiffs' federal civil rights under 42
U.S.C. § 1983.  The plaintiffs also assert state law claims for
tortious interference with contract and tortious interference
with economic advantage against the ADA defendants and one of
the PA defendants.  The plaintiffs also assert a municipal
liability claim against the City of New York (the "City") under
42 U.S.C. § 1983 for failure to train and discipline
prosecutors, and a state law claim for malicious prosecution.

The PA defendants, the ADA defendants, and the City each have moved separately to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and § 1367.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Grp. LLC, 532 F. Supp. 2d 556, 566 (S.D.N.Y. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss a claim if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a

court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.; see also SEC v. Rorech, 673 F. Supp. 2d 217, 221 (S.D.N.Y. 2009).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Rorech, 673 F. Supp. 2d at 221.

## II.

The following factual allegations are accepted as true unless otherwise noted:

Bertuglia founded Laro, a provider of janitorial and maintenance services, over 30 years ago. At its height Laro employed over 3,000 people and had a gross annual revenue in excess of $72,000,000. Laro was based in Bayshore, New York, and its clients have included numerous public entities; it has provided services at well-known landmarks, including the Statute of Liberty, the Fulton Fish Market, and the Port Authority Bus Terminal in Manhattan. (Am. Compl. ¶¶ 32-37.) In 1996, Laro began working for the Port Authority at the Port Authority Bus

Terminal.  Since that time, the Port Authority renewed its contract with Laro several times, and as late as 2008 praised Laro's work.  (Am. Compl. ¶¶ 38-39 & Ex. A.)

In 2004, Laro entered into a new contract with the Port Authority to provide cleaning services at the Port Authority Bus Terminal.  A new provision in this 250 page contract provided that Laro was required to purchase new cleaning equipment for its work for the Port Authority.  This provision was included as part of a vendor-wide policy by the Port Authority and was not specifically directed at Laro.  The contract provided that Laro would be paid an additional $ 0.76 an hour to offset the cost of purchasing new equipment.  (Am. Compl. ¶¶ 40-43.)  While Laro purchased most of the new equipment, it inadvertently failed to purchase all of the new equipment required under the new contract due to the departure of staff members tasked with that responsibility.  The Port Authority continued to use and praise Laro's services despite Laro's failure to purchase all of the new equipment.  (Am. Compl. ¶¶ 44-49 & Ex. A.)  The plaintiffs allege that they failed to purchase two cleaning machines.  (Am. Compl. ¶ 55.)

The plaintiffs allege that no one at Laro ever intended to defraud or steal from the Port Authority, and further that Bertuglia did not even know he was submitting invoices that contained a $0.76 overcharge to the Port Authority.  (Am. Compl.

4

¶¶ 50-51, 57)  The plaintiffs further allege that they had no motive to defraud or steal from the Port Authority, because doing so would have risked their excellent reputation as well as the business generated from a major client, and would further have risked triggering the liquidated damages clause in the Port Authority contract.  (Am. Compl. ¶¶ 52-55.)

In April 2007, an attorney for Laro sent a letter to the Port Authority challenging the integrity of the bidding process for the maintenance contract for Laguardia Airport, based on the allegation that a competitor, Guardian Maintenance, had intimated that it had already secured the contract, potentially outside of the formal bidding process.  (Am. Compl. Ex. B.)  The plaintiffs allege that this same attorney had also written a letter to defendant Robert Van Etten ("Van Etten"), the Port Authority's Inspector General, regarding a similar complaint about the integrity of the bidding process for a new World Trade Center project.  The plaintiffs also allege that Bertuglia had personally made similar complaints about the World Trade Center bidding to Charles Gargano, a Port Authority board member, noting that Guardian had "openly boasted that an upcoming project at the World Trace [sic] Center was already 'in the bag'" and Bertuglia asked "to 'get a fair shake' on an upcoming bid."  (Am. Compl. ¶¶ 15, 102-105.)

The plaintiffs allege that the Port Authority's Office of the Inspector General ("OIG") commenced an investigation into Laro's failure to purchase new equipment as a result of these complaints about the "rigged" Port Authority bidding process. (Am. Compl. ¶¶ 58-59, 66, 106.)  Defendant Jeffrey Schaffler ("Schaffler"), a Port Authority Supervising Investigator, led the investigation.  (Am. Compl. ¶¶ 23, 60.)  Also involved in the investigation were the defendants Fred Ferrone ("Ferrone"), a Forensic Auditor for OIG, and Bernard D'Aleo ("D'Aleo"), a Contract Administrator for the Port Authority Bus Terminal, as well as five other unnamed OIG officers.  (Am. Compl. ¶¶ 21, 25, 59-60.)  The plaintiffs allege that this team was supervised by Inspector General Van Etten, as well as Port Authority Director of Investigations Michael Nestor and Investigative Manager Edward Kennedy.  (Am. Compl. ¶¶ 17, 19, 59-65, 106.)

The plaintiffs allege that this investigation uncovered no evidence of any criminality or intentional misconduct by any of the plaintiffs, and the defendants failed to ask the plaintiffs or any Laro employees directly about the additional $ 0.76 an hour charge.  (Am.  Compl. ¶¶ 57, 61-63.)  The plaintiffs allege that, despite the lack of any evidence, the PA defendants falsely told the New York County District Attorney's Office that Bertuglia "had committed intentional criminal misconduct by knowingly submitting invoices containing the $.76 charge without

having bought the new equipment." (Am. Compl. ¶ 64.) The plaintiffs allege that the defendants "grossly distorted the actual facts and circumstances," and that they told the District Attorney's Office that Bertuglia "had 'stolen a lot of money' from the Port Authority, was a 'thief' and a 'crook', and should be arrested and prosecuted." (Am. Compl. ¶¶ 65, 67.) The plaintiffs allege that these statements were made with the express intent that the plaintiffs be arrested and prosecuted, that the PA defendants continued to advocate for the plaintiffs' arrest and prosecution even after the case was referred to the District Attorney's Office, and that the PA defendants withheld exculpatory evidence from the District Attorney's Office, including that the Port Authority had continued to pay Laro on the contract despite the alleged fraud, and had even renewed the Laro contract for another three years. (Am. Compl. ¶¶ 68-70, 206.)

The plaintiffs allege that ADA Elyse Ruzow ("ADA Ruzow") of the New York County District Attorney's Office opened a criminal investigation in response to the allegations by the Port Authority defendants. (Am. Compl. ¶¶ 10, 71.) The plaintiffs allege that ADA Ruzow, in connection with her role in the District Attorney's Labor and Racketeering Unit, had been separately investigating a person named Vincent Grimaldi who had been on the phone call with Bertuglia and Charles Gargano in

7

which Bertuglia had told Gargano that he was concerned about the Port Authority's bidding process and wanted a "fair shake," and that ADA Ruzow had received a recording of the phone call. (Am. Compl. ¶¶ 101-104.) The plaintiffs allege that, despite the fact that Bertuglia had not implicated himself, Mr. Gargano or Mr. Grimaldi in any criminality in that phone call, ADA Ruzow erroneously believed that Bertuglia was withholding information about Grimaldi, and that, because of this erroneous belief, ADA Ruzow wanted to teach Bertuglia a "lesson." (Am. Compl. ¶¶ 74, 100, 103-104, 107.) The plaintiffs allege that ADA Ruzow became "enraged" when Bertuglia refused to provide information (that he did not have) that might be helpful to ADA Ruzow's other investigation, and that ADA Ruzow threatened to "ruin" Bertuglia, and to prosecute his daughter and his 80-year-old father. (Am. Compl. ¶¶ 108-111, 113.)

The plaintiffs allege that it was clear from the beginning of ADA Ruzow's investigation that there had been no criminal conduct by the plaintiffs, and that there was never "any evidence that any employee at Laro ever knowingly intended to defraud, steal or otherwise wrongfully take money" from the Port Authority, and that, despite this, ADA Ruzow "launched a 'scorched earth' investigation" into the plaintiffs. (Am. Compl. ¶¶ 72-74, 114-15, 128.) The plaintiffs allege that ADA Ruzow's

activities were approved of and encouraged by her supervisor, ADA Scotto.  (See, e.g., Am. Compl. ¶¶ 89, 116.)

The plaintiffs allege that ADA Ruzow conducted interviews with current and former Laro employees in which she pressured and induced them to give false testimony against the plaintiffs. The plaintiffs allege, for example, that ADA Ruzow told one employee, Robert Kolakowski, that Bertuglia was going to implicate him in a crime, and that Bertuglia had deprived him of insurance benefits to which he was entitled, in a successful effort to induce Kolakowski to give false testimony implicating Bertuglia in a fraud against the Port Authority.  (Am. Compl. ¶¶ 75-78.)  The plaintiffs allege that ADA Ruzow threatened to prosecute Laro employees who did not give testimony implicating the plaintiffs in a crime, and that ADA Ruzow also asked inappropriate and baseless questions about whether various members of Bertuglia's family were receiving personal benefits from Laro, including insurance and access to company cars.  (Am. Compl. ¶¶ 79-82.)

The plaintiffs also allege that ADA Ruzow, aided by defendant Schaffler, served numerous subpoenas on the plaintiffs and various third parties for the sole purpose of harassing and intimidating the plaintiffs. (Am. Compl. ¶¶ 83-86, 224-229) Various subpoenas compelled at least six Laro employees, as well as Bertuglia's daughter, to appear at ADA Ruzow's office for an

interview. (Am. Compl. ¶¶ 85-87.)  The plaintiffs allege that
some or all of these actions were taken before any grand jury
had been convened.  (Am. Compl. ¶¶ 84, 88.)

The plaintiffs also allege that ADA Ruzow and defendant
Schaffler, with ADA Scotto's encouragement, contacted at least
five specifically named Laro clients, visiting them in person
and telling them that the plaintiffs had been stealing from the
Port Authority and might also be stealing from them.  (Am.
Compl. ¶¶ 90-95, 318-325, 328-335.)  The plaintiffs allege that
ADAs Ruzow and Scotto and defendant Schaffler had no legitimate
reason for contacting these clients, that these defendants did
so for the sole purpose of inflicting harm on the plaintiffs,
and that the clients who were contacted breached their contracts
and severed their relationships with Laro as a result of these
contacts.  (Am. Compl. ¶¶ 94-99.)

The plaintiffs allege that they were indicted on August 7,
2008, and charged with one count of first degree grand larceny,
three counts of falsifying business records, and three counts of
offering a false instrument for filing.  (Am. Compl. ¶¶ 117,
119.)  The plaintiffs allege that the indictment was the result
of "false and misleading evidence" provided by the Port
Authority defendants.  (Am. Compl ¶ 118.)  The plaintiffs were
arrested and arraigned in New York State Supreme Court in
Manhattan on that same day.  (Am. Compl. ¶ 120.)  Bertuglia

posted $25,000 bail seven hours later, and was thereafter required to make multiple court appearances in connection with the criminal prosecution, and submit to "multiple restrictions on his liberty as a result of the bail conditions which had been set." (Am. Compl. ¶¶ 120-21.)  The plaintiffs allege that the actual arrest was made by Port Authority officers, "in accordance with the express directives, guidance, and advice" of ADAs Ruzow and Scotto.  (Am. Compl. ¶ 199.)

The plaintiffs allege that, after the arrest, ADAs Scotto and Ruzow created and, through the District Attorney's Office, disseminated, a press release "boasting" of Bertuglia's arrest that contained "blatantly false and misleading allegations" concerning the plaintiffs.  (Am. Compl. ¶¶ 122-24.)  The plaintiffs allege that ADAs Scotto and Ruzow contacted the press before the arrest occurred, and that, as a result, there were tabloid photographers waiting outside the courthouse when Bertuglia arrived.  (Am. Compl. ¶ 124.)  The plaintiffs allege that the ADAs proceeded to hold a press conference on the steps of the courthouse "to further publicize the false criminal charges." (Am. Compl. ¶ 124.)  The plaintiffs allege that the press release and the press conference "set off a torrent of highly damaging and prejudicial news coverage throughout the New York metropolitan region," and that Laro lost business as a direct result of this news coverage.  (Am. Compl. ¶¶ 125-27.)

On February 26, 2009, Justice Ronald Zweibel of the New York State Supreme Court dismissed the charges against Bertuglia based on the insufficiency of the evidence against him, with leave to re-present to a new grand jury. (Am. Compl. ¶ 129; see also Roque Decl. Ex. A. ("Zweibel Feb. 26 Dismissal"), at 3 ("The People's case as to Bertuglia is based on speculation as opposed to legally sufficient evidence.").) Justice Zweibel did not dismiss the indictment against Laro. (See Zweibel Feb. 26 Dismissal at 1.) The plaintiffs allege that, in April, 2009, ADAs Ruzow and Scotto decided to seek a new indictment against Bertuglia on a single charge, second degree grand larceny, based on the theory that Bertuglia "implicitly misrepresented" that Laro performed the contract for cleaning services by using the new cleaning equipment and had thereby stolen $ 50,000 from the Port Authority. (Am. Compl. ¶ 131.) The plaintiffs allege that ADAs Ruzow and Scotto then convened a second grand jury for the purpose of obtaining a new indictment against Bertuglia, even though they knew there was no probable cause to prosecute him. (Am Compl. ¶ 132.)

The plaintiffs allege that ADAs Ruzow and Scotto engaged in repeated misconduct before the second grand jury, including that they "improperly vouched for prosecution witnesses, impugned the integrity of witnesses who were favorable to the defense, and improperly introduced prior 'bad act' evidence that was not only

grossly misleading and highly prejudicial, but also, was completely irrelevant to the actual charges that had been brought against [Bertuglia]."  (Am. Compl. ¶¶ 133-34; see also Am. Compl. ¶¶ 141-55.)  The plaintiffs allege that, as a result of this misconduct, Bertuglia was indicted a second time, re-arrested, had restrictions on his travel imposed, and was forced to attend court proceedings and defend against the charges against him for the next fourteen months.  (Am. Compl. ¶¶ 135-36.)  The plaintiffs further allege that the second indictment "ended any hopes of Laro's survival," because additional clients cancelled their contracts with Laro as a result of the new indictment, including the Port Authority, which "abruptly terminated" a 2008 contract with Laro.  (Am. Compl. ¶¶ 137-38.)

On October 5, 2009, Justice Zweibel dismissed the indictment against the plaintiffs in the interests of justice. (Am. Compl. Ex. A ("Zweibel Decision"), at 44; see also Am. Compl. ¶ 139.)  The plaintiffs allege that Justice Zweibel's decision documented a litany of misconduct by ADAs Ruzow and Scotto before the grand jury, including the intentional introduction of irrelevant and prejudicial "bad act evidence," (see Am. Compl. ¶¶ 142-46; Zweibel Decision at 34-36), improper questioning of witnesses and bolstering of testimony, (Am. Compl. ¶¶ 147-50; Zweibel Decision at 30-32), and implicitly threatening one grand jury witness with a perjury charge, (Am.

13

Compl. ¶¶ 151-52; Zweibel Decision at 33).   The plaintiffs allege that Justice Zweibel found that this misconduct substantially prejudiced the plaintiffs, and rendered the ADAs' presentation of the case to the grand jury so defective that dismissal of the indictment was warranted.  (Am. Compl. ¶¶ 153-55; Zweibel Decision at 35-36.)   The plaintiffs further allege that Justice Zweibel found that there was no evidence to support the intent requirement for the charges against the plaintiffs, (Am. Compl. ¶¶ 157-66; see also Zweibel Decision at 24-29, 39-40), and that the case was "a quintessentially civil transaction gone awry" that "does not merit prosecutorial cognizance in the criminal hemisphere."  (Zweibel Decision at 37, 40; see Am. Compl. ¶¶ 167-174.)

The plaintiffs allege that they have suffered massive economic damages, including the total demise of Laro, the loss of millions of dollars in business, approximately $ 500,000 in legal fees, and the destruction of Bertuglia's reputation, without due process of law. (Am. Compl. ¶¶ 179-92, 197.)  The plaintiffs further allege that Bertuglia was arrested and imprisoned and had other conditions on his liberty imposed, suffered severe emotional distress as a result of the events alleged, and was publicly humiliated.  (See, e.g., Am. Compl. ¶ 196.)

The plaintiffs filed this lawsuit on March 29, 2011.  They filed an Amended Complaint in July, 2011.  The plaintiffs assert numerous causes of action against the PA defendants (Van Etten, Kennedy, Nestor, Schaffler, D'Aleo, and Ferrone) and the ADA defendants (Ruzow and Scotto) under 42 U.S.C. § 1983 for violations of their constitutional rights, including false arrest, malicious prosecution, malicious abuse of process, denial of the right to a fair trial, inducement of false testimony, conspiracy and "stigma-plus."  The plaintiffs have also asserted a claim against the City of New York under § 1983, alleging that the City has a policy or practice of failing to train or discipline district attorneys such that they do not commit the types of misconduct that allegedly occurred here. The plaintiffs also assert pendent state law claims for tortious interference with contract, and tortious interference with economic advantage, against PA defendant Schaffler and the ADA defendants.  The plaintiffs assert a pendent state law malicious prosecution claim against the City.

The PA defendants, the ADA defendants, and the City have each moved separately to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons explained below, the motions are **granted in part and denied in part**.

III.

The PA defendants have moved to dismiss the various claims
against them.


A.

The PA defendants first argue that all of the plaintiffs'
federal claims against them must be dismissed because they are
barred by the Rooker-Feldman doctrine.

The Rooker-Feldman doctrine provides that federal district
courts lack jurisdiction over suits that are, in substance,
appeals from state court judgments.  See Hoblock v. Albany Cnty.
Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005); see generally
Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280
(2005).  For the doctrine to apply, four requirements must be
met:  "(1) the federal-court plaintiff must have lost in state
court; (2) the plaintiff's injuries must be caused by the state
court judgment; (3) the plaintiff's claims must invite the
district court to review and reject the state court judgment;
and (4) the state-court judgment must have been rendered prior
to the commencement of the district court proceedings."  Grosso
v. Radice, No. 07 Civ. 3620, 2009 WL 749906, at *8 (E.D.N.Y.
Mar. 16, 2009) (citing Hoblock, 422 F.3d at 85).

The PA defendants admit that these requirements are not
"technically" met, because the plaintiffs were not state court

16

losers.   Indeed, the plaintiffs succeeded in having the state
court indictments against them dismissed, and thus there was no
"extant and controlling" judgment with continuing "legal effect"
in their case.  McCray v. City of New York, No. 03 Civ. 9685,
2007 WL 4352748, at *11 & n.14 (S.D.N.Y. Dec. 11, 2007).
Moreover, the PA defendants have not explained how the
plaintiffs' alleged injuries were caused by the New York State
Supreme Court's dismissal of those indictments, as opposed to
the underlying conduct by the defendants that the plaintiffs
argue resulted in, among other things, the issuance of those
indictments.  The PA defendants have not only failed to satisfy
the "technical requirements" of the Rooker-Feldman doctrine,
they have failed to satisfy the substantive requirements of the
doctrine.  Accordingly, the PA defendants' motion to dismiss on
the basis of the Rooker-Feldman doctrine is **denied**.[1]


                                **B.**

     The PA defendants next move to dismiss the plaintiffs'
first cause of action under § 1983 as a generalized repetition
of the plaintiffs' subsequent, more specific allegations of, for
example, false arrest, malicious prosecution, and malicious
abuse of process.  The plaintiffs argue in response that a

---

[1] The PA defendants withdrew at oral argument their argument that
the claims in this case are barred by the doctrine of issue
preclusion.

                                17

pattern of government misconduct is itself actionable as an independent cause of action under § 1983.

The Court of Appeals for the Second Circuit has explained that "a true pattern of harassment by government officials," where that harassment is "systematic and intentional," "may make out a section 1983 claim for violation of due process of law." Chalfy v. Turoff, 804 F.2d 20, 22-23 (2d Cir. 1986) (per curiam); see Contractors Against Unfair Taxation Instituted on New Yorkers (C.A.U.T.I.O.N.) v. City of New York, No. 93 Civ. 4718, 1994 WL 455553, at *3 (S.D.N.Y. Aug. 19, 1994) (collecting cases); see also Espanola Way Corp. v. Meyerson, 690 F.2d 827, 828 (11th Cir. 1982) (plaintiff had a cause of action sounding in due process where the plaintiff alleged issuance of "344 building code violations . . . as well as numerous fire violations," all of which were unfounded and issued "to harass and drive the [the plaintiff's h]otel out of business") (cited by Chalfy, 804 F.2d at 22).   While a plaintiff therefore may state a due process claim for a systematic pattern of harassment by government officials that is designed to destroy the plaintiff's business, these claims are difficult to maintain. See, e.g., Schultz v. Inc. Vill. of Bellport, No. 08 Civ. 0930, 2010 WL 3924751, at *7-*8 (E.D.N.Y. Sept. 30, 2010) (granting summary judgment to the defendant on the plaintiff's Chalfy claim).

Here, the plaintiffs' first cause of action does not specifically rely upon an alleged pattern of misconduct designed to destroy his business.  Rather, it asserts generally that the "[d]efendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a violation of the Constitution of the United States."  (Am. Compl. ¶ 194.)  The plaintiffs allege that the acts described in the Amended Complaint deprived the plaintiffs of their rights under "the First, Fourth, Fifth, Eighth, and Fourteenth Amendments."  (Am. Compl. ¶ 195.)  Such conclusory allegations are insufficient to state a Chalfy claim.  However, the plaintiffs do allege in other previous portions of the Amended Complaint that are incorporated by reference into the first cause of action, (Am. Compl. ¶ 193), an intentional effort by government officials, including the PA defendants, to harass Bertuglia and his family with improper subpoenas, and to drive away his clients and "ruin" his business, all for the purpose of satisfying personal or vindictive goals.  The plaintiffs allege that Schaffler, the primary PA defendant, personally lied to prosecutors in an intentional effort to initiate a baseless criminal case against the plaintiffs, and that Schaffler personally visited Laro's clients to spread negative information about the allegedly baseless criminal charges against Laro, in order (successfully) to drive Laro out of business.  (See Am.

19

Compl. ¶¶ 58-70, 90-99.)  These allegations, if proven, would
constitute a true pattern of intentional, repeated, tortious
harassment by a government official.  See Chalfy, 804 F.2d at
22.  The plaintiffs therefore have described a plausible due
process claim founded upon a "pattern of harassment" theory with
regard to PA defendant Schaffler.  The PA defendants' motion to
dismiss the first cause of action is therefore **denied** with
respect to Schaffler.

However, the plaintiffs have not pleaded that the other PA
defendants took part in the effort to visit Laro's clients and
undermine Laro's business.  Intentional government harassment
"with the objective of driving plaintiffs out of business" is
the essence of a Chafly claim.  See C.A.U.T.I.O.N., 1994 WL
455553, at *3.  Nor, in any event, have they pleaded that the
other PA defendants were involved in serving improper or
harassing subpoenas, or conducting inappropriate interviews.
The PA defendants motion to dismiss the first cause of action is
therefore **granted** with respect to the remaining PA defendants.


**C.**

The PA defendants also move to dismiss the bulk of the
other § 1983 claims in this case against the PA supervisory
defendants (Van Etten, Nestor and Kennedy) because the only

alleged basis for those defendants' liability is their status as supervisors of PA defendants Schaffler, Ferrone, and D'Aleo.

A plaintiff must plead the personal involvement of each defendant in a violation of § 1983.  "There is no respondeat superior liability in § 1983 cases." Green v. Bauvi, 46 F.3d 189, 194 (2d Cir. 1995) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 129 S. Ct. at 1948.

The law in this Circuit before Iqbal was that a plaintiff may state a claim against a supervisory defendant in a § 1983 case when the plaintiff alleges that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.
> Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

However, courts in this Circuit are divided over the question of how many of the so-called Colon factors survive in the wake of Iqbal.  Compare Martinez v. Perilli, No. 09 Civ. 6470, 2012 WL

75249, at *4 (S.D.N.Y. Jan. 5, 2012) ("[T]he five Colon categories still apply after Iqbal."), with Bellamy v. Mount Vernon Hosp., 07 Civ. 1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third Colon categories pass Iqbal's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."). Our Court of Appeals has not addressed the question directly yet, but it has indicated that at least some of the Colon factors other than direct participation remain viable.  See Rolon v. Ward, 345 F. App'x 608, 611 (2d Cir. 2009) ("A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others."); see also Scott v. Fischer, 616 F.3d 100, 108-09 (2d Cir. 2010). Moreover, it remains the case that "there is no controversy that allegations that do not satisfy any of the Colon prongs are insufficient to state a claim against a defendant-supervisor." Aguilar v. Immigration & Customs Enforcement Div. of the U.S. Dep't of Homeland Sec., 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011).

The plaintiffs allege, with regard to the PA supervisory defendants, that PA defendants Schaffler, Ferrone, and D'Aleo at all times acted "at their direction" "and/or with their express approval." (See Am. Compl. ¶¶ 59, 64, 65, 67, 69, 70).  This conclusory, formulaic language, standing alone, is not entitled to the assumption of truth.  See Iqbal, 129 S. Ct. at 1951 ("The complaint alleges that Ashcroft was the 'principal architect' of this invidious policy, . . . and that Mueller was 'instrumental' in adopting and executing it, . . . .  These bare assertions . . . amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." (quoting Twombly, 550 U.S. at 555)).  The only other allegations against the supervisory defendants are that, after Van Etten, in his capacity as Inspector General, received a complaint by Bertuglia against the Port Authority relating to the Port Authority's bidding process, and in retaliation for that complaint, "Van Etten, along with . . . Nestor and . . . Kennedy, as well as defendants [Shaffler] and Ferrone, decided to selectively investigate and prosecute [the plaintiffs], leading to this matter being referred to the New York County District Attorney's Office and ADA Ruzow." (Am. Compl. ¶¶ 105-106.)  Neither the Amended Complaint, nor any other documents relied on by it, contain further facts regarding the specifics of this decision or the manner in which the PA supervisory defendants acted to

execute it, or the nature of the supervisory defendants supervision or knowledge of the primary PA defendants.

The issue is whether those allegations can support the remaining § 1983 claims against the supervisory defendants under any theory of supervisory liability.  The Court will address in turn the remaining § 1983 claims with reference to both the supervisory and primary PA defendants.

### 1.

With regard to the plaintiffs' false arrest claim, "[u]nder New York state law, to prevail on a claim of false arrest a plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  Jocks v. Tavernier, 316 F.3d 128, 134-35 (2d Cir. 2003) (internal quotation marks omitted).  "A defendant who is not an arresting officer may be liable for false arrest if the defendant instigated an arrest by a police officer, knowing that there was no probable cause to believe that plaintiff committed a crime."  Lopez v. City of New York, 901 F. Supp. 684, 688 (S.D.N.Y. 1995); see also Weintraub

v. Bd. of Educ. of City of N.Y., 423 F. Supp. 2d 38, 56 (E.D.N.Y. 2006).[2]

In this case, the plaintiffs allege that PA defendants Schaffler, D'Aleo, and Ferrone "falsely communicated to the New York County District Attorney's Office that [Bertuglia] had committed intentional criminal misconduct by knowingly submitting invoices containing the $.76 charge without having bought the new equipment," (Am. Compl. ¶ 64), and that they "falsely told the New York County District Attorney's Office that [Bertuglia] had "stolen a lot of money" from the Port Authority, was a "thief" and a "crook", and should be arrested and prosecuted. (Am. Compl. ¶ 67-68.) The plaintiffs allege that the primary PA defendants knew that these allegations were false. (See Am. Compl. ¶¶ 61-64, 69, 72-74, 202.) The plaintiffs allege that the primary PA defendants continued to encourage the ADA defendants to arrest and prosecute the plaintiffs after the ADA defendants had begun their investigation. (Am. Compl. ¶ 69.) The plaintiffs also allege

---

[2] To state a false arrest claim under § 1983 on an instigation of false arrest theory against a private defendant based on the provision of false information to the police, the plaintiff also must allege bad faith. See Chodkowski v. City of New York, No. 06 Civ. 7120, 2007 WL 2717872, at *8-*9 (S.D.N.Y. Sept. 11, 2007). The PA defendants are state, rather than private, actors. Moreover, the plaintiffs plainly have alleged bad faith on the part of the Port Authority defendants in seeking to use the criminal justice system to retaliate against the plaintiffs for complaining about the Port Authority bidding process. (See, e.g., Am. Compl. ¶¶ 66-67, 106.)

that the PA defendants took these actions in retaliation for
Bertuglia's complaints about the bidding process.  (Am. Compl. ¶
106.)  The plaintiffs allege that the provision of this false
information by the primary PA defendants led directly to the
indictment of the plaintiffs.  (Am. Compl. ¶ 204.)

These allegations are sufficient to state a claim against
Schaffler, D'Aleo and Ferrone for false arrest, because, if
proven, they would establish the primary PA defendants, by
offering false information to state authorities, invoked the
power of the state intentionally to cause the plaintiffs'
arrest.  The alleged false accusations in the Complaint, that
Bertuglia "had 'stolen a lot of money' from the Port Authority,
[and] was a 'thief" and a "crook,'" are sufficiently specific to
survive a motion to dismiss.  See, e.g., Rivers v. Towers,
Perrin, Forster & Crosby Inc., No. 07 Civ. 5441, 2009 WL 817852,
at *3-*4 (E.D.N.Y. Mar. 27, 2009) (motion to dismiss false
arrest and malicious prosecution claims denied where the
plaintiff alleged that false claim that he had stolen laptop
computers led to his arrest).

The PA defendants argue in response that the independent
investigation by the ADA defendants broke the chain of causation
between the actions of the PA defendants and the arrest of the
plaintiffs.  However, in this Circuit, "[d]efendants . . . may
be liable for consequences caused by reasonably foreseeable

intervening forces," where, for example, they "deceive[] the subsequent decision maker," or where they "could reasonably foresee that [their] misconduct would contribute to an independent decision that results in a deprivation of liberty." Higazy v. Templeton, 505 F.3d 161, 177 (2d Cir. 2007) (citations, alterations, and quotation marks omitted). Here, the plaintiffs assert that the PA defendants continued to urge the ADA defendants to arrest the plaintiffs based on information that the PA defendants knew was false. (Am. Compl. ¶ 69.) Under these circumstances, the subsequent investigation and arrest of the plaintiffs by the ADA defendants does not relieve the PA defendants of liability. Accordingly, the PA defendants motion to dismiss the false arrest claim is **denied** as to Schaffler, Ferrone, and D'Aleo.[3]

---

[3] The PA defendants have not argued that they cannot be liable for the false arrest in violation of § 1983 because the plaintiffs were only arrested after a grand jury returned an indictment. A warrant predicated on a grand jury indictment bars a false arrest claim, requiring the plaintiff to proceed instead on a theory of malicious prosecution. See Coakley v. Jaffe, 72 F. Supp. 2d 362, 364 (S.D.N.Y. 1999), aff'd, 234 F.3d 1261 (2d Cir. 2000) (table). While this argument is particularly relevent for prosecutors, who possess absolute immunity for their actions in connections with their advocacy before the grand jury, it can also be made by the police, who possess qualified immunity, and even by private individuals. See id. (collecting cases). However, the PA defendants have not yet made this argument, and therefore it would be inappropriate to dismiss this claim on that basis, particularly when the plaintiffs have also asserted a claim for malicious prosecution against these defendants that must proceed in any event.

With regard to the supervisory PA defendants, the only non-conclusory allegation by the plaintiffs is that the supervisory defendants "decided to selectively investigate and prosecute" the plaintiffs in retaliation for complaints about the Port Authority's bidding process.  (Am. Compl. ¶¶ 104-106.)  There are no specific allegations that the supervisory defendants themselves provided false information to the ADA defendants, or indeed that they knew that information provided by subordinates was false; that they created a policy or practice of providing such false information; that they were grossly negligent in supervising the primary PA defendants with regard to their providing the false information; or that they had the opportunity to stop what they knew was a false arrest and did not do so.  See, e.g., Rahman v. Fisher, 607 F. Supp. 2d 580, 585-86 (S.D.N.Y. 2009).  Accordingly, the motion to dismiss the false arrest claim as against the supervisory PA defendants is **granted**.

### 2.

"A malicious prosecution claim under New York law requires the plaintiff to prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation

for defendant's actions." <u>Jocks</u>, 316 F.3d at 136.  With regard
to the "initiation" requirement, "it must be shown that
defendant played an active role in the prosecution, such as
giving advice and encouragement or importuning the authorities
to act." <u>Rohman v. N.Y.C. Transit Auth.</u>, 215 F.3d 208, 217 (2d
Cir. 2000).  The analysis of the malicious prosecution claim
with regard to this requirement is substantially the same as the
analysis for the false arrest claim, and need not be repeated.
The plaintiffs have alleged that the primary PA defendants
actively encouraged the prosecution of the plaintiffs while
providing false information that served as a basis for that
prosecution. (<u>See, e.g.</u>, Am. Compl. ¶¶ 61-74.)  However, they
have not alleged sufficient facts to allow the reasonable
inference that the supervisory PA defendants were personally
involved in offering any encouragement, or even that the
supervisory PA defendants knew that the primary PA defendants
were doing so.  Accordingly, the motion to dismiss the malicious
prosecution claim as against the supervisory defendants is
**granted**.[4]

---

[4] It is insufficient for the plaintiffs to rely on group pleading
against all the PA defendants without making specific factual
allegations against the individual defendants, particularly
where the primary PA defendants and the supervisory PA
defendants are not similarly situated. (<u>See, e.g.</u>, Am. Compl.
¶¶ 201-219.)

The PA defendants argue that, with regard to the remaining
primary defendants, the plaintiffs have not pleaded actual
malice.  However, the plaintiffs have pleaded that the PA
defendants prosecuted the plaintiffs in order to retaliate
against them as part of an ongoing dispute, and, moreover, the
plaintiffs have pleaded that the PA defendants knew that there
was no evidence of criminality against the plaintiffs, and no
probable cause for their prosecution, when they encouraged and
instigated a criminal prosecution against the plaintiffs.  (Am.
Compl. ¶¶ 61-74, 201-219.)  Where, as here, the plaintiffs
allege that the defendants knowingly instigated and aided the
prosecution without any evidence whatsoever, malice may be
inferred.  See, e.g., Cruz v. City of New York, No. 08 Civ.
8640, 2010 WL 3020602, at *6 (S.D.N.Y. July 27, 2010); see also
Cameron v. City of New York, 598 F.3d 50, 69 (2d Cir. 2010).
Accordingly, the motion to dismiss the malicious prosecution
claim as against the primary PA defendants is **denied**.


### 3.

The defendants also seek to dismiss the plaintiffs' § 1983
claim for deprivation of the right to a fair trial.  "Pursuant
to § 1983 and prevailing case law, denial of a right to a fair
trial is a separate and distinct cause of action."  Nibbs v.
City of New York, 800 F. Supp. 2d 574, 575 (S.D.N.Y. 2011); see

generally Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123 (2d
Cir. 1997).  A plaintiff may state a § 1983 fair trial claim by
pleading that the defendants fabricated evidence and forwarded
it to the prosecutors, and that the fabricated evidence was
"likely to influence a jury's decision."  Id. at 130.  "[C]ourts
in this District have regularly found Ricciuti to stand for the
proposition that a claim for denial of a right to a fair trial
may be brought alongside one for malicious prosecution even
where both are supported by the same evidence."  Nibbs, 800 F.
Supp. 2d at 576 (collecting cases).  Moreover, a  § 1983 fair
trial claim does not require that a plaintiff actually go to
trial; in Ricciuti itself, the charges against the plaintiff
were dismissed before trial.  See Ricciuti, 124 F.3d at 127; see
also Douglas v. City of New York, 595 F. Supp. 2d 333, 346
(S.D.N.Y. 2009) ("The Second Circuit has permitted a claim under
§ 1983 for violation of the right to a fair trial to proceed
even where no trial took place.").  The issue is whether the
plaintiffs have pleaded sufficient facts to state a § 1983 fair
trial claim.

The plaintiffs allege that the primary PA defendants
knowingly provided false information to prosecutors;
specifically, the primary PA defendants allegedly told
prosecutors that Bertuglia "had stolen a lot of money" from the
Port Authority, and was a "thief" and a "crook."  (Am. Compl. ¶¶

67, 203.)  The defendants argue that these allegations are insufficient because, even if true, the primary PA defendants were merely expressing an opinion, and thus their assertions to the ADA defendants about Bertuglia's stealing from the Port Authority do not constitute fabricated evidence.  This argument is unpersuasive.  The plaintiffs have pleaded that the defendants had no evidence to support the claim that Bertuglia knew that the Port Authority was being charged more than it should be on the contract with Laro, or that the contract was not being performed as required, or that Bertuglia intended to steal from the Port Authority, or that any criminal violation had occurred.  (See Am. Compl. ¶¶ 61-64, 69, 72-74, 202.) Accepting those allegations as true, it is plain that a statement to prosecutors that Bertuglia was a "thief" and "stole a lot of money" would have been false statements of fact.  Such claims, if made to a jury, would likely affect its verdict. Accordingly, the motion to dismiss the § 1983 fair trial is **denied** as against the primary PA defendants.

However, the plaintiffs have not pleaded that the PA supervisory defendants made any such false statements, or took such specific action or inaction as to make them liable for those false statements.  Accordingly, the motion to dismiss the § 1983 fair trial is **granted** as to the supervisory defendants.

**D.**

The PA defendants move to dismiss the § 1983 stigma plus claim against all of the PA defendants.  "To establish a 'stigma plus' claim, a plaintiff must show (1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'"  Vega v. Lantz, 596 F.3d 77, 81 (2d Cir. 2010) (quoting Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004) (Sotomayor, J.)).  The deprivation of a property interest will satisfy the second, or "plus" prong of the stigma plus test.  See Greenwood v. N.Y. Office of Mental Health, 163 F.3d 119, 124 (2d Cir. 1998); see also Vega, 596 F.3d at 81 ("[A]n action can be grounded in 42 U.S.C. § 1983 when that plaintiff can demonstrate 'a stigmatizing statement plus a deprivation of a tangible interest.'" (quoting Algarin v. Town of Walkill, 421 F.3d 137, 138 (2d Cir. 2005)).  "However, deleterious effects [flowing] directly from a sullied reputation, standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine"; rather, there must be a material, government-imposed burden "in addition to" and temporally proximate to, the stigmatizing statement.  Sadallah, 383 F.3d at 38 (internal quotation marks omitted); see also Doe v. Dep't of Pub. Safety ex rel. Lee, 271

F.3d 38, 54 (2d Cir. 2001), <u>rev'd on other grounds sub nom.</u>,
<u>Conn. Dep't of Pub. Safety v. Doe</u>, 538 U.S. 1, 6-7 (2003) (the
plus factor must be "some material indicium of government
involvement beyond the mere presence of a state defendant to
distinguish his or her grievance from the garden-variety
defamation claim") (citing <u>Paul v. Davis</u>, 424 U.S. 693, 701
(1976)).

The plaintiffs have not pleaded any facts to show that any
of the supervisory PA defendants made any allegedly stigmatizing
statements or were involved in any stigmatizing statements by
the primary PA defendants.  Accordingly, the motion to dismiss
the stigma plus claims is **granted** as against the supervisory
defendants.

With regard to the primary PA defendants, the Complaint
indicates that the derogatory, false statements were those
contained in a press release about the plaintiffs' arrest.  (Am.
Compl. ¶¶ 248-250.)  However, the Complaint does not allege that
any of the PA defendants were personally involved in the
drafting or dissemination of that press release, and the
plaintiffs therefore cannot establish a stigma plus claim
against any of the PA defendants on that basis.  However, the
plaintiffs do plead that PA defendant Schaffler contacted Laro's
clients and told them Laro was stealing from the Port Authority,
and might have stolen from them, too.  (Am. Compl. ¶¶ 91, 320-

34

21.)[5]  Such accusations are plainly sufficiently derogatory to injure the plaintiffs' reputation.  See, e.g., LaForgia v. Davis, No. 01 Civ. 7599, 2004 WL 2884524, at *7 (S.D.N.Y. Dec. 14, 2004) ("[C]harges of dishonesty, immorality or illegality are statements beyond plaintiff's power to correct and . . . establish[] stigmatization.").  Moreover, the plaintiffs have pleaded that these statements were false, and that Schaffler knew when he made those statements that there was no evidence that the plaintiffs intended to take money that was not rightfully owed to them under the contract from the Port Authority.  (See Am. Compl. ¶¶ 51, 61-62, 74, 321-23.)  The claim that the plaintiffs were "stealing" is capable of being proven false.  The first prong of the test is plainly satisfied with regard to defendant Schaffler.

     With regard to the second, "plus" prong, the Amended Complaint alleges that the plaintiffs lost current contracts and opportunities to bid on future contracts.  However, to the

_____

[5] The "stigma plus" claim under § 1983 against the PA defendants is based on the allegedly "false and misleading information provided to the press." (Am. Compl. ¶¶ 248-52.)  In their opposition to the current motion, the plaintiffs argued that the claims also applied to information provided to other third parties, and the claim did recite a formulaic incorporation of other allegations. (Am. Compl. ¶ 247.)  In their reply, the PA defendants did not object to this broadening of the apparent breadth of the claim, and responded to it on the merits.  The Court will therefore consider the allegations of information provided to other third parties other than the press as a basis for this claim.

extent that the Amended Complaint alleges that these losses were the direct result of the stigmatizing statements made by the defendants, those losses fail to satisfy the "plus prong."  See Sadallah, 383 F.3d at 38.  However, the plaintiffs have also pleaded the cancellation of their lucrative Port Authority Bus Terminal contract by the Port Authority.  (See Am. Compl. ¶ 137.)  The plaintiffs have further pleaded that they were falsely arrested by the Port Authority police, and, as a result, deprived of their liberty.  (See Am. Compl. ¶ 199.)  Accepting these allegations as true, the cancellation of the contract, and the arrest of the plaintiffs and the resulting liberty deprivation they endured, were indicia of government involvement "in addition to" the stigmatizing statements.  Sadallah, 383 F.3d at 38.[6]  The defendants motion to dismiss the stigma plus claim is therefore **denied** as to defendant Schaffler and **granted** as tom the remaining PA defendants.

**E.**

The PA defendants move to dismiss the § 1983 selective prosecution claim against the PA supervisory defendants.  To state a selective prosecution claim, the plaintiffs must plead

---

[6] The defendants do not appear to argue that the alleged stigmatizing statements and the alleged "plus" lacked the requisite "proximity" for the creation of a "stigma-plus liberty interest."  See Velez v. Levy, 401 F.3d 75, 89 & n.12 (2d Cir. 2005).

first that "compared with others similarly situated, [they were]
selectively treated," and second, that "such selective treatment
was based on impermissible considerations such as . . . intent
to inhibit or punish the exercise of constitutional rights, or
malicious or bad faith intent to injure a person." Crowley v.
Courville, 76 F.3d 47, 52-53 (2d Cir. 1996). "Demonstrating
that a plaintiff has been treated differently is the sine qua
non of a . . . selective enforcement violation." Kamholtz v.
Yates Cnty., 350 F. App'x 589, 591 (2d Cir. 2009) (summary
order) (internal quotation marks, alteration and citation
omitted); see also D.F. ex rel. Finkle v. Bd. of Educ. of
Syosset Cent. Sch. Dist., 386 F. Supp. 2d 119, 128 (E.D.N.Y.
2005), aff'd, 180 F. App'x. 232 (2d Cir. 2006) (summary order)
(conclusory allegations of different treatment fail to state a
selective treatment claim).

The PA defendants argue that there is no specific factual
allegation in the Amended Complaint that the plaintiffs were
treated differently from similarly situated individuals.  This
is correct.  The Amended Complaint alleges that the plaintiffs,
because of Bertuglia's exercise of his First Amendment rights in
criticizing the Port Authority's bidding process, were
investigated "more vigorously than ordinary police practices
would dictate under similar circumstances," (Am. Compl. ¶ 260),
but it does not allege any other instance where another person

or entity was investigated or not investigated under similar circumstances.  Cf. Kennie v. White Plains Police Dep't Vice Control Unit, 108 F.3d 1369, 1997 WL 138849, at *2 (2d Cir. 1997) (table).  The issue is whether the plaintiffs were, on the basis of their protected speech, treated differently from "others similarly situated," not whether the plaintiffs were treated differently from what "ordinary police practices" would dictate on that basis.  See Kamholtz, 350 F. App'x at 591 ("Appellant failed to allege any facts showing that he was treated differently than others similarly situated; in fact, appellant failed to compare his situation to that of anyone else.")  While the plaintiffs noted at oral argument that they mention another company, their competitor Guardian Maintenance, in the Complaint, they do not allege that any of the supervisory defendants treated Guardian differently with regard to an investigation or a complaint.  (See Am. Compl. ¶¶ 104-106, 255.) Accordingly, the motion to dismiss the selective prosecution claim against the PA supervisory defendants is **granted.**

**F.**

The PA defendants also move to dismiss the two § 1983 claims that were asserted against Schaffler: malicious abuse of process and inducement of false testimony.[7]

**1.**

In New York, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003).

The defendants argue that, because there is no allegation in the Complaint that Schaffler personally issued subpoenas or was involved with their issuance, this claim must fail. Some district courts in this Circuit have found that promoting the issuance of process for illegitimate ends by lying to prosecutors with the requisite harmful intent is sufficient to state a claim for malicious abuse of process. See Rivers, 2009 WL 817852, at *5; but see Morse v. County of Seneca, No. 08 Civ. 6231, 2009 WL 2762304, at *4 (W.D.N.Y. Aug. 26, 2009). This

---

[7] While Schaffler was the only PA defendant on these claims, they were also asserted against the ADA defendants.

Court need not address that issue, because the plaintiffs did plead that "defendants," a term that, in context, refers to the ADA defendants and Schaffler, issued subpoenas. (See, e.g. Am. Compl. ¶ 228.)[8]  Whether it is likely that Schaffler actually was involved in issuing or serving these subpoenas is an issue of fact that the Court cannot decide at the pleadings stage.  The defendants' motion to dismiss the abuse of process claim against defendant Schaffler is **denied**.

### 2.

The Court of Appeals for the Second Circuit has explained that "in order to state a legally sufficient claim for the manufacture of false evidence, a plaintiff must colorably allege that this evidence was used against him to cause a constitutional injury."  Rolon v. Henneman, 517 F.3d 140, 148 (2d Cir. 2008) (Sotomayor, J.); see generally Zahrey v. Coffey, 221 F.3d 342, 353-54 (2d Cir. 2000).

The Complaint alleges that "Schaffler, acting on behalf of defendant [ADA] Ruzow and under her direct supervision, . . . harassed, threatened, intimidated, manipulated, and coerced . . . witnesses to give false "bad act" evidence against [Bertuglia]." (Am. Compl. ¶ 236.)  The Complaint also alleges that "[a]t least one of these witnesses, Robert Kolakowski, did

---

[8] The plaintiffs reasserted this contention at oral argument.

in fact give false testimony to the Grand Jury as a direct result of the pressure and coercion of ADA Ruzow." (Am. Compl. ¶ 237.) The defendants argue that there are no factual allegations that tie Schaffler to any false testimony or evidence given by third-party witnesses. This is plainly correct; the only witness specifically named in the complaint who allegedly gave false testimony as a result of coercion is Mr. Kolakowski, and his testimony is attributed specifically to the "coercion of ADA Ruzow." Because there is no sufficient allegation that false testimony by a third party was elicited by Schaffler and then used against the plaintiffs, the motion to dismiss the § 1983 inducement of false testimony claim against Schaffler is **granted.**


## G.

The defendants next move to dismiss the § 1983 conspiracy claim against the PA defendants. "The Second Circuit Court of Appeals has found that to survive a motion to dismiss a claim for conspiracy to violate § 1983 a plaintiff must allege: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Bullard v. City of New York, 240 F. Supp. 2d 292, 301 (S.D.N.Y. 2003) (citing

41

Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999)).
"[C]onclusory allegations of conspiracy are insufficient to
survive a motion to dismiss." Sudler v. City of New York, No.
08 Civ. 11389, 2010 WL 68095, at *12 (S.D.N.Y. January 8, 2010)
(citing Iqbal, 129 S. Ct. at 1949) (collecting cases), report
and recommendation adopted, 2010 WL 726964 (S.D.N.Y. Feb 19,
2010).  "A plaintiff must allege facts that plausibly suggest a
'meeting of the minds' and provide some details of time and
place." AK Tournament Play, Inc. v. Town of Wallkill, No. 09
Civ. 10579, 2011 WL 197216, at *3 (S.D.N.Y. Jan. 19, 2011)
(citing Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y.
2000), aff'd, 444 F. App'x 475 (2nd Cir. Oct. 28, 2011) (summary
order).  Moreover, "absent an underlying constitutional
violation on which to base a § 1983 conspiracy claim, a
plaintiff's conspiracy claim fails as a matter of law."  Id.

        The defendants argue that the allegations of a conspiracy
against the PA defendants are too vague and conclusory to state
a claim.  In response, the plaintiff notes that there are
specific allegations in the complaint detailing the alleged
cooperation between ADA Ruzow and PA defendant Schaffler to
commit the underlying § 1983 violations discussed above, for the
common purpose of harassing, harming, and retaliating against
the plaintiffs.  (See, e.g., Am. Compl. ¶¶ 90-96, 233-240.)  The
allegation that Schaffler and Ruzow together served coercive

subpoenas, together visited Laro's clients in order to stigmatize his business, and together harassed potential witnesses are sufficient to suggest plausibly that there was a genuine meeting of the minds between Schaffler and Ruzow. Accordingly, the motion to dismiss the conspiracy claim is **denied** as against defendant Schaffler.

The plaintiffs do not indicate where in the complaint they plead facts that plausibly support a meeting of the minds between any of the other PA defendants and an actor outside of the Port Authority.  The conclusory allegation that the PA defendants and the ADA defendants "conspired and acted in concert," (Am. Compl. ¶ 242), is insufficient to state a claim where it is not supported by additional factual allegations describing the alleged conspiracy.  Moreover, any factual allegations that the PA defendants conspired together are legally insufficient, because the intracorporate immunity doctrine generally bars conspiracy claims against employees of the same corporation.  See AK Tournament Play, 2011 WL 197216 at *4; see also Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 461 (E.D.N.Y. 2011) ("[O]fficers, agents and employees of a single corporate entity are legally incapable of conspiring together while acting within the scope of their employment.") (citation omitted).  The allegations against the other PA defendants are, in any event,

too conclusory to state a claim.  The only reference to an agreement among them is the decision allegedly made by the supervisory defendants, along with the primary defendants, to investigate and prosecute Bertuglia in a selective fashion. (Am. Compl. ¶ 106.)  This allegation, as explained above, pleads insufficient facts to state an underlying constitutional violation.  Accordingly, the motion to dismiss the conspiracy claim against the remaining PA defendants is **granted**.

### H.

The PA defendants next move to dismiss the state law claims for tortious interference with contract and tortious interference with prospective economic advantage against defendant Schaffler.[9]

### 1.

"The elements of tortious interference with a contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." Advanced Marketing Group, Inc. v. Bus. Payment Sys., LLC, 300 F. App'x 48, 50 (2d Cir. 2008) (summary order) (quoting Kirch v. Liberty

---

[9] These claims are also asserted against the ADA defendants.

Media Corp., 449 F.3d 388, 401 (2d Cir. 2006)).  "[A] plaintiff must show that the third party would not have breached the contract but for the activities of the defendant."  St. John's Univ. v. Bolton, 757 F. Supp. 2d 144, 172 (E.D.N.Y. 2010) (internal quotation marks omitted).

The PA defendants contest only whether the plaintiffs have pleaded that Schaffler intentionally induced Laro's clients to breach their contracts with Laro by telling them that Laro and Bertuglia had stolen from the Port Authority, and that they might be stealing from them, too.  (See Am. Compl. ¶ 321.)  This allegation is plainly sufficient to support intentional inducement at the pleadings stage.  "An actor intentionally procures a breach of a third party's contract even where the breach 'is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.'"  St. John's Univ., 757 F. Supp. 2d at 173 (quoting RESTATEMENT (SECOND) OF TORTS § 766 cmt. j. (1979)).  Here, it would be reasonable to infer from the facts alleged that Schaffler knew that the Laro clients he contacted would breach their contracts with Laro as a result of being told by another, major Laro client, accompanied by a state prosecutor, that Laro and Bertuglia had stolen from one client and might be stealing from others.  Indeed, the plaintiffs explicitly allege that specific companies breached their contracts with Laro "as a direct

result" of the false statements by Schaffler and ADA Ruzow to them about the alleged misconduct by Laro and Bertuglia.  (Am. Compl. ¶ 325.)  Accordingly, the motion to dismiss the tortious interference with contract claim against Schaffler is **denied.**

### 2.

To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must "establish four elements: (1) the existence of a profitable business relationship, (2) [the defendant's] interference with that relationship, (3) [the defendant's] use of dishonest, unfair or improper means, and (4) damage to [the plaintiff's] business relationships." Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y. 1997).  The New York Court of Appeals has explained that "the defendant's conduct must amount to a crime or an independent tort.  Conduct that is not criminal or tortious will generally be . . . insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004).  Where an independent tort has not been alleged, a plaintiff may also state a claim by alleging that the defendant has "engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiffs." Id. (internal quotation marks omitted); see also

RFP LLC v. SCVNGR, Inc., 788 F. Supp. 2d 191, 196 (S.D.N.Y. 2011) ("A claim of tortious interference with prospective economic advantage requires a showing of interference with business relations existing between the [claimant] and a third party, either with the sole purpose of harming the claimant or by means that are dishonest, unfair or in any other way improper.") (internal quotation marks omitted).

The PA defendants argue that the plaintiffs' claim against Schaffler must fail because the plaintiffs have not pleaded improper means.  However, the plaintiffs have pleaded that Schaffler made misrepresentations about the plaintiffs' professional honesty.  See Software AG, Inc. v. Consist Software Solutions, Inc., No. 08 Civ. 389, 2008 WL 563449, at *19 (S.D.N.Y. Feb. 21, 2008) ("[M]isrepresentations to consumers are recognized as 'wrongful means' that support of claim for tortious interference with prospective business relations.") aff'd, 323 F. App'x 11 (2d Cir. 2009) (summary order); see also Amaranth LLC v. J.P. Morgan Chase & Co., 888 N.Y.S.2d 489, 494 (App. Div. 2009) ("Defamation is a predicate wrongful act for a tortious interference claim.").  Moreover, the plaintiffs have also pleaded that Schaffler and ADA Ruzow "made these statements solely out of malice, with the express purpose of interfering with plaintiffs' business relationships with these third parties."  (Am. Compl. ¶ 333.)  Accordingly, the motion to

dismiss the tortious interference with prospective economic advantage claim against Schaffler is **denied.**

### IV.

The plaintiffs assert the following claims against the ADA defendants: false arrest, malicious abuse of process, inducement of false testimony and conspiracy, all under § 1983, as well as state law claims for tortious interference with contract and tortious interference with prospective economic advantage.  The ADA defendants have moved to dismiss these claims.

### A.

The ADA defendants first argue that all of the plaintiffs' claims against them are barred by the doctrine of absolute prosecutorial immunity.

"Prosecutors are generally immune from liability under 42 U.S.C. § 1983 for conduct in furtherance of prosecutorial functions that are intimately associated with initiating or presenting the State's case." Flagler v. Trainor, 663 F.3d 543, 546 (2d Cir. 2011) (citing Imbler v. Pachtman, 424 U.S. 409, 427–28 (1976).  Courts employ a functional test in determining whether a prosecutor's actions are covered by absolute immunity. See, e.g., Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010).

The Court of Appeals for the Second Circuit has recently
explained that

> [prosecutorial] immunity is not a function of the
> prosecutor's title.  Prosecutors are absolutely immune from
> suit only when acting as advocates and when their conduct
> involves the exercise of discretion. Thus, the Supreme
> Court has found prosecutors absolutely immune from suit for
> alleged misconduct during a probable cause hearing, in
> initiating a prosecution, and in presenting the State's
> case.  On the other hand, the Court has withheld absolute
> immunity for conduct unrelated to advocacy, such as giving
> legal advice, holding a press conference, or acting as a
> complaining witness.

Flagler, 663 F.3d at 547 (internal citations omitted).  The

Supreme Court has further explained that "absolute immunity may

not apply when a prosecutor is not acting as 'an officer of the

court,' but is instead engaged in other tasks, say,

investigative or administrative tasks." Van de Kamp v.

Goldstein, 555 U.S. 335, 342, 344 (2009) (holding that

"prosecutors involved in . . . supervision or training or

information-system management enjoy absolute immunity" from

claims arising from such "administrative obligation[s]" when

those obligations are "directly connected with the conduct of a

trial"); see also Buckley v. Fitzsimmons, 509 U.S. 259, 273

(1993) ("A prosecutor's administrative duties and those

investigatory functions that do not relate to an advocate's

preparation for the initiation of a prosecution or for judicial

proceedings are not entitled to absolute immunity.").

Presenting evidence to the grand jury in seeking an indictment "lie[s] at the very core of a prosecutor's role as an advocate engaged in the judicial phase of the criminal process." Bernard v. County of Suffolk, 356 F.3d 495, 503 (2d Cir. 2004); accord Burns v. Reed, 500 U.S. 478, 490 & n.6 (1991).

The plaintiffs do not dispute that the ADA defendants' conduct before the grand jury is subject to absolute immunity. They argue, however, that their claims relate solely to the ADA defendants' actions that took place outside the grand jury, and outside their role as advocates.  The "ultimate question" is whether the ADA defendants, in committing the conduct alleged in support of the claims against them, were acting as advocates. Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996) (internal quotation marks omitted).  If they were, they are immune from suits arising from those actions.  The burden is on the party asserting absolute immunity.  See, e.g., id.  "District courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery.  This is because an absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." Conte v. County of Nassau, No. 06 Civ. 4746, 2010 WL 3924677, at *7 (E.D.N.Y. Sept. 30, 2010) (alterations and internal quotation marks omitted).

**1.**

The Complaint alleges that no grand jury had been convened at the time that ADA Ruzow issued at least some of the subpoenas and conducted some of the interviews at issue. (See Am. Compl. ¶¶ 86, 88.)  The first issue is whether misconduct surrounding subpoenas issued or interviews conducted by a prosecutor before the convening of a grand jury is protected by absolute immunity. There is some authority for the proposition that subpoenas issued before a grand jury is convened come under the "investigative" rather than "advocacy" function of a prosecutor, and are therefore not entitled to absolute immunity.  See Conte, 2010 WL 3924677, at *22; Coakley v. Jaffe, 49 F. Supp. 2d 615, 627-28 nn. 11-12 (S.D.N.Y. 1999); Rodrigues v. City of New York, 602 N.Y.S.2d 337, 341-42 (App. Div. 1993); but see Hirschfeld v. City of New York, 686 N.Y.S.2d 367, 370 (App. Div. 1999) ("There is no requirement that the People open a Grand Jury proceeding prior to the return date of a Grand Jury subpoena.") (holding that prosecutors were entitled to absolute immunity against abuse of process claim), lv. to appeal denied, 719 N.E.2d 922.

The ADA defendants argue that, because the Port Authority had already conducted its own investigation on Bertuglia and Laro and forwarded it to the ADA defendants, (see Am. Compl. ¶ 71), the ADA defendants had already zeroed in on a suspect and

were therefore acting as advocates when they issued the first
subpoena.  Under Buckley, if the ADA defendants were
"prepar[ing] for the initiation of a prosecution or for judicial
proceedings" they would be entitled to absolute immunity.  509
U.S. at 273.  Whether the ADA defendants already had made the
decision to seek an indictment when they issued the first
subpoenas and began conducting interviews in this case, and
could therefore be considered to be preparing to present their
case to the grand jury and initiate a prosecution, rather than
investigating whether any criminality existed, is a factual
dispute that cannot be resolved on this motion.  Indeed, the
parties dispute as a factual matter whether a grand jury had
been convened by the return date of some of the subpoenas at
issue.  Accordingly, the record is insufficient to determine
whether the ADAs' actions prior to the convening of the grand
jury are protected by absolute immunity.


## 2.

The next issue is whether the ADA defendants' activities in
conducting interviews and subpoenaing witnesses after the grand
jury had been convened were entitled to absolute immunity.
These actions were plainly taken in the ADA defendants' roles as
advocates, because they were in the process of gathering and
presenting evidence to the grand jury.  See, e.g., id. (immunity

includes "the professional evaluation of the evidence assembled
by the police and appropriate preparation for its presentation
at trial or before a grand jury after a decision to seek an
indictment has been made."). Moreover, any subpoenas issued or
interviews conducted between the dismissal of the first
indictment and the issuance of the second indictment were also
covered by absolute immunity. The State Supreme Court retained
jurisdiction over the prosecution of the plaintiffs after the
dismissal of the first indictment, and explicitly granted the
ADA defendants time to convene another grand jury and seek a
second indictment. (See Zweibel Feb. 26 Dismissal at 3-4;
Rocque Decl. Ex. B (Order of Justice Zweibel extending the
People's time to re-file charges against Bertuglia).) Because a
judicial proceeding was therefore ongoing, the ADA defendants
are also entitled to absolute immunity for their actions during
this period.

It is true that, to the extent that the ADA defendants
conducted interviews or issued subpoenas "without any colorable
claim of authority," then they would not be entitled to absolute
immunity even when functioning as advocates. Shmueli v. City of
New York, 424 F.3d 231, 237 (2d Cir. 2005) (citing Barr v.
Abrams, 810 F.2d 358, 361 (2d Cir. 1987)). However, there is no
allegation in the Amended Complaint that any parties were
interviewed who were so categorically unrelated to Bertuglia or

Laro that they could not have in any way furthered the Grand Jury's investigation.  Cf. United States v. Mandujano, 425 U.S. 564, 571 (1976) ("[T]he law vests the grand jury with substantial powers, because '[t]he grand jury's investigative power must be broad if its public responsibility is adequately to be discharged.'" (quoting United States v. Calandra, 414 U.S. 338, 344, (1974) (second alteration in original)).  Rather, the Amended Complaint alleges that the ADA defendants interviewed Bertuglia's and Laro's employees, clients, and family, and asked improper questions and made threats.  (See, e.g., Am. Compl. ¶¶ 79-80.)  To the extent that the Amended Complaint alleges that the ADA defendants engaged in misconduct through improper lines of questioning or threats while interviewing or evaluating potential grand jury witnesses, that conduct—interviewing potential grand jury witnesses—is plainly within the power of a prosecutor, and is protected by absolute immunity.  See, e.g., Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994) ("[A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include . . . allegedly conspiring to present false evidence at a criminal trial.").[10]  As the Court of Appeals for the Second Circuit has

_____

[10] Zahrey v. Coffey is not to the contrary.  In Zahrey, the plaintiff brought claims against a prosecutor for fabricating

recognized, even alleged reprehensible prosecutorial conduct is protected by absolute immunity because "there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the performance of their duties." Id.

Accordingly, based on the pleadings, the ADA defendants' actions in issuing subpoenas and interviewing potential grand jury witnesses after the convening of a grand jury constituted advocacy, were protected by absolute immunity, and cannot serve as the basis for a claim in this case.

### 3.

The next issue is whether the ADA defendants have absolute immunity for the press release that they allegedly issued, and the alleged subsequent press conference. (See Am. Compl. ¶¶ 122-27.) Plainly they do not. The Court of Appeals for the Second Circuit has recently affirmed that "statements to the media are not entitled to absolute immunity." Flagler, 663 F.3d at 549 (quoting Buckley, 509 U.S. at 277). Rather, they are

---

evidence. On appeal, the prosecutor conceded only for the purposes of the appeal that he was acting in his investigative capacity, and only entitled to qualified immunity. 221 F.3d at 347. The prosecutor reserved the right to argue on remand that he was actually acting in his function as an advocate if he did not prevail on qualified immunity grounds, and the Court of Appeals therefore expressly did not hold that absolute immunity does not apply to a prosecutor who induces false testimony or fabricates evidence. Id.

entitled to qualified immunity.  Id.  The ADA defendants have
not relied on qualified immunity as a basis to dismiss any
claims against them.

### 4.

The next issue is whether the ADA defendants have absolute
immunity for allegedly contacting Laro's clients and telling
them about the criminal investigation.  The Amended Complaint
alleges that ADA Ruzow and Schaffler contacted Laro's clients in
order to induce them to breach their contracts with Laro.  (See
Am. Compl. ¶¶ 93-94.)  The Amended Complaint further alleges
that "[t]here was no legitimate investigative reason why [Ruzow
and Schaffler] needed to speak with any of these customers, much
less inform them of the indictment against" the plaintiffs.
(Am. Compl ¶ 98 (emphasis omitted).)  The plaintiffs appear to
argue that these alleged contacts, like "[c]omments to the
media[,] ha[d] no functional tie to the judicial process" and
did "not involve the initiation of a prosecution, the
presentation of the state's case in court, or actions
preparatory for these functions."  Buckley, 509 U.S. at 277-278.

However, by the terms of the Amended Complaint, the
plaintiffs had already been indicted when Ruzow and Schaffler
contacted Laro's clients, and Ruzow and Schaffler alerted the
clients to the indictment over the course of their contacts with

the clients.  Whether or not these contacts were improper, the
Complaint does not allege facts that create a plausible
inference that Ruzow was not acting as an advocate seeking to
strengthen her case against an indicted defendant by seeking
information from the defendants' clients.  Cf. Deskovic v. City
of Peekskill, Nos. 07 Civ. 8150, 07 Civ. 9488, 2009 WL 2475001,
at *14 (S.D.N.Y. Aug. 13, 2009) ("Although Buckley did not
explicitly hold that all witness interviews conducted after
indictment are advocatory in nature, the Court's reasoning
strongly indicates that many, perhaps most, such interviews are
likely to be advocatory rather than investigative.") (quoting
Cousin v. Small, 325 F.3d 627, 633 (5th Cir. 2003).  While the
Complaint conclusorily alleges that there was "no legitimate
investigative reason" to contact the Laro clients, (Am. Compl.
¶ 98), the actual facts alleged are plainly consistent with an
attempt to secure additional negative information against the
plaintiffs in an effort, however illegitimate or improper, to
aid the ongoing prosecution.  See Iqbal, 129 S. Ct. at 1949
("Where a complaint pleads facts that are merely consistent with
a defendant's liability, it stops short of the line between
possibility and plausibility of entitlement to relief.")
(internal quotation marks omitted).  Indeed, the Amended
Complaint is more consistent with a legitimate attempt to obtain
information about prior bad acts that might appropriately be

used to show the motive or intent of the plaintiffs in connection with the crime with which they were eventually charged.  Accordingly, the ADA defendants are entitled to absolute immunity with regard to ADA Ruzow's contacts with Laro's clients.


## B.

Because at least some of the ADA defendants' conduct is not covered by absolute immunity, the specific claims against the ADA defendants must be analyzed.


## 1.

The ADA defendants move to dismiss the plaintiffs' false arrest claim.  The Complaint makes plain that the plaintiffs were arrested subsequent to a grand jury indictment.  (Am. Compl.   ¶¶ 117, 120.)  The defendants correctly note that "the tort of false arrest does not permit recovery for 'confinement imposed pursuant to legal process.'"  Coakley v. Jaffe, 72 F. Supp. 2d 362, 363 (S.D.N.Y. 1999) (quoting Heck v. Humphrey, 512 U.S. 477, 483 (1994), aff'd, 234 F.3d 1261 (2d Cir. 2000) (table)).  Indeed, a "warrant predicated on grand jury action bars a false arrest claim, requiring the plaintiff to proceed instead under a theory of malicious prosecution." Id. at 364.

The plaintiffs do not respond to this argument.  They
respond to the somewhat different argument that there is no
specific allegation as to how the ADA defendants were personally
involved in the arrest of the plaintiffs.  The plaintiffs point
out that they have alleged that the Port Authority Police
arrested them "in accordance with the express directives,
guidance and advice" of the ADA defendants, (Am. Compl. ¶ 199),
and therefore that the ADA defendants were directly involved
with their arrest.  Whether the ADA defendants gave any advice
to the Port Authority defendants is irrelevant, because the
Amended Complaint alleges that the plaintiffs were arrested
following the return of the grand jury indictment.  Any
plausible reading of the Amended Complaint indicates that the
plaintiffs were arrested pursuant to legal process and their
claim, if any, is for malicious prosecution and not for false
arrest.

Accordingly, the motion to dismiss the false arrest claim
against the ADA defendants is **granted**.


## 2.

The ADA defendants next move to dismiss the malicious abuse
of process claim.  As explained above, the plaintiffs have
stated a claim for malicious abuse of process, inasmuch as they
have alleged in some detail that the ADA defendants caused

subpoenas to be issued, intending to do harm to the plaintiffs
and to achieve some collateral, illegitimate purpose, most
importantly to make good on ADA Ruzow's promise to "ruin" the
plaintiffs.  (See Am. Compl. ¶ 228.)  Undoubtedly, some, and
perhaps all, of the subpoenas that form the basis for the
malicious abuse of process claim were issued after the ADA
defendants decided to convene a grand jury and seek an
indictment, and to that extent any claims stemming from the use
of those subpoenas are barred by the doctrine of absolute
immunity.  The ADA defendants argue that all of the subpoenas in
this case were for the purpose of prosecuting the plaintiffs.
The Complaint alleges to the contrary.  These factual issues as
to individual subpoenas and witnesses cannot be resolved at this
stage.  Accordingly, the ADA defendants' motion to dismiss the
malicious abuse of process claim is **denied.**

### 3.

The ADA defendants next move to dismiss the "stigma plus"
claims based on the ADA defendants' statements to the press.

The plaintiffs have pleaded that the ADA defendants issued
a press release that "contained blatantly false and misleading
allegations concerning" the plaintiffs, and held a press
conference publicizing the false charges.  (See, e.g., Am.
Compl. ¶¶ 122-23.)  This is sufficient to meet the first prong

of the stigma plus test; plainly, a false allegation of criminal
fraud would (and, allegedly, did) badly damage the plaintiffs'
reputations.  With regard to the second prong, the plaintiffs
have pleaded that, as a result of statements by the ADA
defendants to the press, some of the plaintiffs' clients
cancelled their contracts.  However, these allegations are the
type of "deleterious effects flowing directly from a sullied
reputation" that are insufficient to satisfy the plus prong.
See Sadallah, 383 F.3d 34, 38.  Moreover, while the plaintiffs'
arrest and prosecution plainly constitute a "material indicium
of government involvement beyond the mere presence of a state
defendant," Doe, 271 F.3d at 54, the ADA defendants' role in
pursuing the plaintiffs' arrest and prosecution are subject to
absolute immunity.  However, to the extent that the plaintiffs
have alleged malicious use of subpoenas that was not protected
by absolute immunity, such abuse resulting in loss to the
plaintiffs is sufficient to meet the plus prong in this case,
because it constitutes government involvement that
"distinguish[es the plaintiffs'] grievance from [a] garden-
variety defamation claim."  Id.  Accordingly, the ADA
defendants' motion to dismiss the stigma plus claim is **denied**.

**4.**

The ADA defendants next move to dismiss the inducement of
false testimony claim.  This motion must be **granted**.  The
complaint alleges that, during ADA Ruzow's "pre-trial
investigation," she and PA defendant Schaffler coerced and
harassed various witnesses into giving false testimony and
offering up "bad act" evidence against Laro and Bertuglia in
order to get an indictment against them.  (Am. Compl. ¶¶ 233-
240.)  While the facts alleged, if true, would constitute
reprehensible conduct, and while the complaint does allege that
ADA Ruzow took these acts "in her investigative capacity," the
facts alleged also establish that ADA Ruzow was acting in her
capacity as an advocate, inasmuch as she plainly was "seek[ing]
an indictment." Kent v. Cardone, 404 F. App'x 540, 543 (2d Cir.
2011) (summary order); see also Desrouleaux v. City of New York,
No. 08 Civ. 3157, 2010 WL 3602997, at *3 (E.D.N.Y. Sept. 7,
2010).  Indeed the very nature of the claims is that ADA Ruzow
was seeking false testimony, and the only specific witness
identified by the plaintiffs, Robert Kolakowski, was alleged to
have been persuaded to give false testimony to the grand jury.
(See Am. Compl. ¶ 78.)  The conduct alleged, reprehensible as it
would be if it in fact occurred, is protected by absolute
immunity in order to protect "the vigorous and fearless
performance of the prosecutor's duty that is essential to the

62

proper functioning of the criminal justice system." <u>Imbler</u>, 424 U.S. at 428.

Moreover, there is no allegation that ADA Scotto was personally involved in these events, and therefore the claim fails as against him for that reason as well.  <u>See, e.g.</u>, <u>Iqbal</u>, 129 S. Ct. at 1948.  Accordingly, the motion to dismiss the inducement of false evidence claim as against the ADA defendants is **granted**.

**5.**

The ADA defendants move to dismiss the conspiracy claim. As explained above, the plaintiffs have adequately pleaded the elements of a conspiracy to violate § 1983 in this case with regard to an agreement between PA defendant Schaffler and ADA defendant Ruzow.  Moreover, these allegations are based at least in part on alleged facts that are not covered by absolute immunity, namely defaming the plaintiffs while depriving them of a legal right, and issuing process for illegitimate ends.  (<u>See</u> Am. Compl. ¶¶ 122-23, 228, 235.)  However, the complaint fails to state a conspiracy claim against ADA Scotto.  The plaintiffs have not pleaded facts supporting a plausible claim that ADA Scotto and any of the PA defendants had the requisite meeting of the minds.  Accordingly, the ADA defendants' motion to dismiss

the conspiracy claim is **granted** as to ADA Scotto and **denied** as to ADA Ruzow.[11]

### C.

Finally, the ADA defendants argue that the plaintiffs' state law claims are barred for failure to file a notice of claim.  See N.Y. Gen. Mun. Law §§ 50-e, 50-i; see also Hardy v. New York City Health & Hospitals Corp., 164 F.3d 789, 793 (2d Cir. 1999).  However, "the notice of claim requirement of General Municipal Law § 50-e appl[ies] to . . . claims against . . . individual defendants only if [an institutional] defendant . . . is obligated to indemnify them. . . . The obligation to indemnify in turn depends upon the resolution of the fact-sensitive question of whether [the individual defendants] were acting within the scope of their employment" in committing the alleged tortious acts.  International Shared Services, Inc. v. County of Nassau, 634 N.Y.S.2d 722, 724 (App. Div. 1995) (citation omitted); see also Costabile v. County of Westchester, 485 F.Supp.2d 424, 432 (S.D.N.Y. 2007) (collecting cases).  Here the plaintiffs have alleged that ADA Ruzow was acting with "no lawful excuse or justification" when she contacted Laro's

---

[11] The ADA defendants have not specifically moved to dismiss the plaintiffs' Chalfy claim, even though that claim was asserted against all defendants.  To the extent that they move to dismiss that claim without argument, the motion is **denied**.

clients and allegedly committed economic torts against the
plaintiffs.  (Am. Compl. ¶ 97.)  Accordingly, the Court cannot
find that the state law claims against ADA Ruzow are barred on
that basis at this stage.

However, the motion to dismiss the state law claims against
the ADA defendants is **granted** nevertheless, because they are
barred by absolute immunity.  The state law economic tort claims
arise out of Ruzow's and Schaffler's contacting Laro clients and
informing them of the indictment, and, as explained above, Ruzow
is absolutely immune from suit for those actions based on the
allegations in the complaint.  Moreover, there is no allegation
in the complaint that ADA Scotto took part in Schaffler's and
Ruzow's contacting Laro's clients, and the state law claims are
therefore dismissed against him on that basis as well.
Accordingly, the ADA defendants' motion to dismiss the state law
claims is **granted**.

**V.**

The City defendants move to dismiss the two claims against
them, namely a Monell claim, and a state law malicious
prosecution claim.

## A.

"[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)).  Municipalities are not subject to liability under a theory of respondeat superior, but rather on the basis that their policies or customs "inflict[ed] the injury upon the plaintiff."  Id.  "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  Id.; see also Adam v. Metro. Transp. Auth., No. 07 Civ. 8807, 2011 WL 891441, at *3 (S.D.N.Y. Mar. 15, 2011).

The plaintiffs have alleged two bases for their Monell claim: first, the City's failure to train prosecutors to avoid various forms of misconduct, including threatening witnesses, Brady violations, and introducing inadmissible "bad act evidence" and other improper conduct before grand juries; and second, the City's policy of lax discipline with regard to prosecutors who did commit such acts of misconduct.  (See Am. Compl. ¶¶ 267-78; 287-91.)  Both are viable theories of a policy

66

or custom that can satisfy the first requirement for a <u>Monell</u> claim.  <u>See, e.g.</u>, <u>Walker v. City of New York</u>, 974 F.2d 293, 297-98, 300 (2d Cir. 1992) (allegations that the district attorney completely failed to train prosecutors to avoid <u>Brady</u> violations stated a claim against the City); <u>Gentile v. County of Suffolk</u>, 926 F.2d 142, 152-53 (2d Cir. 1991) ("negligent disciplinary policies in handling cases of police and prosecutorial misconduct" can be the basis of municipal liability).  The plaintiffs cite at least 15 reported cases, as well as Justice Zweibel's decision in this case, that they claim evidence a pattern of constitutional violations by prosecutors for the City of which the violations the plaintiffs suffered were allegedly a part.  (Am. Compl. ¶ 274.)  They allege that many more such decisions indicating an even broader pattern of constitutional violations are evidenced by unreported decisions that the City alone possesses.  (Am. Compl. ¶¶ 276-277.)  They allege that, as a matter of policy, the city never disciplines prosecutors for the types of misconduct alleged.  (Am. Compl. ¶ 277.)

The City in its opening brief did not address the plaintiffs' "lax discipline" argument, focusing exclusively on the "failure to train" argument.  While the City did address the plaintiffs' lax discipline argument in its reply papers, arguments raised for the first time in reply should not be

considered, because the plaintiffs had no opportunity to respond to those new arguments.  See, e.g., Velez v. Reynolds, 325 F. Supp. 2d 293, 317 (S.D.N.Y. 2004); Evans v. City of New York, 308 F. Supp. 2d 316, 328 n.7 (S.D.N.Y. 2004).  In any event, the City's arguments with regard to both theories fail for similar reasons.

The City argues that the plaintiffs have not pleaded sufficient facts to state a failure to train claim under the Supreme Court's decision in Connick v. Thompson, 131 S. Ct. 1350 (2011).  However, the Court in Connick plainly acknowledged that, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  Id. at 1359.  The Connick Court did note that failure to train claims are a particularly "tenuous" species of municipal liability action, and held that they require that the "municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  Id. (internal quotation marks omitted).

The procedural context of Connick is very different from the procedural context of the present motion.  In Connick, the plaintiff had obtained a substantial jury verdict against a

prosecutor's office based on a failure to train prosecutors on their obligations to comply with Brady v. Maryland, 373 U.S. 83 (1963).  The trial court refused to set aside the jury verdict and the Court of Appeals for the Fifth Circuit affirmed.  The Supreme Court found that the evidence was insufficient to support the jury's verdict, and the trial judge erred in not granting judgment as a matter of law to the defendant.  Connick, 131 S. Ct. at 1366.  The Court found that a history of four prior Brady violations did not constitute a pattern and that the case did not fall within the narrow range of a possible "single incident liability."  Id. at 1360, 1366.

This case, by contrast, is at the pleadings stage.  To plead a Monell claim based on a failure to train, a plaintiff must plead (1) that "a [municipality] knows 'to a moral certainty' that her employees will confront a given situation," (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation,"  and (3) "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  Walker, 974 F.2d at 297-98. As the Supreme Court explained in Connick, a "pattern of similar constitutional violations by untrained employees is 'ordinarily

necessary' to demonstrate deliberate indifference for purposes of a failure to train." Connick, 131 S. Ct. at 1360.

The plaintiffs have pleaded that the City has a longstanding, de facto policy of never disciplining prosecutors who commit specified types of prosecutorial misconduct and not otherwise training them to avoid misconduct. The City and the District Attorney's office plainly know, to a moral certainty, that assistant district attorneys will find themselves questioning witnesses before grand juries, interviewing witnesses beforehand, and being in possession of Brady material, because these are basic facets of an ADA's job. See Walker, 974 F.2d at 300 ("[T]he district attorney knows to a moral certainty that ADAs will acquire Brady material."). The Amended Complaint points to over fifteen cases where City prosecutors allegedly committed misconduct, and alleges the existence of many more such cases in the form of unpublished opinions like Justice Zweibel's. The plaintiffs rely in addition upon Justice Zweibel's forty page opinion that, they argue, documents the misconduct that took place in this case. The City has distinguished many, but not all, of the cases cited by the plaintiffs as evidence of a pattern or practice that has resulted in constitutional violations, but the City does not address the allegation that a far larger number of unreported decisions evidencing this pattern are in its possession. These

allegations may be difficult to prove.  But at this stage, the issue is only whether the factual content alleged by the plaintiffs, accepted as true, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949.  Here, the Complaint alleges sufficient facts to allow the Court to draw the inference that there is a history of mishandling grand jury presentations.  With regard to the third prong, there is no dispute at this stage that, where an assistant district attorney commits misconduct before a grand jury that results in an indictment based on insufficient evidence, or violates their obligations under Brady, those actions will frequently result in the violation of citizens' constitutional rights. Accordingly, the City's motion to dismiss the Monell claim is **denied**.[12]

### B.

The City also moves to dismiss the state law malicious prosecution claim against it, arguing that the plaintiffs failed to file a timely notice of claim.

---

[12] The City has not specifically moved to dismiss the plaintiffs' Chalfy claim, even though that claim was asserted against all defendants.  To the extent that they move to dismiss that claim without argument, the motion is **granted**, because the first cause of action does not allege a policy or practice by the City which resulted in a constitutional violation.

Under New York law, a notice of claim must be filed in a malicious prosecution action against a municipality within ninety days from the accrual of the claim.  See N.Y. GEN. MUN. LAW §§ 50-i(1); see also, e.g., Rivera v. City of New York, 931 N.Y.S.2d 400, 401 (App. Div. 2011).  The parties do not dispute that a notice of claim was filed on or about January 7, 2010. (See Krasnow Decl. Ex. F (notice of claim).)  Nor do they dispute that the plaintiffs' cause of action for malicious prosecution accrued when the action was "favorably terminated." See generally Smith-Hunter v. Harvey, 734 N.E.2d 750 (N.Y. 2000); see also Brogdon v. City of New Rochelle, 200 F. Supp. 2d 411, 428 (S.D.N.Y. 2002).  The issue is when the prosecution of the plaintiffs was terminated in their favor such that their malicious prosecution claim accrued.

The City argues that the prosecution was terminated in the plaintiffs' favor on October 5, 2009, the date on which Justice Zweibel dismissed the second indictment.  This is plainly correct.  Justice Zweibel dismissed the second indictment in the interests of justice and based on the insufficiency of the evidence, and did not authorize the ADA defendants to submit the charges again for a possible third indictment.  (See Zweibel Decision at 29, 44.)  At that point, the ADA defendants were barred by statute from bringing the charges again.  See N.Y. CRIM. P. LAW §§ 210.20(1)(b), (1)(i), (4).  The charges were

72

therefore favorably terminated on October 5, 2009, when Justice Zweibel issued his decision. See Smith-Hunter, 734 N.E.2d at 753 ("[A] criminal proceeding is terminated favorably to the accused when there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense." (internal quotation marks omitted)).

While the plaintiffs argue that there was no favorable decision until the prosecutors affirmatively decided not to seek another indictment, this argument is meritless, because the ADA defendants were legally barred from doing so. Because the malicious prosecution claim at issue accrued on October 5, 2009, the notice of claim filed on January 6, 2010 was not timely filed. Accordingly, the motion to dismiss the malicious prosecution claim against the City is **granted**.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. As explained above, the motions to dismiss are **granted in part and denied in part.**

**The Clerk is directed to close Docket Nos. 26, 30 and 35.**

SO ORDERED.

Dated:  New York, New York
        March 19, 2012

John G. Koeltl
United States District Judge