UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────

ROBERT BERTUGLIA, JR. Individually,
and as President of LARO MAINTENANCE
CORPORATION, LARO MAINTENANCE, AND         11 Cv. 2141 (JGK)
LARO SERVICE SYSTEMS,
                                           OPINION AND ORDER

                    Plaintiffs,


            - against -


THE CITY OF NEW YORK, ADA ELYSE
RUZOW, ADA MICHAEL SCOTTO, PORT
AUTHORITY INSPECT GENERAL ROBERT E.
VAN ETTEN, PORT AUTHORITY DIRECTOR
OF INVESTIGATIONS MICHAEL NESTOR,
PORT AUTHORITY INVESTIGATIVE MANAGER
EDWARD KENNEDY, PORT AUTHORITY
FORENSIC AUDITOR FRED FERRONE, PORT
AUTHORITY SUPERVISING INVESTIGATOR
JEFFREY SCHAFFLER, PORT AUTHORITY
CONTRACT ADMINISTRATOR BERNARD
D'ALEO AND PORT AUTHORITY
INVESTIGATORS JOHN AND JANE DOE #1-5
(names and shield numbers whom are
unknown at present and other
unidentified members of the Port
Authority),

                    Defendants.
─────────────────────────────────────

JOHN G. KOELTL, District Judge:

     Robert Bertuglia, Jr. ("Bertuglia"), and Laro Maintenance

Corporation, Laro Maintenance, and Laro Service Systems

(together "Laro") bring this action against the following

defendants: (1) three Port Authority of New York and New Jersey

employees--Jeffrey Schaffler, Fred Ferrone, and Bernard D'Aleo;

(2) New York Assistant District Attorneys ("ADAs") Elyse Ruzow

1

and Michael Scotto; and (3) the City of New York for alleged violations of 42 U.S.C. § 1983 and New York State tort law.[1] Bertuglia and Laro allege that the defendants violated their constitutional rights by, among other things, prosecuting them for grand larceny in the second degree and other crimes in connection with a services contract between Laro and the Port Authority. The charges were ultimately dismissed. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). The plaintiffs move for partial summary judgment against Schaffler on the claim of malicious prosecution. Schaffler cross moves for summary judgment dismissing all of the plaintiffs' claims against him. The other Port Authority defendants, Ferrone and D'Aleo, move for summary judgment dismissing all the claims against them. ADAs Ruzow and Scotto move for summary judgment dismissing all the claims against them. And the City moves for summary judgment dismissing a <u>Monell</u> claim for failure to train and failure to discipline prosecutors.

For the reasons explained below, the defendants' motions for summary judgment are granted and the plaintiffs' motion for partial summary judgment is denied.

---

[1] The plaintiffs sued other Port Authority employees who held supervisory positions, but this Court previously dismissed the claims against those defendants. <u>See</u> <u>Bertuglia v. City of New York</u>, 839 F. Supp. 2d 703, 722-26 (S.D.N.Y. 2012).

# I.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify the material facts and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); see also Chepilko v. Cigna Grp. Ins., No.
08cv4033 (JGK), 2012 WL 2421536, at *1 (S.D.N.Y. June 27, 2012).

In determining whether summary judgment is appropriate, the
Court must resolve all ambiguities and draw all reasonable
inferences against the moving party. See Matsushita Elec. Indus.
Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing
United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see
also Gallo, 22 F.3d at 1223. Summary judgment is improper if
there is any evidence in the record from any source from which a
reasonable inference could be drawn in favor of the non-moving
party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d
Cir. 1994); see also Perez v. Duran, 962 F. Supp. 2d 533, 535-36
(S.D.N.Y. 2013); Pelayo v. Port Auth., 893 F. Supp. 2d 632, 634-
35 (S.D.N.Y. 2012).

"When faced with cross-motions for summary judgment, a
district court is not required to grant judgment as a matter of
law for one side or the other." Heublein, Inc. v. United States,
996 F.2d 1455, 1461 (2d Cir. 1993). "Rather, the court must
evaluate each party's motion on its own merits, taking care in
each instance to draw all reasonable inferences against the
party whose motion is under consideration." Id.

Under this Court's local rules, parties moving for summary
judgment must submit a "separate, short and concise statement,
in numbered paragraphs, of the material facts as to which the

moving party contends there is no genuine issue to be tried."
Local Civ. R. 56.1(a). If an opposing party fails to respond to
the moving party's Rule 56.1 statement, then the facts therein
may be deemed admitted. See Giannullo v. City of New York, 322
F.3d 139, 140 (2d Cir. 2003); Local Civ. R. 56.1(c). But "'[t]he
local rule does not absolve the party seeking summary judgment
of the burden of showing that it is entitled to judgment as a
matter of law, and a Local Rule 56.1 statement is not itself a
vehicle for making factual assertions that are otherwise
unsupported in the record.'" Giannullo, 322 F.3d at 140 (quoting
Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir.
2001)).

Here, Schaffler initially did not file a response to the
plaintiffs' Rule 56.1 statement.[2] The plaintiffs argue that
Schaffler's cross motion for summary judgment falls short of
refuting their statements of undisputed facts, and that the
Court must enter summary judgment for the plaintiffs. The
plaintiffs are clearly wrong. See Vt. Teddy Bear Co., Inc. v. 1-
800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (a non-movant
is not required to rebut an insufficient showing in support of
summary judgment and the district court "may not rely solely on

---

[2] After argument, Schaffler submitted a response to the plaintiffs' Local Rule
56.1 Statement. As with the recent supplemental submissions from the
plaintiffs, the Court could disregard Schaffler's late response. But in any
event, the Court has examined Schaffler's submission, and the submission does
not change any of the conclusions in this opinion.

the statement of undisputed facts contained in the moving party's Rule 56.1 statement [because i]t must be satisfied that the citation to evidence in the record supports the assertion"); Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996) (per curiam) ("The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically. Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that the moving party is entitled to a judgment as a matter of law.'" (quoting then-current version of Fed. R. Civ. P. 56(c))).

Similarly, the ADA defendants contend that the plaintiffs' response to the ADA defendants' Rule 56.1 Statement was defective because the response did not cite to the record or set forth disputed facts. ADA Defs.' Reply at 1-2. To the extent the plaintiffs admitted facts in response to the ADA defendants' Rule 56.1 Statement, those facts, if supported by the record, are deemed admitted. But even if the plaintiffs' responses to disputed facts are deficient, this Court will not simply deem admitted the ADA defendants' Rule 56.1 Statement of Facts. Rather, this Court must still ascertain that the record supports all the facts in that Statement. See Giannullo, 322 F.3d at 140.[3]

---

[3] The plaintiffs also argue that this Court should deem admitted the content of the requests for admissions sent to the City and the ADA defendants because the City and ADA defendants failed to respond four separate times to these requests. See Fed. R. Civ. P. 36(a)(3). "[T]he court may permit withdrawal or amendment [of admissions] if it would promote the presentation

## II.

The parties do not dispute the following facts unless otherwise noted.

## A.

Laro began working for the Port Authority in 1996 when Laro began providing janitorial maintenance for the Port Authority bus terminal on Eighth Avenue in Manhattan. In response to the Port Authority's Request for Proposals in 2005, Laro submitted a bid for the 2005-2007 contract. Krasnow Decl., Ex. D, at 238-39. The Port Authority stipulated that the bidders had to provide new equipment; this requirement would level the playing field for new bidders and ensure that the winner of the bid used quality equipment. Id. at 239. Robert J. Bertuglia, as President of Laro, attended meetings with the Port Authority

---

of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Fed. R. Civ. P. 36(b). The majority of the admissions pertain to whether the DA's Office in New York has training materials that address prosecutorial misconduct, has ever punished or disciplined its prosecutors for misconduct, and has written guidelines instructing prosecutors on what to do if a court makes a finding of misconduct. See generally Norinsberg Decl. in Opp. to ADA Defs.' Mot. for Summ. J.("Norinsberg Decl. 1"), Exs. A and C. An additional set of requests to the City and the ADA defendants focused on a press release issued on August 7, 2008, relating to the indictment of Bertuglia and Laro and asked whether the facts in the release were true. Norinsberg Decl. 1, Ex. U. Because the parties have fully briefed the summary judgment motions and have put into evidence Rule 56.1 statements and evidence concerning these factual statements that pertain to the substance of the requests for admissions, the Court will allow the City and ADA defendants to withdraw their admissions. To the extent possible, cases should be decided on the merits rather than on procedural defects. The plaintiffs, having had a full opportunity for discovery and briefing, have not shown that they would be prejudiced by allowing the City and the ADA defendants to withdraw their admissions by default.

representatives when Laro was preparing its bid. Id. at 239-40. During these meetings, Laro and the Port authority discussed price adjustments. Id. at 240.

Bertuglia signed a Letter of Acceptance for a contract with the Port Authority, agreeing to provide janitorial maintenance and cleaning services in the Port Authority bus terminal on Eighth Avenue. Schaffler's R. 56.1 Stmt. ¶ 2; Pls.' Resp. to Schaffler's R. 56.1 Stmt. ¶ 2; Krasnow Decl., Ex. E, at 2. The contract provided that "all equipment shall be in new and unused condition at the start of the Initial Term[.]" Miller Decl. in Supp. of Schaffler's Mot. for Summ. J. ("Miller Decl. 1"), Ex. D, at 41. The contract ran from January 1, 2005 to December 31, 2007. ADA Defs.' R. 56.1 Stmt. ¶ 5; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 5.

Pursuant to Laro's bid and the subsequent contract, Laro billed the Port Authority an annual lump sum charge of $6,708,600 for station cleaning, in addition to other charges. Krasnow Decl., Ex. E, at 13. The total contract price for the initial three year period was $24,583,065. Id. Laro billed the Port Authority on a monthly basis. See, e.g., Krasnow Decl., Ex. N. The lump sum charge was calculated by estimating the number of work hours at the station. As part of the hourly wage calculation under the contract, Laro billed the Port Authority $0.76 per hour for the cost of equipment. Krasnow Decl., Ex. E,

at 15 ("Equipment"), 17 ($154,493 total cost per annum); Schaffler's R. 56.1 Stmt. ¶ 71; Pls.' Resp. to Schaffler's R. 56.1 Stmt. ¶ 71; Miller Decl. 1, Ex. EE, at 194-95.[4] The hourly wage also included other overhead costs such as holiday allowance, healthcare, pension, payroll taxes and insurance, supplies, and uniforms. Krasnow Decl., Ex. E, at 14-15. Laro cleaned the bus terminal from January 1, 2005 through December 31, 2007 and submitted thirty-six monthly invoices, all of which were paid by the Port Authority. ADA Defs.' R. 56.1 Stmt. ¶ 9; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 9.

It is undisputed that Laro never purchased two major pieces of equipment that the contract required. Schaffler's R. 56.1 Stmt. ¶ 70; Pls.' Resp. to Schaffler's R. 56.1 Stmt. ¶ 70. These two pieces were the Tennant Model 800 for roadway sweeping and the Tennant Model 550 for roadway scrubbing. Krasnow Decl., Ex. E, at 11 (provisions J. and K.); Miller Decl. in Supp. of D'Aleo's Mot. ("Miller Decl. 2"), Ex. C, at 9. The anticipated cost of the scrubber was $85,000, and the anticipated cost of the sweeper was $68,000; these were the two most expensive

---

[4] The plaintiffs object to the use of the word "cost" because the Port Authority never held title to the equipment nor did the contract contemplate that the Port Authority would ever own the equipment. See Norinsberg Decl. in Opp. to D'Aleo's Mot. for Summ. J. ("Norinsberg Decl. 2"), Ex. XXX, at 187-88; Pls.' Resp. to D'Aleo's R. 56.1 Stmt. ¶ 29. This opinion uses the term "cost" not to indicate that the Port Authority was purchasing the equipment, but simply to explain that the contract amortized the equipment's cost over the period of the contract and Laro was paid accordingly. Although the contract was a services contract, the calculation of the cost of service included reimbursement for the cost of equipment.

pieces of equipment to be purchased. Miller Decl. 2, Ex. C, at 11; Krasnow Decl., Ex. E, at 19. The cost of the equipment was to be recouped from the Port Authority by the monthly charges over the course of the contract. Miller Decl. 2, Ex. C, at 12-13. Laro did not purchase the scrubber or the sweeper, but still billed the full hourly wage, including the $0.76 for equipment, throughout the entire period of the contract. Id. at 47-48. The monthly invoices were not itemized to show the breakdown of the hourly wage calculation. Krasnow Decl., Exs. N, O, P. The net effect of these payments was that the Port Authority paid at least $153,000 to Laro over a three year period for equipment that Laro was required to purchase but did not purchase during that period.

## B.

In the spring of 2006, the New York County District Attorney's Office ("DA's Office") opened an investigation into Vincent Grimaldi, a man suspected of arranging kickbacks and bribes in connection with contracts. Charles Gargano, the head of the Port Authority's Board of Commissioners, was also involved in the investigation. ADA Elyse Ruzow was investigating Grimaldi for allegedly fixing the bidding process on government contracts. ADA Defs.' R. 56.1 Stmt. ¶ 11; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 11; Miller Decl. 1, Ex. R, at 20; Krasnow Decl., Ex. F, at 21. Michael Scotto, the Chief of the Labor and

10

Racketeering Unit, was ADA Ruzow's immediate supervisor and participated in the investigation. Krasnow Decl., Ex. F, at 20-21; ADA Defs.' R. 56.1 Stmt. ¶ 12; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 12. ADA Ruzow obtained a wiretap on Grimaldi's phone. According to ADA Ruzow and the wiretap transcripts, Bertuglia was captured on the wiretap, discussing the possibility of obtaining public contracts and requesting Grimaldi's assistance and influence to secure a public contract. Miller Decl. 1, Ex. R, at 26-28; Krasnow Decl., Ex. G (wire transcript).

Jeffrey Schaffler, an investigator at the Port Authority, became involved in the investigation and participated by investigating Bertuglia and Laro. Schaffler and Fred Ferrone, another investigator at the Port Authority, reviewed the Laro/Port Authority contract and began investigating Laro and Bertuglia for possible overbilling on the bus terminal contract. ADA Defs.' R. 56.1 Stmt. ¶ 20-21; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 20-21. On March 29, 2007, Schaffler told ADA Scotto that the Port Authority was investigating Laro for overbilling on the bus terminal contract. ADA Defs.' R. 56.1 Stmt. ¶ 22; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 22.[5]

---

[5] The parties dispute at what point Schaffler referred the Laro matter to the DA's Office for a criminal investigation. The ADA defendants contend that ADA Scotto went to Schaffler after Bertuglia was captured on the wiretap. ADA Defs.' R. 56.1 ¶¶ 17-19. An email dating back to March 29, 2007, from ADA Scotto mentioned that Schaffler was "looking into" Laro Maintenance for

In the course of his investigation, Schaffler interviewed Port Authority employees, including Bernard D'Aleo. D'Aleo was a maintenance supervisor and contract administrator at the Port Authority and oversaw the administration of outside contracts dealing with sanitation. Miller Decl. 2, Ex. A, at 13-15; D'Aleo's R. 56.1 Stmt. ¶ 2; Pls.' Resp. to D'Aleo's R. 56.1 Stmt. ¶ 2. D'Aleo told Schaffler that he was constantly asking Laro employees, specifically Robert Kolakowski, about the new equipment that Laro had not purchased. ADA Defs.' R. 56.1 Stmt. ¶ 40; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 40; Norinsberg Decl. in Supp. of the Pls.' Mot. for Summ. J. ("Norinsberg Decl. 3"), Ex. NN, at 387; Miller Decl. 1, Ex. L, at 29.

The DA's Office officially opened the Laro investigation on May 7, 2007. ADA Defs.' R. 56.1 Stmt. ¶ 25; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 25; Krasnow Decl., Ex. F, at 56 (Scotto saying he probably decided to open the matter). ADA Ruzow opened the case before the grand jury between June 18, 2007 and July 13, 2007, under case number 2007-006639. ADA Defs.' R. 56.1

---

overbilling. Krasnow Decl., Ex. F, at 30. Schaffler testified in his deposition that he did not mention Bertuglia to ADA Scotto until Fall 2007, and that he had no recollection of approaching ADA Scotto prior to that time. Miller Decl. in Reply to Pls.' Opp. to Schaffler's Mot. ("Miller Decl. 3"), Ex. JJ, at 21. The plaintiffs dispute this account and contend that Schaffler referred the matter to ADA Ruzow in May 2007, before he had any information to support his accusations. Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 19; Krasnow Decl., Ex. F, at 30-31 (ADA Scotto stating that Schaffler told him in March 2007 that the Port Authority was investigating Bertuglia). For reasons explained below, the issue of when Schaffler approached the Port Authority is not dispositive of any of the current motions.

Stmt. ¶ 27; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 27. ADA
Ruzow proceeded to issue subpoenas seeking documentation of
Laro's payment and receipt of all equipment as well as invoices
from the Tennant Company. ADA Defs.' R. 56.1 Stmt. ¶¶ 44, 49;
Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶¶ 44, 50; Krasnow
Decl., Ex. M, at 1-2, 6. ADA Ruzow also interviewed several Port
Authority employees, but did not meet or interview current Laro
employees. Nor did ADA Ruzow subpoena any Laro employees to
testify before the grand jury at this time. ADA Defs.' R. 56.1
Stmt. ¶¶ 42, 53; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶¶ 42,
53.

The grand jury convened on August 5, 2008 to hear the
People's evidence. Krasnow Decl., Ex. Q, at 1. The grand jury
considered an indictment consisting of one count of grand
larceny in the second degree, three counts of falsifying
business records in the first degree, and three counts of
offering a false instrument for filing in the first degree.
Miller Decl. 2, Ex. C. The false records and false instrument
charges alleged that Bertuglia and Laro had made false entries
by filing invoices that contained charges for equipment that was
never purchased and submitted those invoices to the Port
Authority, a public entity. Id. at 2-3. Lawrence Waxman, a Port
Authority employee in the procurement department, testified
before the grand jury that the contract required Laro to

13

purchase several pieces of equipment, including a Tennant Model 800 roadway sweeper and a Tennant Model 550 roadway scrubber. Id. at 4,9. The anticipated cost of the equipment was $85,000 for the scrubber and $68,000 for the sweeper. Id. at 11. Laro billed the Port Authority $153,000 over the contract period to cover the cost of the equipment. Id. at 13. Laro would bill for every hour of use of the cleaning equipment, and the bill included a charge to offset the cost of the new equipment. Id. at 15.

Antoinette Tahan, a Port Authority employee working in expenditure review, testified next. Id. at 20. Tahan testified that Laro received payment for thirty-six monthly invoices from January 1, 2005 to December 31, 2007. Id. at 25. Bruce Wild, a distribution manager at Tennant, testified that no other companies sold the Tennant equipment the contract required. Id. at 30. Wild further testified that Laro had not purchased the sweeper and the scrubber provided for in the contract. Id. at 28-29. Robert Vetter, the next witness, was the former Chief Operating Officer at Laro. Id. at 32-33. He testified that it was his understanding that Laro was required to purchase new equipment pursuant to the Port Authority contract. Id. at 36-37. Vetter testified that he and Bertuglia had the authority to order the purchase of equipment. Id. at 39. Vetter left Laro in April of 2005. Id. at 40.

Finally, Dennis Felice testified before the grand jury. Felice, a Port Authority employee, was an accounts specialist who drafted part of the Laro/Port Authority contract, including the equipment list and technical specifications. Id. at 42-43. Felice explained how the lump sum in the monthly invoices billed the hourly wage for the station cleaning. He testified that the hourly wage for cleaning services included a charge for the purchase of the new equipment. Id. at 46. He also testified that Laro billed the Port Authority for the cost of the sweeper and scrubber that were never purchased. Id. at 48.

The grand jury returned a true bill against Laro and Bertuglia on all counts. Miller Decl. 1, Ex. X; Norinsberg Decl. 3, Ex. G. Bertuglia was arraigned the morning of August 7, 2008 and released on $25,000 bail. Krasnow Decl., Ex. V, at 7-8. ADA Ruzow stated in court that Bertuglia's case "involve[d] a theft of a substantial amount of money from the Port Authority. . . . Pursuant to th[e] contract he was required to purchase new unused equipment for which he billed the Port Authority. He was reimbursed. He did not purchase a majority of that equipment. The equipment that was involved was $400,000. He did not purchase at least $200,000 worth of that equipment." Id. at 7.

The DA's Office issued a press release on August 7, 2008, announcing the indictment of Laro and Bertuglia and the arrest of Bertuglia. Krasnow Decl., Ex. X. Alicia Maxey Greene, an

employee in the Public Information Office of the DA's Office, drafted the press release with ADA Ruzow's input and under her supervision. ADA Defs.' R. 56.1 Stmt. ¶¶ 68-70; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶¶ 68-70. The press release stated that Laro "did not purchase a majority of the required equipment" and noted that over $200,000 in equipment had not been purchased. Krasnow Decl., Ex. X.[6]

After the grand jury returned the indictment, Schaffler also recommended that the DA's Office investigate Bertuglia's parents and his immediate family for suspected health insurance and pension fraud. ADA Defs.' R. 56.1 Stmt. ¶ 74; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 74; Norinsberg Decl. 3, Ex. CC at 174. The gist of the allegations was that Bertuglia's father who had retired from a job as a bus driver and was collecting a pension, was working at Laro, and that, his wife, Bertuglia's mother, received a paycheck and healthcare coverage for an alleged no-show job. Norinsberg Decl. 3, Ex. CC at 174; Miller Decl. 1, Ex. R, at 59. ADA Ruzow was reluctant to investigate Bertuglia's family because of the advanced age of Bertuglia's parents and because she did not generally expand her investigations to include a defendant's family. Miller Decl. 1,

---

[6] As discussed below, the plaintiffs argue the press release contained false information. Pls.'s Resp. to ADA Defs.' R. 56.1 Stmt. ¶¶ 67-68. The plaintiffs also argue that the press release was not based on the arraignment and was finalized before the arraignment. Id. at ¶ 65.

Ex. R, at 59; Norinsberg Decl. 3, Ex. CC at 175. Nevertheless, ADA Ruzow opened a healthcare fraud case in October 2008 under the case number 2008-007117 and opened a grand jury investigation at that time. ADA Defs.' R. 56.1 Stmt. ¶¶ 75-76; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶¶ 75-76; Krasnow Decl., Ex. L. In connection with the healthcare fraud case, ADA Ruzow subpoenaed health insurance, bank, and pension records. ADA Defs.' R. 56.1 Stmt. ¶ 78; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 78.

On February 26, 2009, Judge Ronald Zweibel dismissed the first indictment against Bertuglia but did not dismiss the indictment against Laro. Judge Zweibel concluded that the evidence presented to the grand jury was insufficient to support a reasonable inference that Bertuglia knew about the equipment requirement and that he had intended to defraud the Port Authority and file false business records. Norinsberg Decl. 3, Ex. A, at 1-3.

After Judge Zweibel dismissed the first indictment against Bertuglia, the DA's Office dropped the indictment against Laro in order to present a second indictment against Bertuglia and Laro together. Miller Decl. 1, Ex. R, at 144. The second indictment dropped six of the seven charges. The second indictment charged only grand larceny in the second degree against Bertuglia and Laro. Id. at 145.

17

Before the second grand jury presentation in connection
with the alleged overbilling, Schaffler and Ferrone interviewed
several Laro employees, including Robert Kolakowski, Gregory
Pulitano, and Steve Davidson. ADA Defs.' R. 56.1 Stmt. ¶ 90;
Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 90. Schaffler
testified that he reported back to ADA Ruzow after he
interviewed each witness. Krasnow Decl., Ex. H, at 150. ADA
Ruzow issued several subpoenas. Some subpoenas were addressed to
Laro's counsel, seeking records of Laro's equipment purchases.
ADA Defs.' R. 56.1 Stmt. ¶ 92; Pls.' Resp. to ADA Defs.' R. 56.1
Stmt. ¶ 92; Krasnow Decl., Ex. BB, at 1.  ADA Ruzow also signed
subpoenas directing Stephanie Bertuglia Henninger, Bertuglia's
daughter, and Robert Bertuglia, Sr., Bertuglia's father, to
appear before the grand jury. ADA Defs.' R. 56.1 Stmt. ¶¶ 98-99;
Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶¶ 98-99. It is
undisputed that ADA Ruzow did not serve or issue any subpoenas
in connection with the second grand jury presentation directing
a witness to appear in her office for an interview. ADA Defs.'
R. 56.1 Stmt. ¶ 103; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶
103.

ADA Ruzow presented the People's evidence to the grand jury
in connection with the second indictment on March 16, 18, 23,
and 30, 2009 and April 6 and 8, 2009. ADA Defs.' R. 56.1 Stmt. ¶
104; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 104. The grand

jury heard evidence from Port Authority forensic investigator
Fred Ferrone about Bertuglia's signature on the Port Authority
contract. Krasnow Decl., Ex. D, at 15. Ferrone also testified
that Laro was paid monthly as evidenced by monthly invoices, and
that Laro's contract was extended after the initial three-year
contract period. Id. at 16, 18. Wild, Waxman, and Tahan
testified as they had before the first grand jury. Id. at 319
(Wild testifying that Laro did not purchase the scrubber or
sweeper from Tennant), 238-39 (Waxman testifying about the
requirement for new equipment), 331-35 (Tahan explaining Laro's
invoice history at the Port Authority). Waxman supplemented his
first testimony by testifying that Bertuglia had been involved
in meetings where the Port Authority and Laro discussed the
pricing of the contract. Id. at 239-40.

Robert Vetter also testified again, and he supplemented his
previous testimony with details about Laro's financial
difficulties. Id. at 31-35. Vetter testified that he spoke to
Bertuglia about how the fixed cost of supplies and equipment was
built into the hourly wage of the station workers. Id. at 34-35.
Vetter testified that he spoke to Bertuglia about the need to
purchase new equipment while Laro was preparing the Port
Authority bid. Id. at 46. Vetter testified that Laro did not
have the credit facility at Tennant to purchase the equipment.
Id. at 64. Vetter also testified that after he left Laro in

19

April of 2005, Bertuglia was in charge of managing the bus terminal contract. Id. at 58-59.

Port Authority employee Bernard D'Aleo testified for the first time. He testified about his responsibility overseeing the administration of contracts at the Port Authority, including the Laro contract. Id. at 379. D'Aleo testified that Laro purchased some new equipment, but not all of it. Norinsberg Decl. 3, Ex. NN, at 383-84. D'Aleo testified that he talked to Robert Kolakowski at Laro about the missing equipment. Id. at 384. D'Aleo also said he told his supervisors, Roger Prince and Rob King, about the missing equipment. Id. D'Aleo recalled that a Tennant Model 550 arrived at the terminal two years into the contract, but a Tennant Model 800 never arrived. Id. at 385-86. D'Aleo was in charge of approving Laro's monthly invoices, and he testified he did not know that the invoices calculated the cost of the new equipment and incorporated the cost into the hourly wage for the cleaners. Id. at 391-92. Had he known, D'Aleo testified he would have taken deductions to compensate for the missing equipment. Id. at 392.

Roger Prince, D'Aleo's supervisor, testified that Bertuglia was his contact at Laro after Vetter left. Krasnow Decl., Ex. D, at 220. However, Prince testified that he was not aware that equipment was missing, thereby contradicting part of D'Aleo's testimony. Id. at 234. Robert Kolakowski, a former site manager

at the bus terminal and a Laro employee, also testified, saying
that he was aware that Laro was supposed to purchase the
equipment. Miller Decl. 1, Ex. I, at 361-62. He said that D'Aleo
asked about the new equipment once or twice a week. Id. at 364.
Kolakowski testified that he spoke to Gregory Pulitano, Laro's
acting Chief Financial Officer, about the new equipment, and
that eventually "everybody forgot about it basically." Id. at
365. Kolakowski said that D'Aleo called him about six or seven
times asking for the equipment. Id. at 371. The grand jury also
heard testimony from additional witnesses including Laro
employees Gregory Pulitano, Stephanie Bertuglia Henninger, and
Steve Davidson. ADA Defs.' R. 56.1 Stmt. ¶¶ 117, 119, 121; Pls.'
Resp. to ADA Defs.' R. 56.1 Stmt. ¶¶ 117, 119, 121.

On April 8, 2009, the grand jury returned an indictment
against Bergulia and Laro for the crime of grand larceny in the
second degree in violation of New York Penal Law § 155.40(1).
ADA Defs.' R. 56.1 Stmt. ¶ 122; Pls.' Resp. to ADA Defs.' R.
56.1 Stmt. ¶ 122; Krasnow Decl., Ex. DD.

On October 5, 2009, Judge Zweibel dismissed the second
indictment against both Laro and Bertuglia. Norinsberg Decl. 3,
Ex. H. Judge Zweibel concluded that there was enough evidence to
satisfy the amount of loss for grand larceny of $50,000 or more
because there was evidence that the scrubber and sweeper cost
$153,000 combined. Id. at 22. Judge Zweibel also concluded that

21

there was "prima facie evidence that the cost of this purchase was built into the contract and had been paid to Laro in installments . . . upon [the Port Authority's] receipt of thirty-six monthly invoices." Id. at 23. Judge Zweibel concluded that "Laro's invoices could be viewed as containing an implied false representation." Id. However, Judge Zweibel was skeptical of the People's evidence of an intent to defraud by Bertuglia and Laro. Id. He concluded that once Vetter and Davidson left Laro, Laro was "left . . . without someone who knew what [to do] with the contract." Id. at 24. He pointed out that it was unclear whether the Port Authority had paid Laro "based on reliance of a false statement" in the invoices. Id. at 26. Because of thin evidence on the element of intent, Judge Zweibel concluded that the grand jury evidence was "legally insufficient" as to Bertuglia and Laro. Id. at 28.

Judge Zweibel then commented on the "prosecutors' misconduct in their presentation to the grand jury." Id. He noted that dismissal of an indictment on the grounds of prosecutorial misconduct is only possible if the misconduct consisted of deliberate prosecutorial wrongdoing or involved errors that would have potentially prejudiced the defendant. Id. at 29. Judge Zweibel determined that the grand jury presentation did not "rise to that level" of prosecutorial wrongdoing but that it was very close. Id.  He identified the following

problems: (1) vouching for evidence and improper questioning during the presentation of the testimony of Stephanie Bertuglia Henninger and Gregory Pulitano, id. at 31-32, (2) an implied threat of a perjury charge, id. at 32, and (3) introduction of bad act evidence when the prosecutors asked about possible health insurance fraud because Bertuglia's family members were on the payroll and receiving health insurance through Laro despite not being actual employees, id. at 33-34. Judge Zweibel noted that, "[w]ith certain exceptions, criminal trial rules of evidence are also applicable to Grand Jury proceedings." Id. at 34. Judge Zweibel stated that "the cumulative effect of the prosecution's error, given the insufficiency of the evidence, further justifies dismissal of the entire indictment. . . . [T]he Court believes [the prosecutor's conduct] rendered the presentation so defective that the indictment must be dismissed on this ground as well." Id. at 35 (emphasis added). The alleged misconduct was not the sole basis for dismissal given that Judge Zweibel dismissed the indictment for insufficient evidence of intent to defraud as well as in the interest of justice because the court did not regard Laro's acts as criminal. Id. at 37.

## C.

On March 29, 2011, Bertuglia and Laro filed a complaint against the Port Authority defendants, supervisory defendants at

the Port Authority, ADAs Ruzow and Scotto, and the City of New York. In their Amended Complaint, filed in July 2011, the plaintiffs asserted numerous causes of action under 42 U.S.C. § 1983, including false arrest, malicious prosecution, malicious abuse of process, denial of the right to a fair trial, inducement of false testimony, conspiracy, and "stigma plus," against various sets of defendants. The plaintiffs asserted a Monell claim against the City of New York for being deliberately indifferent in connection with prosecutorial training and discipline. The plaintiffs also asserted state law claims for tortious interference with contract and tortious interference with an economic advantage.

Following motions to dismiss by all the defendants, this Court dismissed all of the claims by Bertuglia and Laro against the Port Authority supervisory defendants for failure to plead personal involvement. See Bertuglia v. City of New York, 839 F. Supp. 703, 719, 721-23 (S.D.N.Y. 2012). Several § 1983 claims against Port Authority employees Schaffler, D'Aleo, and Ferrone survived: (1) false arrest for allegedly urging the ADA defendants to arrest the plaintiffs based on information the defendants allegedly knew to be false, id. at 722 (against only Schaffler and Ferrone); (2) malicious prosecution against the Port Authority defendants for allegedly encouraging the prosecution of the plaintiffs while providing false information,

24

id. at 723; (3) deprivation of the right to a fair trial because
the Port Authority defendants allegedly provided knowingly false
information to the prosecutors, id. at 724. A § 1983 "stigma
plus" claim against Schaffler also survived based on Schaffler's
alleged communications with Laro's clients in which he allegedly
told Laro's clients that Bertuglia and Laro were likely stealing
from them. Id. at 725-26. A malicious abuse of process claim
survived against Schaffler and ADAs Ruzow and Scotto because the
plaintiffs alleged that the ADAs and Schaffler issued illegal
subpoenas to Laro's employees, clients, and other individuals.
Id. at 727, 735. A Chalfy claim alleging a violation of due
process of law based on a systematic pattern of harassment also
survived against Schaffler and ADAs Ruzow and Scotto; the claim
was premised on the same allegations of the misuse of subpoenas,
harassment, and manipulation, as well as on allegations that the
defendants were out to destroy Laro's business and to ruin
Bertuglia and his family. Id. at 719, 736 n.11; Chalfy v.
Turoff, 804 F.2d 20, 22-23 (2d Cir. 1986) (per curiam).

A conspiracy claim against ADA Ruzow and Schaffler survived
because the plaintiffs had sufficiently pleaded the existence of
an agreement between those two defendants to serve coercive
subpoenas, visit Laro's clients together, and harass witnesses.
Bertuglia, 839 F. Supp. at 728,735. A stigma plus claim against
ADAs Ruzow and Scotto survived because the plaintiffs alleged

25

that the ADA defendants publicized false charges in the press.
Id. at 735. Finally, a Monell claim against the City for failure
to train and failure to discipline survived because the
plaintiffs alleged a longstanding policy of the City never
disciplining prosecutors who committed the types of misconduct
ADAs Ruzow and Scotto had allegedly committed. Id. at 738-39.

In connection with the claims against the ADA defendants,
this Court held that all claims premised on subpoenas issued
after a grand jury was convened or that were based on the
alleged conduct of the defendants before the grand jury were
barred by absolute immunity. Id. at 732-33. The malicious abuse
of process claims, Chalfy claims, and conspiracy claims could
proceed only to the extent they were based on activities that
were undertaken when the ADAs were not acting in their roles as
advocates. Id. at 732. If the ADAs were preparing to present a
case to the grand jury, those activities would be protected by
absolute immunity because the ADAs were acting as advocates in
preparing for the initiation of judicial proceedings. Id. The
Court also concluded that "any subpoenas issued or interviews
conducted between the dismissal of the first indictment and the
issuance of the second indictment were also covered by absolute
immunity because the State Supreme Court had retained
jurisdiction after the dismissal of the first indictment, and

explicitly granted the ADA defendants time to convene another grand jury and seek a second indictment." Id.

# III.

## A. SCHAFFLER

The plaintiffs now move for partial summary judgment against Schaffler on their claim of malicious prosecution. Schaffler cross-moves for summary judgment, seeking dismissal of all the § 1983 claims asserted against him, namely: (1) malicious prosecution, (2) false arrest, (3) the Chalfy claim, (4) malicious abuse of process, (5) deprivation of the right to a fair trial, (6) the "stigma plus" claim, (7) and conspiracy to violate the plaintiffs' constitutional rights.[7]

### (1)

To sustain a § 1983 claim based on malicious prosecution, a plaintiff must demonstrate a seizure amounting to a Fourth Amendment violation and establish the elements of a malicious prosecution claim under state law. Manganiello v. City of New York, 612 F.3d 149, 160–61 (2d Cir. 2010); see also Garrett v. City of New York, No. 10cv2689 (JGK), 2011 WL 4444514, at *7

---

[7] The plaintiffs also asserted state law claims of tortious interference with contract and tortious interference with an economic advantage, and Schaffler moved for summary judgment dismissing those claims. The plaintiffs do not oppose Schaffler's motion to dismiss these claims, and those claims are therefore dismissed. Pls.' Mem. of Law in Opp. to Schaffler's Mot. for Summ. J. at 36 n.8.

(S.D.N.Y. Sept. 26, 2011). Under New York law, "[m]alicious prosecution occurs when '(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor.'" Cameron v. City of New York, 598 F.3d 50, 63 (2d Cir. 2010) (quoting Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997)). Schaffler does not dispute that a criminal proceeding was initiated against the plaintiffs and that the second proceeding terminated in Laro and Bertuglia's favor. Schaffler's Mem. of Law in Opp. to Pls.' Mot. for Summ. J. at 6.[8]

However "the existence of probable cause is a complete defense to a claim of malicious prosecution." Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003). The undisputed facts, construed in the light most favorable to Schaffler as the non-moving party, fail to show that Bertuglia and Laro are entitled to judgment as a matter of law. Here, the plaintiffs' motion fails because there was sufficient probable cause for the

---

[8] "[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); Fed. R. Evid. 201(c); Fed. R. Evid. 201(b),(2). It is appropriate to take judicial notice of Judge Zweibel's dismissal of the second indictment and to conclude that the dismissal amounted to a favorable termination in the plaintiffs' favor for the purposes of their § 1983 claims. Cf. Gem Fin. Serv., Inc. v. City of New York, No. 13cv1686 (MKB), 2014 WL 1010408, at *11 n.11 (E.D.N.Y. Mar. 17, 2014) (on a motion to dismiss, recognizing the transcripts from a state court proceeding and considering their relevance to the issue of favorable termination in a malicious prosecution case).

charges in the two indictments.  Indeed, as explained below, Schaffler is entitled to summary judgment, dismissing the claim even construing the evidence in the light most favorable to the plaintiffs.

As a threshold matter, well-established law in this Circuit requires this Court to apply a presumption of probable cause when there is a grand jury indictment. See id. at 72 ("The District Court also correctly recognized that, under New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"(emphasis in the original) (quoting Colon v. City of New York, 455 N.E.2d 1248, 1251(N.Y. 1983))); Colon, 455 N.E.2d at 1250 ("Once a suspect has been indicted, however, the law holds that the grand jury action creates a presumption of probable cause." (internal citation omitted)).

> The rule is founded upon the premise that the grand jury acts judicially and it may be presumed that it has acted regularly. The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the grand jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith. . . . In [New York], the trial court may not weigh the evidence upon

> which the police acted or which was before
> the grand jury after the indictment has
> issued. If plaintiff is to succeed in his
> malicious prosecution action after he has
> been indicted, he must establish that the
> indictment    was    produced    by    fraud,
> perjury, the suppression of evidence or
> other police conduct undertaken in bad
> faith.

Colon, 455 N.E.2d at 1250-51 (internal citations omitted).

     Bertuglia argues that the grand jury presumption does not

apply in this case because Judge Zweibel dismissed the

indictments. However, in Colon, the New York Court of Appeals

made it clear that a court is not permitted to weigh the

evidence presented to the grand jury to determine if there was

probable cause. The indictment itself answers that question in

the affirmative. Id. at 1251. In Colon itself, the New York

Court of Appeals found that it was irrelevant that the

prosecutor dismissed the indictment because the People lacked

evidence to establish a prima facie case. Id. And in Rothstein

v. Carriere, 373 F.3d 275 (2d Cir. 2004), the Court of Appeals

for the Second Circuit reversed the district court's judgment

for a plaintiff in a § 1983 action partially due to the district

court's refusal to apply the presumption of probable cause

created by an indictment. Id. at 283. In Rothstein, the

prosecutor also dismissed the grand jury indictment. Id. at 281.

     Here, too, the indictments were dismissed by the court,

although unlike in Colon and Rothstein, the prosecutor did not

initiate the dismissal. But dismissals of indictments based on insufficient evidence for the prosecution to make out a prima facie case do not vitiate the presumption of probable cause from a grand jury indictment. See Colon, 455 N.E.2d at 1251 (noting that the DA's dismissal of the indictment did not vitiate the presumption because it was not "a concession that the arrest was made without probable cause" in contrast to a grand jury indictment that is superseded by a no bill action by the grand jury); Cornell v. Kapral, No. 09cv0387 (GTS/ATB), 2011 WL 94063, at *9 (N.D.N.Y. Jan. 11, 2011), aff'd, 483 F. App'x 590 (2d Cir. 2012) ("The presumption of probable cause created by an indictment is not even vitiated, at least in New York State, by a dismissal of the indictment based on a discovery that the people lack evidence to establish a prima facie case of guilt.").[9]

Therefore, to rebut the presumption the plaintiffs must show that the indictment was produced by fraud, perjury, or

---

[9] The plaintiffs contend that a dismissed indictment is null and void under Weyant v. Okst, 101 F.3d 845 (2d Cir. 1996). In Weyant, the Court of Appeals concluded that it was inappropriate to consider a guilty verdict of resisting arrest as evidence of probable cause for an arrest because the conviction had been reversed. Weyant, 101 F.3d at 854. Weyant is inapposite. It concerned the effect of a guilty verdict in a town court that was reversed on appeal. In Weyant, an information charged the plaintiff with resisting arrest, and there was no grand jury indictment. Id. at 850. The Court of Appeals concluded that the information was insufficient to give the Town Court jurisdiction. Id. at 854. Weyant had nothing to with the presumption of probable cause that flows from a grand jury indictment or the effect of a subsequent dismissal of such an indictment.

suppression of evidence.[10] <u>Rothstein</u>, 373 F.3d at 283. The
plaintiffs cannot rely on the dismissals because while Judge
Zweibel criticized the prosecution's presentation of bad act
evidence and examination of witnesses before the grand jury,
there is no mention of false evidence or perjury. Norinsberg
Decl. 3, Ex. H. at 32-33. Judge Zweibel concluded that there was
insufficient evidence to proceed with a criminal prosecution and
trial. He did not conclude that there was the type of severe
misconduct that New York law requires to vitiate the presumption
of probable cause afforded by a grand jury indictment. <u>See</u>
<u>Colon</u>, 455 N.E.2d at 1251.

The plaintiffs cannot overcome the grand jury presumption
because the plaintiffs fail to raise a triable issue of fact
that Schaffler lied to the grand jury or to ADA Ruzow. The
plaintiffs have produced no evidence that the grand jury was
defrauded or that its integrity was undermined. With respect to
whether Schaffler lied to the grand jury, it is undisputed that
Schaffler did not testify before the grand jury and thus, it was
impossible for him to have presented false testimony to the

_____

[10] The plaintiffs bear the burden of proof in rebutting the presumption of
probable cause. <u>See</u> <u>Savino</u>, 331 F.3d at 73. It is the plaintiffs' burden, not
only on their motion for partial summary judgment but also on Schaffler's
cross motion for summary judgment. <u>See</u> <u>id.</u> ("In order to survive a motion for
summary judgment on the malicious prosecution claim, [the plaintiff] must
have submitted evidence sufficient for a reasonable jury to find that his
indictment was procured as a result of . . . conduct undertaken in bad
faith.").

grand jury. Schaffler's R. 56.1 Stmt. ¶ 54; Pls.' Resp. to
Schaffler's R. 56.1 Stmt. ¶ 54.

The presumption can be rebutted if a defendant failed to
give a "complete and full statement of facts . . . to the
District Attorney. . . [or] misrepresented or falsified
evidence." See Rothstein, 373 F.3d at 283 (internal citations
omitted). But there is no evidence that Schaffler did so in this
case. Out of the extensive record in this case, the plaintiffs
point to three allegedly false statements Schaffler made to ADA
Ruzow: (1) that the plaintiffs had knowingly overbilled the Port
Authority; (2) that Kolakowski had complained to Bertuglia about
the lack of equipment; and (3) that Bertuglia was a "thief" and
a "crook" who "stole a lot of money." Pls.' Mem. of Law in Opp.
to Schaffler's Mot. for Summ. J. at 15-16; Pls.' R. 56.1 Stmt.
¶¶ 59-62; Schaffler's Resp. to Pls.' R. 56.1 Stmt ¶¶ 59-62.

The plaintiffs argue that these statements rebut the grand
jury presumption because the statements show Schaffler gave ADA
Ruzow baseless information. The plaintiffs argue that Schaffler
lied to ADA Ruzow in May 2007, and told her that Laro was
knowingly overbilling the Port Authority.[11] There is no

---

[11] While ADA Ruzow testified at her deposition that she assumed she was told
by Schaffler that Laro was overbilling the Port Authority, she had no
recollection of how he described the situation and no recollection of
Schaffler describing the case as "knowing overbilling." Miller Decl. 1, Ex.
R, at 48, 235-37. Schaffler referred the matter to the DA's Office for
"consideration for criminal charges" but whether the investigation warranted
criminal prosecution was Ruzow's "determination." Id. at 236.

contemporaneous evidence of what Schaffler actually said to ADA
Ruzow about the alleged overbilling at the initiation of the
ADA's investigation in May 2007. See Norinsberg Decl. 3, Ex. BB,
at 48-49. An email from March 29, 2007, states that Schaffler
was "looking into" Bertuglia and Laro for overbilling, and the
DA's Office opened an investigation in May 2007. Krasnow Decl.,
Ex. F, at 30; id. at 40. Schaffler also admitted that he told
ADA Ruzow "in sum and substance" that it was his opinion that
Laro had knowingly overbilled the Port Authority but he admitted
that he made the statement at "some point during the
investigation." Norinsberg Decl. 3, Ex. CC, at 117-18. The
evidence available to Schaffler supported a conclusion of
overbilling. Schaffler had access to the Laro proposal and
contract, and the Laro proposal included the cost of new
equipment in the hourly wage. See Krasnow Decl., Ex. E, at 15
("Equipment"), 17 ($154,493 total cost per annum); see generally
Miller Decl. 1, Ex. B. And Bertuglia admitted that the Port
Authority paid all the invoices from 2005 to 2007 that Laro
submitted. Miller Decl. 3, Ex. KK, at 435-36.  Thus, Schaffler's
statements about overbilling were not false.

     The plaintiffs rely on Schaffler's 2014 deposition where he
stated that he did not "personally" have any knowledge of Laro
overbilling or potentially overbilling the Port Authority in
2007. See Norinsberg Decl. 3, Ex. CC, at 41-42; Pls.' R. 56.1

Stmt. ¶ 66. The plaintiffs contend that Schaffler told ADA Ruzow
about the overbilling and referred the matter for criminal
prosecution without investigating whether the accusation was
true. But, it is undisputed that in the course of the months
following May 2007, and before the first grand jury presentation
over a year later, Schaffler interviewed employees of the Port
Authority and former employees at Laro who informed him that new
equipment was missing. See Schaffler's R. 56.1 Stmt. ¶¶ 50, 53
(Ferrone inspected the machines at the bus terminal in early
2008 and found that the scrubber and sweeper were old models);
Pls.' Resp. to Schaffler's Stmt. ¶¶ 50, 53. The evidence
described above supports Schaffler's inferences that the
plaintiffs were overbilling the Port Authority. Schaffler was an
investigator. He was not a witness with personal knowledge and
the investigation was pursued for over a year before ADA Ruzow
presented the case to the grand jury without relying on
Schaffler.

The plaintiffs also argue that Schaffler's statement to ADA
Ruzow that Kolakowski complained to Bertuglia about the missing
equipment was false. See Norinsberg Decl. 4, Ex. NNN, at 78.
Kolakowski, in a 2014 deposition, denied that he complained to
Bertuglia or that Kolakowski told Schaffler or any other
investigator about complaining to Bertuglia. Norinsberg Decl. 4,
Ex. JJJ, at 101. But whether Kolakowski ever actually told

35

Schaffler that he spoke to Bertuglia is irrelevant to the claim for malicious prosecution. Schaffler's statement could not have called into question the integrity of the grand jury because no testimony was presented to the grand jury by Schaffler or by ADA Ruzow that Kolakowski had directly complained to Bertuglia.

Kolakowski did not testify before the grand jury considering the first indictment. Kolakowski testified before the grand jury considering the second indictment that he complained to Laro employees other than Bertuglia about the missing equipment. Kolakowski testified that he reported to Robert Vetter and later Gregory Pulitano and Bertuglia, and that Kolakowski knew that Laro was supposed to buy new equipment. Miller Decl. 1, Ex. I, at 361-62. Kolakowski testified that Laro never purchased the new equipment. Id. at 362-63. Kolakowski testified that D'Aleo at the Port Authority asked him "once or twice a week" where the new equipment was. Id. at 364-65, 371 (saying that D'Aleo asked about the equipment six or seven times). Kolakowski also testified that he spoke to Gregory Pulitano at Laro corporate headquarters about the missing equipment, and that eventually "everybody forgot about it basically." Id. at 365.[12] Given Kolakowski's first hand

---

[12] In his deposition, Kolakowski did not recall his grand jury testimony and stated that he had no reason to doubt his testimony. Miller Decl. 1, Ex. J. at 19-21. Kolakowski's description about his conversations with D'Aleo, Vetter, and Pulitano in 2014 were consistent with his 2009 grand jury testimony although he only recalled D'Aleo asking him about the equipment two

testimony, the grand jury was not misled by Schaffler's alleged statement to ADA Ruzow.

Schaffler's statement is in any event, supported by other evidence. Bertuglia himself admitted having a conversation with Kolakowski about the equipment in 2008 in which Kolakowski said that Vetter did not finish purchasing the equipment before he left Laro. Miller Decl. 1, Ex. EE, at 191-94. And Vetter testified to the grand jury that Bertuglia *was* aware about the need to purchase the equipment and that Vetter (who left Laro in spring of 2005) had discussed the equipment with Bertuglia. Miller Decl. 1, Ex. G-2, at 56 (discussing the lack of financing for the equipment), 60-61.

Bertuglia also claims that Schaffler referred to him as a "crook" in front of ADA Ruzow, and that this statement is false because Bertuglia did not knowingly overbill the Port Authority. Miller Decl. 2, Ex. D, at 243-44; Miller Decl. 3, Ex. KK, at 510-11. Schaffler admitted that he told ADA Ruzow "[i]n sum and substance" that it was his opinion that Laro had knowingly overbilled the Port Authority and that Bertuglia was a "thief," although he did not use those exact words. Norinsberg Decl. 3, Ex. CC, at 117-18. Schaffler appears to have called Bertuglia a "thief" or "crook" or something to that effect to his face while

---

or three times. Id. at 22-24. In any event, inconsistencies without more are not sufficient to rebut the grand jury presumption. See Watson v. Grady, No. 09cv3055 (NSR), 2015 WL 2168189, at *15 (S.D.N.Y. May 7, 2015).

Bertuglia and his attorney were meeting with Schaffler and ADA Ruzow. Miller Decl. 3, Ex. KK, at 510-11. The context shows that Schaffler's statement was a statement of Schaffler's personal opinion, not a statement of fact.

Moreover, the evidence does support a conclusion of overbilling. Bertuglia admitted that the Port Authority paid all the invoices from 2005 to 2007 that Laro submitted. Id. at 435-36. And Bertuglia admitted that during the contract period, two pieces of equipment were not replaced—the scrubber and sweeper. Id. at 418. Bertuglia has even admitted that he had a "partial understanding" that Laro was paid at an hourly rate of $0.76 for the equipment. Schaffler's R. 56.1 Stmt. ¶ 71; Pls.' Resp. ¶ 71; Miller Decl. 1, Exhibit EE, at 194-95. Schaffler's statement was not false nor was it the type of statement that would affect the grand jury's integrity.

The plaintiffs have failed to show a triable issue of fact that Schaffler provided knowingly false evidence to the grand jury or that he made knowingly false statements to ADA Ruzow. Therefore, the plaintiffs have not overcome the grand jury presumption of probable cause. [13]

---

[13] In a letter to the Court, the plaintiffs contend that the ADAs' alleged prosecutorial misconduct defeats the grand jury presumption. The plaintiffs cite Tabaei v. N.Y.C. Health and Hosps. Corp., No 11cv2013 (JSR), 2012 WL 5816882, at *6 (S.D.N.Y. Nov. 14, 2012) for the proposition that prosecutorial misconduct including disregard of the rules of evidence may rebut the presumption of probable cause. This position appears to go beyond the limited circumstances recognized by the New York Court of Appeals as

On the merits, the plaintiffs' malicious prosecution claim fails because the plaintiffs have produced no evidence to support an essential element of their claim: causation. If there is a superseding cause for the indictment, a defendant may not be liable for malicious prosecution. See Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999) (noting the well-established rule that the chain of causation is broken "in the absence of evidence that [the defendant] misled or pressured the official who could be expected to exercise independent judgment"); see also Douglas v. City of New York, 595 F. Supp. 2d 333, 342 (S.D.N.Y. 2009); Alcantara v. City of New York, 646 F. Supp. 2d 449, 459 (S.D.N.Y. 2009).

There is an exception for a defendant who has fabricated evidence or provided false testimony. To prevail in a § 1983 malicious prosecution action premised on false and fabricated statements, those statements must have been the proximate cause of the prosecution. In Bermudez v. City of New York, 790 F.3d 368 (2d Cir. 2015), the Court of Appeals concluded that although the ADA made the independent decision to prosecute the plaintiff, the plaintiff had raised a triable issue of fact as to whether the ADA may have been misled about the fact that the

---

sufficient to overcome the presumption. See Colon, 455 N.E.2d at 1250-51; see also Rothstein, 373 F.3d at 283. In any event, there was sufficient evidence of probable cause to defeat the plaintiffs' malicious prosecution claim.

defendant police officers had coerced witnesses and used improper identification procedures. Id. at 374-75.

The evidence in this case shows that Schaffler was not the proximate cause of the prosecution. ADA Ruzow decided to prosecute the plaintiffs based on her independent examination of witnesses and the evidence of the alleged overbilling. Miller Decl. 1, Ex. R, at 50, 52 (ADA Ruzow decided to issue subpoenas), 236 (ADA Ruzow made the determination of whether to prosecute Laro and Bertuglia). Her independent decision was the superseding cause of the plaintiffs' prosecution.

It is undisputed that Schaffler provided information and updates to ADA Ruzow and participated in the Laro investigation. See Pls.' R. 56.1 Stmt. ¶¶ 67, 69; Schaffler's Resp. to Pls.' R. 56.1 Stmt. ¶¶ 67, 69 (Schaffler updated ADA Ruzow on the progress of the investigation). But as described above, the plaintiffs fail to show Schaffler made false statements or fabricated or withheld evidence. And the information Schaffler provided did not constitute evidence. ADA Ruzow decided not to call Schaffler as a witness before the grand jury because she had "the actual witnesses there." See Miller Decl. 1, Ex. R, at 233-34. It is undisputed that ADA Ruzow personally interviewed the witnesses and presented their testimony to the grand jury. The plaintiffs provide no evidence that Schaffler somehow misled ADA Ruzow. Schaffler's statements to ADA Ruzow may have

influenced her to investigate Bertuglia and Laro, but his
statements were not false, and ADA Ruzow's ultimate decision to
prosecute the plaintiffs was based on the evidence from several
sources, such as Robert Vetter. Miller Decl. in Reply to Opp. to
Mot. ("Miller Decl. 4"), Ex. RR, at 136-38 (ADA Ruzow noting
evidence that supported her conclusion that Bertuglia knew about
the equipment requirement). ADA Ruzow's independence severs the
chain of causation between Schaffler's statements and the
indictments.

Moreover, unlike the prosecutor in Cameron v. City of New
York, ADA Ruzow did not merely verify Schaffler's reports and
rely on his investigation. See Cameron, 598 F.3d at 64. In
Cameron, the defendant police officer's personal account of the
arrest was the main evidence against the plaintiff, along with
video footage that arguably corroborated the officer's account,
and it was the officer's account that led the prosecutor to
prosecute the case against the plaintiff. Id. But Schaffler's
investigative role was very different. Schaffler did not have
personal knowledge of the billing practices of Laro and
Bertuglia. He relayed what he gleaned from witness interviews to
ADA Ruzow, without providing any independent evidence. The
record reflects that ADA Ruzow interviewed witnesses, subpoenaed
documents related to the Port Authority contract, and built a
case against the plaintiffs that did not depend on Schaffler's

suspicions of overbilling. See Bermudez, 790 F.3d at 377 (noting
that even if the ADA was misled by the police's photo array, the
ADA interviewed the witnesses herself and their testimony
provided sufficient probable cause); Miller Decl. 1, Ex. R, at
50.  Thus, no reasonable juror could find that Schaffler's
actions satisfied the causation element of the plaintiffs'
§ 1983 malicious prosecution claim.

Furthermore, the plaintiffs' malicious prosecution claim
also fails because there was sufficient probable cause[14] to
prosecute Laro and Bertuglia of the grand larceny charges in the
first and the second indictments.[15] "The determination of

---

[14] The plaintiffs argue that Federal Rule of Evidence 803(8) authorizes the
admission of Judge Zweibel's opinions as substantive evidence of the lack of
probable cause. That Rule provides an exception to the exclusion of hearsay
statements in a civil case for certain factual findings from an
investigation. This provides for the admission of an administrative law
judge's findings in an administrative proceeding. See Fed. R. Evid.
803(8)(A)(iii), (B); Henry v. Daytop Vill., Inc., 42 F.3d 89, 96 (2d Cir.
1994). But Judge Zweibel's opinions are different from factual findings in an
administrative proceeding. His opinions concern legal questions about the
misconduct of the prosecutors and the sufficiency of the evidence and are not
admissible under Rule 803(8). See, e.g., U.S. Steel, LLC, v. Tieco, Inc., 261
F.3d 1275, 1287 (11th Cir. 2001) (state court opinion dismissing indictments
was inadmissible hearsay); Nipper v. Snipes, 7 F.3d 415, 417-18 (4th Cir.
1993) (concluding a state court opinion was hearsay and was inadmissible);
Trs. of Univ. of Pa. v. Lexington Ins. Co., 815 F.2d 890, 905 (3d Cir. 1987)
(statements by state court judge were inadmissible hearsay); Blue Cross &
Blue Shield of N.J., Inc. v. Philip Morris, Inc., 141 F. Supp. 2d 320, 323
(E.D.N.Y. 2001) (Weinstein, J.). Because Judge Zweibel's opinions are hearsay
and no hearsay exception applies, the opinions are inadmissible on this
motion for the truth of whether there was sufficient probable cause for the
first or second indictments. They are also not admissible on the question of
whether there was prosecutorial misconduct. As explained above, the decisions
are admissible only for the fact that the prosecution terminated in favor of
the plaintiffs.

[15] Bertuglia and Laro were first indicted on charges of grand larceny in the
second degree, three counts of falsifying business records in the first
degree, and three counts of offering a false instrument for filing in the
first degree. The DA's Office dropped the charges of filing false instruments

probable cause to *prosecute* is distinct from probable cause to *arrest*, and is assessed in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of the arrest." Sankar v. City of New York, 867 F. Supp. 2d 297, 311 (E.D.N.Y. 2012) (analyzing probable cause at the time the defendant filed a sworn complaint and when he testified before the grand jury) (citing Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003) and Carson v. Lewis, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999)) (internal citations quotation marks omitted) (emphasis in the original)). "Probable cause 'exists when [one] ha[s] knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" Williams v. Town of Greenburgh, 535 F.3d 71, 79 (2d Cir. 2008) (quoting Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007)); Rothstein, 373 F.3d at 292.

ADA Ruzow testified that the overbilling investigation was a joint investigation that the Port Authority brought to the DA's office's attention after doing some "preliminary investigation" and that "an additional investigation [was] done

---

and falsifying business records when ADA Ruzow presented the case to the second grand jury.

after it was initially brought to reach the threshold required." Miller Decl. 1, Ex. R, at 50. The DA's Office "interviewed a number of witnesses, reviewed documents, subpoenaed individuals, and companies." Id. The crucial inquiry for a claim of malicious prosecution is not whether Laro and Bertuglia actually overbilled and defrauded the Port Authority but whether the evidence from the investigation supports a finding of probable cause to believe that Laro and Bertuglia had knowingly overbilled the Port Authority such that a reasonable person would believe they had committed grand larceny.[16] See Phillips v. DeAngelis, 571 F. Supp. 2d 347, 354-55 (N.D.N.Y. 2008), aff'd, 331 F. App'x 894 (2d Cir. 2009).

Based on the evidence available to the DA's Office, there was sufficient probable cause to seek the first indictment against Bertuglia and Laro. First, as to Laro, there is clear probable cause from the first grand jury indictment, that Judge Zweibel did not dismiss against Laro. Norinsberg Decl. 3, Ex. A. As to Bertuglia, several witnesses testified that Laro knew about the equipment requirement and flouted it, and that

---

[16] "A person is guilty of grand larceny in the second degree when he steals property and when . . . [t]he value of the property exceeds fifty thousand dollars." N.Y. Penal Law § 155.40(1). The plaintiffs contend there was no probable cause because there was no evidence that the plaintiffs knew about the "new and unused equipment" requirement in the contract, knew that two pieces of equipment had not been delivered, and ever instructed any Laro employee not to purchase the equipment. Pls.' Mem. in Supp. of Mot. for Summ. J. at 11-14.

Bertuglia, as Laro's principal and CEO, was aware of the requirement by virtue of having signed the contract. There was testimony that Bertuglia signed the Letter of Acceptance that accepted the Port Authority's offer and contract to clean the bus terminal. Miller Decl. 2, Ex. C, at 8. The contract provided that Laro was required to purchase certain equipment, id. at 9, and Laro indicated that it would spend about $153,000 on the equipment. Id. at 11. Laro received payment for the entire period of the contract, and the invoices, though not itemized, included an annual lump sum charge that incorporated the hourly wage rate for equipment. Id. 13-14, 24-25. Laro did not purchase the sweeper or the scrubber. Id. at 30. And Vetter testified that Bertuglia had the ultimate decision-making power at Laro. Id. at 33.

On the basis of all the information known to the DA's Office, there was sufficient evidence from reasonably reliable sources, including Port Authority employees and a Laro employee, to conclude that Bertuglia and Laro were knowingly overbilling the Port Authority and submitting false invoices that reflected an annual lump sum that had not been adjusted to account for the fact that equipment was never purchased. See United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004). Thus, there was

45

sufficient probable cause to prosecute Laro and Bertuglia for grand larceny.[17]

Moreover, the evidence presented to the second grand jury was considerably stronger. It included the testimony of Robert Kolakowski and additional testimony from Robert Vetter. Their testimony addressed Bertuglia's knowledge of the provisions of the contract and buttressed the circumstantial evidence of Bertuglia's and Laro's intent to defraud. During his second grand jury testimony, Vetter testified that Bertuglia was aware that new equipment had to be purchased under the Port Authority contract and that Bertuglia was aware that the cost of the

_____

[17] The plaintiffs, citing Janetka v. Dabe, 892 F.2d 187 (2d Cir. 1989), argue that each charge must be individually supported by probable cause. Janetka is not on point because it concerned whether a conviction on a less serious charge indicated that the proceeding did not terminate in favor of the accused despite the acquittal on a more serious charge. Id. at 189-90. Similarly, in Posr v. Doherty, 944 F.2d 91 (2d Cir. 1991) the Court of Appeals found that a finding of probable cause on a lesser charge would not foreclose a finding of malicious prosecution on other charges requiring more culpable behavior. Id. at 100. The Court of Appeals reasoned that the rule was justified because otherwise "an officer with probable cause as to a lesser offense could tack on more serious, unfounded charges which would support a high bail or a lengthy detention, knowing that the probable cause on the lesser offense would insulate him from liability for malicious prosecution on the other offenses." Id. Neither Janetka nor Posr is relevant here. Janetka and Posr involved malicious prosecution claims against police officers who were directly involved in the prosecution. In Posr, the prosecution was commenced by a complaint supported by the defendant police officer's affidavit that charged each of the offenses. Id. at 94. There is no evidence in this case that Schaffler was directly involved in the specifics of the charges that would be presented to the grand jury. Moreover, this is not a case where there is probable cause on a less culpable charge but not on a more culpable charge. The charge of grand larceny in the second degree is a Class C felony under N.Y. Penal Law § 155.40(1). The remaining six counts for falsifying business records in the first degree in violation of N.Y. Penal Law § 175.10, and offering a false instrument for filing in first degree, in violation of N.Y. Penal Law § 175.35(1), are Class E felonies. This is not a case where probable cause on a less culpable charge is used to justify a prosecution on a more culpable charge.

equipment was built into the hourly wage rate. Miller Decl. 1,
Ex. G-2, at 60-61. Vetter said he had short conversations with
Bertuglia about the new equipment and how much it was all going
to cost. Most of his conversations about the equipment were with
Steve Davidson, another Laro employee. Bertuglia would "pop in
[to] ask some questions." Id. at 46. Vetter said he believed
that Bertuglia was aware of the equipment provision because they
had reviewed the contract several times. Id. at 50, 61. Vetter
testified that Bertuglia was in and out of meetings when they
were discussing the need for new equipment, including early
meetings at which the new equipment requirement was first
discussed when Laro was preparing to bid on the Port Authority
contract.  Id. at 56, 60, 46; see also Krasnow Decl., Ex. D, at
240.[18] Vetter discussed financing and the inability to purchase
the new equipment in front of Bertuglia. Miller Decl. 1, Ex. G-
2, at 60.

Laro submitted invoices that included charges for equipment
that was never purchased. The charges reflected the cost of the
new equipment to be purchased for $154,493.00 that was not
actually purchased. Schaffler's R. 56.1 Stmt. ¶ 12; Pls.' Resp.
to Schaffler's R. 56.1 Stmt. ¶ 12; Miller Decl. 1, Ex. F, at

---

[18] At his 2014 deposition, Vetter testified that he had discussions with
Bertuglia "in passing" about getting financing for the equipment. Miller
Decl. 1, Ex. H, at 60-61, 88-89 (answering that he definitely had at least
one conversation with Bertuglia in 2005).

347-48. It is undisputed that Laro never actually purchased the
equipment. Miller Decl. 1, Ex. K, at 386. Bertuglia signed the
contract and Vetter testified that Bertuglia was aware of the
contract's equipment requirement, and the difficulty of
financing the purchase. There was sufficient probable cause for
a reasonable person to conclude that Bertuglia and Laro had an
intent to defraud by continuing to submit the invoices that
included payments for equipment that had not in fact been
purchased. Thus, there was sufficient probable cause to
prosecute Laro and Bertuglia of the charges of grand larceny in
the first and second indictments. The plaintiffs fail to show
there was a lack of probable cause. By the same measure, the
evidence in the light most favorable to the plaintiffs for the
purposes of Schaffler's motion for summary judgment, shows that
there is no triable issue of fact on the question of probable
cause. Thus, probable cause forecloses the plaintiffs' claim for
malicious prosecution.

Schaffler's motion for summary judgment dismissing the
malicious prosecution claim should also be granted because the
plaintiffs have not raised a triable issue of fact that
Schaffler acted with malice.  The plaintiffs cannot rely on an
inference of malice based on a lack of probable cause because
there was sufficient probable cause to prosecute the plaintiffs.
See Boyd, 336 F.3d at 78("A lack of probable cause generally

creates an inference of malice."). Therefore, the plaintiffs must put forth evidence of actual malice, and they failed to do so. "Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (quoting Nardelli v. Stamberg, 377 N.E.2d 975, 976 (N.Y. 1978)).

In the Amended Complaint, the plaintiffs argued that Schaffler and the other Port Authority defendants opened the investigation into Laro's alleged overbilling because Bertuglia had complained about the process for bidding contracts and suggested that the Port Authority's process was "rigged." Am. Compl. ¶ 66.  The plaintiffs no longer argue that the Port Authority defendants were retaliating against them. Instead, Bertuglia claims that Schaffler investigated him because of Bertuglia's ties to alleged political corruption. In an email dated January 2010, Schaffler stated that Bertuglia was a "worthy and vulnerable target" whose "vulnerability stems from clear frauds engaged by his mother and father with his assistance." See Norinsberg Decl. 3, Ex. R. Schaffler also referred to a wiretap interception where Bertuglia mentioned a contact at the Port Authority and his ties to political figures.

49

Id. Schaffler does not dispute the content of the email.
Schaffler's Resp. to Pls.' R. 56.1 Stmt. ¶¶ 56-57. But even if
Schaffler's motive was to investigate Bertuglia in the hopes of
uncovering corruption within the Port Authority, an
investigative motive is not an improper motive or a desire other
than to see justice served. See Lowth, 82 F.3d at 573. Without
the essential element of malice, the plaintiffs cannot proceed
with their malicious prosecution claim.

Bertuglia's motion for summary judgment on the malicious
prosecution claim against Schaffler should be denied and
Schaffler's motion should be granted because (1) there was
sufficient probable cause to prosecute Bertuglia and Laro based
on the grand jury indictments and the independent evidence and
(2) there is no showing in the record of malice.

Finally, the plaintiffs' motion must also be denied and
Schaffler's motion must be granted because Schaffler is
protected by qualified immunity. "While the right to be free
from malicious prosecution is a clearly established right,
defendants may nevertheless enjoy qualified immunity if it was
objectively reasonable for them to believe that their actions
did not violate that right." Bonide Prods., Inc. v. Cahill, 223
F.3d 141, 145 (2d Cir. 2000) (per curiam) (internal quotation
marks and alterations omitted). "Normally, it is only the
'plainly incompetent or those who knowingly violate the law'-

50

those who are not worthy of the mantle of office—who are
precluded from claiming the protection of qualified immunity."
Moore v. Andreno, 505 F.3d 203, 214 (2d Cir. 2007) (quoting
Malley v. Briggs, 475 U.S. 335, 341 (1986)); see also Garrett,
2011 WL 4444514, at *9; Alcantara, 646 F. Supp. 2d at 462. "An
officer's determination is objectively reasonable if there was
'arguable' probable cause at the time of the arrest—that is, if
officers of reasonable competence could disagree on whether the
probable cause test was met." Gonzalez v. City of Schenectady,
728 F.3d 149, 157 (2d Cir. 2013) (internal citation and
quotation marks omitted).

Although Bertuglia claims that Schaffler fabricated
evidence against him and gave false evidence to ADA Ruzow, as
discussed above, there is no evidence in the record to support
that charge. The plaintiffs are complaining about Schaffler's
strongly held opinions rather than fabricated evidence. Here,
the evidence plainly shows at least "arguable probable cause" to
recommend a criminal investigation of Bertuglia and Laro, and
thus, Schaffler is entitled to qualified immunity. Viewing the
evidence in the light most favorable to the plaintiffs, there
was at least arguable probable cause to pursue the criminal
investigation, and therefore, Schaffler has qualified immunity
from the charge of malicious prosecution. For this reason also,
Schaffler's motion for summary judgment dismissing the malicious

prosecution claim is granted and the plaintiffs' motion for summary judgment on the malicious prosecution claim is denied.

### (2)

Schaffler also argues that that the plaintiff's false arrest claim under 42 U.S.C. § 1983 should be dismissed because there was probable cause to arrest Bertuglia, or, in the alternative, there was arguable probable cause and he is entitled to qualified immunity.

"Under New York state law, to prevail on a claim of false arrest a plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Jocks v. Tavernier, 316 F.3d 128, 134–35 (2d Cir. 2003). Although the Court of Appeals has held that the probable cause presumption arising from a grand jury indictment does not apply to a false arrest action, probable cause for the arrest is nevertheless a complete defense to a claim for false arrest. Savino, 331 F.3d at 75–76.[19]

The probable cause analyses for initiating a prosecution and for conducting an arrest are typically distinct, see Sankar, 867 F. Supp. 2d at 311, but here Bertuglia was arrested the day

---

[19] Schaffler did not argue that the false arrest claim was barred by probable cause when the Port Authority defendants moved to dismiss Bertuglia's complaint. See Bertuglia, 839 F. Supp. 2d at 722 n.3.

after the grand jury returned the indictment against him. Thus, the analysis of probable cause for the indictment is the same as the probable cause to support the arrest. See Rivas v. Suffolk Cnty., 326 F. Supp. 2d 355, 361 (E.D.N.Y. 2004) ("[A]fter the plaintiff was arrested he was subsequently indicted by the grand jury. Thus, probable cause is presumed.")(citing Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994)). For the reasons explained above, probable cause existed at the time of the indictments.

As with the malicious prosecution claim, the false arrest claim also fails because the DA's Office made an independent decision to seek the plaintiffs' indictment and subsequent arrest. The rule in this Circuit on causation follows the common law definition of superseding cause—if a third person prevents the actor from being liable for the harm, then the unconstitutional action is not the proximate cause of the violation. Higazy v. Templeton, 505 F.3d 161, 175 (2d Cir. 2007). Here, the prosecutors did their own examination of witnesses and reached their own conclusions. This was not a case where Schaffler fabricated evidence or where the foreseeable consequence of his actions was to deceive the prosecutors. Schaffler did not provide evidence—he spoke to witnesses, and the prosecutors then spoke to the witnesses and presented them to the grand jury. These facts are very different from Higazy

where the defendant coerced the plaintiff while administering a polygraph, manipulated the results, and gave the prosecutor a fabricated confession as evidence. Id. at 176-78. The uncontroverted evidence shows that ADA Ruzow decided to present the Bertuglia and Laro case to a grand jury and examined witnesses before the grand jury. Miller Decl. 1, Ex. R. at 50. No reasonable jury could conclude that Schaffler's statements to ADA Ruzow were the proximate cause of the indictment and Bertuglia's arrest.

Additionally, qualified immunity protects Schaffler. As explained above, Schaffler had sufficient information based on his investigation and discussions with witnesses to conclude that Laro and Bertuglia had knowingly overbilled the Port Authority. See Savino, 331 F.3d at 76 ("Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." (internal quotation marks omitted)); Krasnow Decl., Ex. H, at 77-78. Therefore, Schaffler's motion for summary judgment dismissing the false arrest claim is granted.

### (3)

Schaffler also moves to dismiss the Chalfy claim the plaintiffs asserted against him. Chalfy claims under § 1983 are

substantive due process claims that are available when there is
"a true pattern of harassment by government officials." Chalfy,
804 F.2d at 22. "Generally, defendants in [Chalfy] cases either
acted illegally, or used their legal authority for a purpose
other than that for which it was intended." Contractors Against
Unfair Taxation Instituted on New Yorkers v. City of New York,
No. 93cv4718 (KMW), 1994 WL 455553, at *3 (S.D.N.Y. Aug. 19,
1994). The challenged activity must be one that "'can properly
be characterized as arbitrary, or conscience-shocking, in a
constitutional sense.'" Interport Pilots Agency, Inc. v. Sammis,
14 F.3d 133, 144 (2d Cir. 1994) (quoting Collins v. City of
Harker Heights, 503 U.S. 115, 128 (1992)). As such, Chalfy
claims are exceedingly difficult to prove. See Kastle v. Town of
Kent, No. 13cv2256 (VB), 2014 WL 1508703, at *9 (S.D.N.Y. Mar.
21, 2014) (noting that the Chalfy line of cases does not extend
the breadth of substantive due process where a claim may more
appropriately be covered by the Fourth Amendment). In Chalfy
itself, the Court of Appeals affirmed summary judgment
dismissing such a claim against the Taxi and Limousine
Commission and other defendants because the plaintiffs had shown
only overzealous and strict adherence to procedures and not
"systematic and intentional harassment." Chalfy, 804 F.2d at 22-
23.

Here, the plaintiffs point to a series of subpoenas,
witness interviews, and investigations into Bertuglia's family
and Laro employees as proof of a pattern of harassment. It is
undisputed that Schaffler spoke to Laro employees when he served
subpoenas or when he asked them to meet with the DA's Office
voluntarily. Miller Decl. 1, Ex. T, at 151. Schaffler told at
least one witness that she had to come in for interviews with
the DA's Office. Supp. Norinsberg Decl. in Supp. of Pls.' Mot.
("Norinsberg Decl. 4"), Ex. NNN, at 141-42. Schaffler also spoke
to various entities with whom Laro had contracted and which
appeared to be contracting with Loyal Building Services, a
company that Bertuglia's son-in-law started. Id. at 265-68;
Norinsberg Decl. 3, Ex. X., ¶¶ 8-10. Schaffler stated that he
spoke to employees of the various churches, hospitals, and
commercial centers as part of the healthcare fraud
investigation. Norinsberg Decl. 4, Ex. NNN, at 269.

The plaintiffs point out that a couple Laro employees were
upset because Schaffler came to their homes and disrupted their
families. Pulitano stated that Schaffler and Ferrone came to his
home to serve him with a subpoena and told him to "take care of
[himself and his] family." Norinsberg Decl. 4, Ex. LLL, at 193.
Pulitano stated that he felt like he could be personally
threatened by Schaffler. Id. at 194-95. Vacca also testified
that Schaffler was "tracking [him] down" and that they came to

56

his house three or four times and scared his daughter.
Norinsberg Decl. 4, Ex. KKK, at 16.  Vacca testified that
Schaffler wanted information about how often Bertuglia's parents
were working at Laro and their involvement with the company. <u>Id.</u>
at 17, 88.

Schaffler also worked closely with ADA Ruzow and suggested
pursuing certain leads in the investigation concerning Bertuglia
and Laro, including looking into Laro's payroll and possible
healthcare fraud by Bertuglia's parents.  Norinsberg Decl. 3,
Ex. CC, at 174.  While ADA Ruzow was reluctant to investigate
Bertuglia's immediate family, she did open an investigation, and
ultimately decided not to prosecute Bertuglia's family. <u>Id.</u> at
175.

Taking all these facts as true, the plaintiffs still fail
to adduce evidence of a pattern of systematic and intentional
harassment that shocks the conscience. At most the evidence
shows that Schaffler interviewed witnesses, went to their homes,
and was overly zealous and less than courteous on a couple of
occasions. The fact that Schaffler pursued an investigation of
healthcare fraud or pension fraud is not evidence of arbitrary
or conscience-shocking behavior. The evidence would not allow a
jury to find that Schaffler's conduct amounted to an actionable
pattern of harassment. Viewing the evidence in the light most
favorable to the plaintiffs, the evidence falls short of the

high threshold necessary for a <u>Chalfy</u> claim. No reasonable jury could find that Schaffler's interviews or investigative methods constituted conscience-shocking harassment or that Schaffler was trying to force Laro out of business. <u>See</u> <u>Interport</u>, 14 F.3d at 144. Schaffler's motion for summary judgment on the plaintiffs' <u>Chalfy</u> claim is granted.

### (4)

Schaffler next moves for summary judgment dismissing the malicious abuse of process claim. Bertuglia and Laro claim that Schaffler employed subpoenas improperly and maliciously prosecuted them. Am. Compl. ¶ 224-31.

"A malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." <u>Savino</u>, 331 F.3d at 76 (internal citation and quotation marks omitted). "[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." <u>Id.</u> at 77.  The use of the instrument or process must have itself

been improper. See Curiano v. Suozzi, 469 N.E.2d 1324, 1326
(N.Y. 1984)(dismissing the plaintiffs' abuse of process claim
because "[t]hey do not contend that the summons issued by
defendants was improperly used after it was issued but only that
defendants acted maliciously in bringing the action. A malicious
motive alone, however, does not give rise to a cause of action
for abuse of process.").

Schaffler contends, without contradiction, that he did not
issue the subpoenas and served only those subpoenas issued by
the DA's Office. Schaffler's R. 56.1 Stmt. ¶ 51; Pls.' Resp. to
Schaffler's R. 56.1 Stmt. ¶ 51. There is also no evidence that
Schaffler had an improper motive or pursued a collateral purpose
outside the legitimate ends of process. As explained above,
there is no evidence of malice. While Schaffler described
Bertuglia in January 2010, as a "worthy and vulnerable target,"
that comment was in the context of possible healthcare frauds by
Bertuglia's family and wiretaps suggesting possible undue
influence. Norinsberg Decl. 3, Ex. R. Schaffler's interest in
pursuing additional criminal matters and suspects was not a
collateral objective outside the legitimate ends of process.

Moreover, the record shows that while Schaffler
participated in serving subpoenas, ADA Ruzow decided what
subpoenas should be issued. Miller Decl. 1, Ex. R, at 52-53. The
subpoenas themselves were signed by ADA Ruzow or ADA Scotto. The

subpoenas included several subpoenas directing Laro to provide
records related to its contract with the Port Authority and
directing the companies to produce documents related to Laro's
bank accounts and the Bertuglia family's accounts. Bertuglia and
Laro claim that the ADAs issued almost 100 grand jury subpoenas,
but the record reflects that the DA's Office served only
approximately 35 subpoenas. The plaintiffs submitted duplicates
of several subpoenas to substantiate their claims of abuse of
process. Compare Norinsberg Decl. 4, Ex. EEE with Krasnow Decl.,
Ex. M (Overbilling investigation, Case Number 2007-006639);
Krasnow Decl., Ex. Z (Healthcare fraud investigation, Case
Number 2008-007171); Krasnow Decl., Ex. BB (Overbilling
investigation, Case Number 2007-006639). The DA's Office issued
these subpoenas in 2008 and in early-2009 while ADA Ruzow was
preparing to present the case to the grand jury investigating
the overbilling and while the grand jury investigation of the
healthcare fraud was open. The plaintiffs do not argue that any
recipients of the subpoenas moved to quash or limit the
subpoenas as unreasonable.

No reasonable jury could find that Schaffler, who did not
even sign any of the subpoenas, abused the subpoena process to
achieve a collateral objective outside the legitimate ends of
process. Schaffler's motion for summary judgment dismissing the
malicious abuse of process claim is granted.

(5)

Schaffler next seeks summary judgment dismissing the plaintiffs' claim that he deprived them of the right to a fair trial by giving false information to ADA Ruzow. An investigating officer that provides false information to the prosecution that is likely to influence a jury's decision undermines an individual's right to a fair trial. See Ricciuti, 124 F.3d at 130; Perez, 962 F. Supp. 2d at 543.  In Ricciuti, the Court of Appeals found that the plaintiff had a claim for denial of the constitutional right to a fair trial against police officers who fabricated a confession and forwarded it to the prosecutors. Ricciuti, 124 F.3d at 129-30. The information, the Court explained, was likely to influence a jury's verdict and was an unacceptable "'corruption of the truth-seeking function of the trial process.'" Id. at 130 (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)).

The plaintiffs rely on the same three comments by Schaffler to ADA Ruzow that formed the basis for the malicious prosecution allegation—that the plaintiffs had knowingly overbilled the Port Authority, that Kolakowski complained to Bertuglia about the lack of equipment, and that Bertuglia was a "crook." Pls.' Mem. of Law in Opp. to Schaffler's Mot. for Summ. J. at 21. For the

61

reasons explained above, none of the statements constituted false evidence.

Moreover, none of the statements were fabricated evidence or could likely have influenced a jury. Schaffler never testified before the grand jury and his statements were either opinions or hearsay statements of what others, particularly Kolakowski, would say. Schaffler did not create or fabricate any false evidence or false testimony that was likely to influence a jury and could not be found to have violated the plaintiffs' right to a fair trial.

Accordingly, Schaffler's motion for summary judgment on the plaintiffs' fair trial claim is granted.

### (6)

A stigma plus claim "requires a plaintiff to allege (1) the utterance of a statement about [the plaintiff] that is injurious to [the plaintiff's] reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden . . . in addition to the stigmatizing statement." Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005)(internal quotations marks omitted) (alterations in the original). Schaffler moves for summary judgment dismissing the plaintiffs' stigma plus claim and argues that the plaintiffs failed to produce evidence to satisfy either of the two prongs.

62

The termination of a government contract is a loss that would typically satisfy the "plus" prong of a government-imposed stigma that represents a deprivation of liberty and property. See Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004) ("Burdens that can satisfy the "plus" prong under this doctrine include . . . the termination of a plaintiff's government employment." (internal citation omitted)). Laro lost a lucrative government contract, but the loss of the contract flows from the indictment, not from Schaffler's statements. See Norinsberg Decl. 4, Ex. VV (Port Authority Memorandum recommending the termination of Laro's contract); Norinsberg Decl. 4, Ex. XX (Letter of Revocation). Thus, there is no connection between Schaffler's allegedly stigmatizing statements and the "plus."

Bertuglia argues that Schaffler's statements to ADA Ruzow about Laro's overbilling were stigmatizing and defamatory. Bertuglia also points to several allegedly stigmatizing statements Schaffler made to Lou Vacca and Eugene Gasparo, two former Laro employees, about Laro's failure to purchase the equipment. Pls.' Mem. of Law in Opp. to Schaffler's Mot. for Summ. J. at 31; Norinsberg Decl. 4, Ex. KKK, at 89; Norinsberg Decl. 4, Ex. CCC. But none of those statements have any connection to any state-imposed burden or alteration in the plaintiffs' status. See Velez, 401 F.3d at 89 ("[W]e need only determine that both 'stigma' and 'plus' are claimed to be

sufficiently proximate. This requirement will be satisfied where
. . . the stigma and plus would, to a reasonable observer,
appear connected."). Whatever statements Bertuglia made to Laro
employees or to ADA Ruzow are not causally connected to the loss
of the contract.[20] Laro lost the Port Authority contract because
of the ongoing investigation into overbilling—supported by
probable cause—not due to Schaffler's statements to ADA Ruzow,
Gasparo, or Vacca. Thus, the loss of the Port Authority contract
did not result from Schaffler's statements. And the plaintiffs
have failed to point to any other loss that satisfies the "plus"
prong. Indeed, the plaintiffs conceded at argument of the
current motions that there was no connection between Schaffler's
allegedly false statements and a "plus." Without a connection
between a "plus" and a "stigma," the plaintiffs' claim fails and
Schaffler's motion for summary judgment on this claim should be
granted.

### (7)

Schaffler next moves for summary judgment dismissing the
conspiracy claim, arguing that the plaintiffs have not pointed

---

[20] Although in their Amended Complaint the plaintiffs alleged that Schaffler
made false statements to Laro's clients and caused Laro to lose future
contracts, the plaintiffs presently rely only on Schaffler's statements to
ADA Ruzow and Laro employees. Pls. Mem. of Law in Opp. to Mot. for Summ. J.
at 31-32.

to the violation of a constitutional right as the alleged object
of the conspiracy.

"To prove a § 1983 conspiracy, a plaintiff must show:
(1) an agreement between two or more state actors or between a
state actor and a private entity; (2) to act in concert to
inflict an unconstitutional injury; and (3) an overt act done in
furtherance of that goal causing damages." Pangburn v.
Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). The plaintiffs argue
that ADA Ruzow and Schaffler tried to pressure Bertuglia into
cooperating by threatening to indict him and sought information
about Charles Gargano.[21]

This claim founders on the lack of evidence to show an
unconstitutional object of any agreement between Schaffler and
Ruzow. It is undisputed that the investigation in the DA's
Office in its early stages focused on Vincent Grimaldi and
Charles Gargano. Miller Decl. 1, Ex. R, at 20. ADA Ruzow
testified that she first heard Bertuglia's name on a wiretap,
when Bertuglia was speaking to Grimaldi about obtaining certain
contracts and requesting his influence in obtaining contracts.
Id. at 27-28. In her deposition, ADA Ruzow stated that she met
with Bertuglia and his attorney to discuss the possibility of
Bertuglia cooperating with the DA's Office in a way that would

---

[21] This Court previously dismissed the conspiracy claim against ADA Scotto.
Bertuglia, 839 F. Supp. 2d at 728.

be valuable to the Grimaldi investigation. Norinsberg Decl. 4, Ex. GGG, at 109. She stated she believed Bertuglia "could have been informative in [the] investigation" because he socialized with Gargano and Grimaldi. Id. at 114. Ruzow explained that if Bertuglia had cooperated, she would have discussed with her supervisors what benefit Bertuglia could receive. Id. at 109.

Considering all this evidence in the light most favorable to the plaintiffs, there is no evidence that Schaffler and Ruzow had an agreement to deprive Bertuglia of a constitutional right. The plaintiffs have failed to articulate the violation of a specific constitutional right that was the alleged object of the conspiracy. Schaffler did not violate a constitutional right by investigating Bertuglia and his associates who were suspected of political corruption. See Albright v. Oliver, 510 U.S. 266, 271 (1994) ("Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. The first step in any such claim is to identify the specific constitutional right allegedly infringed." (internal citation and quotation marks omitted)); id. at 271, 274-75 (concluding that a plaintiff's claim that his substantive right to be free of prosecution without probable cause could not be asserted as a constitutional violation when the Fourth Amendment more aptly covers deprivations of liberty). Moreover, because there is no evidence that the evidence before

the grand jury was falsified or manufactured, the plaintiffs'
argument that ADA Ruzow and Schaffler conspired to indict
Bertuglia and Laro on false charges is also unavailing.

Moreover, it was not unreasonable for Schaffler to pursue
the investigation of Bertuglia, his business, and family because
there was at the very least arguable probable cause to believe
that the plaintiffs were responsible for overbilling at the time
the plaintiffs were prosecuted and indicted. There was also a
basis to pursue a healthcare fraud investigation although that
investigation did not result in a prosecution and could not be
the basis of any malicious prosecution claim. Thus, Schaffler is
protected by qualified immunity. The ultimate rationale or
motivation behind the investigation is irrelevant. See Singer
v. Fulton Cnty. Sheriff, 63 F.3d 110, 120 (2d Cir. 1995) ("We
have held previously that if the officer either had probable
cause or was qualifiedly immune from subsequent suit (due to an
objectively reasonable belief that he had probable cause), then
we will not examine the officer's underlying motive in arresting
and charging the plaintiff."). For these reasons, Schaffler's
motion for summary judgment dismissing the § 1983 conspiracy
claim should be granted.

## B. D'ALEO AND FERRONE

D'Aleo and Ferrone move for summary judgment on all remaining claims against them. The plaintiffs do not oppose Ferrone's motion for summary judgment, and therefore, the claims against Ferrone are dismissed. Pls'. Mem. of Law in Opp. to D'Aleo's Mot. for Summ. J. at 1 n.1. The plaintiffs do not have Monell claims against the Port Authority. Id. at 14. The only remaining claims against any Port Authority defendants (other than the claims against Schaffler which are disposed of above) are against D'Aleo for malicious prosecution and deprivation of the right to a fair trial. The plaintiffs oppose D'Aleo's motion for summary judgment, arguing that D'Aleo testified falsely before the grand jury and made misleading and false statements to ADA Ruzow. D'Aleo, a maintenance supervisor at the Port Authority, was a contract administrator at the bus terminal during the period of Laro's contract. D'Aleo's R. 56.1 Stmt. ¶¶ 1-2; Pls.' Resp. to D'Aleo's R. 56.1 Stmt. ¶¶ 1-2. The plaintiffs contend that D'Aleo's testimony to the grand jury considering the second indictment that he spoke to his supervisors about the missing equipment and repeatedly complained to Kolakowski about the missing equipment was false. The plaintiffs also contend that D'Aleo falsely claimed to the grand jury that he had sent an e-mail notice to Laro concerning

68

Laro's failure to purchase new equipment. Pls.' Mem. in Opp. to
D'Aleo's Mot. for Summ. J. at 3-4.

D'Aleo has absolute immunity for his statements before the
grand jury and to ADA Ruzow in preparation for the grand jury
appearance. The Supreme Court explained: "The factors that
justify absolute immunity for trial witnesses apply with equal
force to grand jury witnesses. In both contexts, a witness' fear
of retaliatory litigation may deprive the tribunal of critical
evidence. And in neither context is the deterrent of potential
civil liability needed to prevent perjurious testimony." Rehberg
v. Paulk, 132 S. Ct. 1497, 1505 (2012). The Supreme Court also
made clear that a plaintiff cannot rely on a witness's grand
jury testimony for purposes of liability by arguing that the
witness conspired with the prosecutor to present false
testimony. Id. at 1506. Absolute immunity would cover
"preparatory activity, such as a preliminary discussion in which
the witness relates the substance of his intended testimony."
Id. at 1507. The Court nonetheless noted that there is only
qualified immunity for other activity that occurs outside the
grand jury room such as the preparation of false affidavits. Id.
at 1507 n.1.

None of D'Aleo's statements to the second grand jury can be
the basis for a malicious prosecution or deprivation of the
right to a fair trial claim under Rehberg. The plaintiffs attempt

69

to avoid Rehberg by relying on Marshall v. Randall, 719 F.3d 113
(2d Cir. 2013). Marshall held that grand jury testimony could
still be used for purposes of impeachment. Id. at 116-18.
Marshall also left open the question of how Rehberg affects the
Court of Appeals' holding in Manganiello v. City of New York,
612 F.3d 149 (2d Cir. 2010) that allegedly false grand jury
testimony could be used to overcome the presumption of probable
cause created by the indictment. Marshall, 719 F.3d at 118-19
n.2. But Marshall did not permit grand jury testimony to be used
as substantive evidence to impose civil liability for malicious
prosecution or denial of the right to a fair trial which is
precisely what the plaintiffs attempt to do against D'Aleo.

The plaintiffs also argue that statements D'Aleo made to
ADA Ruzow were false and were not made before the grand jury.
These arguments appear to "reframe [the] claim to attack the
preparation instead of the absolutely immune actions
themselves," a tactic that the Supreme Court foreclosed in
Rehberg.  See Rehberg, 132 S. Ct. at 1506-07 (internal quotation
marks omitted). Under Coggins v. Buonora, the plaintiff's claim
must exist independently of any grand jury testimony and may not
be "based on" that testimony. 776 F.3d 108, 113 (2d Cir. 2015).
Here, the plaintiffs' claim is based on D'Aleo's alleged
statements to ADA Ruzow that not only "parallel[] information"
that he provided to the grand jury but also constitute

70

"preparatory activity" in advance of his grand jury testimony. See id. & 113 n.7.

The plaintiffs fail to point to any alleged false statements by D'Aleo that were not from his grand jury testimony. See Pls.' Mem. of Law in Opp. to D'Aleo's Mot. for Summ. J. at 8-9 (citing only grand jury testimony). This is fatal to the plaintiffs' claims against D'Aleo. See Coggins, 776 F.3d at 113. ADA Ruzow stated she did not remember if D'Aleo told her he had complained to his supervisors. She also stated that D'Aleo's statements in discussions with her were consistent with his testimony before the grand jury. Miller Decl. 4, Ex. RR, at 173. ADA Ruzow did not independently recall what D'Aleo said in interviews prior to the grand jury and did not have a recollection of the meeting that took place outside the grand jury. Id. at 173-75. ADA Ruzow stated that she prosecuted the plaintiffs based on evidence that Bertuglia and Laro were aware of the new equipment requirement and did not comply. See id. at 136-37. Ruzow relied on Vetter's testimony that Bertuglia had decision-making power and circumstantial evidence that Bertuglia would have had knowledge of the decision not to purchase the equipment. Id. at 138. Vetter stated that he had short, general conversations with Bertuglia about the need to purchase equipment. Vetter also stated that he discussed the Port

Authority contract with Steve Davidson, another Laro employee.
Norinsberg Decl. 3, Ex. EE, at 63.

There are additional reasons that the claims against D'Aleo
must be dismissed.

While the plaintiffs accuse D'Aleo of providing knowingly
false testimony to the grand jury, the evidence fails to support
such charges. First, the plaintiffs allege that D'Aleo falsely
claimed that he asked Kolakowski "maybe every couple of weeks,
twice a month" about the missing equipment. Norinsberg Decl. 2,
Ex. TTT, at 383-84. This testimony was in fact consistent with
Kolakowski's testimony before the grand jury that D'Aleo asked
him about the whereabouts of the equipment "once or twice a
week." Miller Decl. 1, Ex. I, at 164-65. Second, the plaintiffs
claim that D'Aleo knowingly gave false testimony to the grand
jury when he testified that he told his supervisors, Robert King
and Roger Prince, that Laro had not provided the new equipment.
Norinsberg Decl. 2, Ex. TTT, at 384. This brief comment could
not have been material and could not have misled the grand jury
or the prosecutor because it said nothing about the knowledge of
Laro or Bertuglia but spoke only to the knowledge within the
Port Authority. Moreover, Roger Prince testified before the
grand jury that he was unaware that Laro had not purchased the
new equipment because the contract was being managed by D'Aleo.
Miller Decl. 4, Ex. SS, at 223-24. The grand jury was thus well

72

aware of the different recollections of D'Aleo and Prince.
Finally, the plaintiffs charge that D'Aleo falsely testified in
response to a grand juror's question about whether he ever put
in writing that Laro was not providing equipment as follows:
"Probably in an email." Norinsberg Decl. 2, Ex. TTT, at 394.
D'Aleo did in fact send an e-mail to Vacca in March 2008 to
which Pulitano responded, quoting D'Aleo's email. Miller Decl.
4, Ex. TT. Thus, D'Aleo's brief statement was not false.

The lack of evidence of false statements undermines both
the malicious prosecution and denial of a fair trial claims
against D'Aleo.

Moreover, the malicious prosecution claim fails because the
second grand jury indictment establishes a presumption which,
for the reasons explained above and in connection with
Schaffler's motion, has not been overcome. There was also
independent probable cause for the indictment, and the decision
of the prosecutors independent of D'Aleo's testimony was a
superseding cause of the prosecution and defeats the causation
element of the malicious prosecution claim against D'Aleo. See
Bermudez, 790 F.3d at 377; Higazy, 505 F.3d at 175. There is
also no evidence whatsoever of malice on behalf of D'Aleo who
was merely a mid-level Port Authority employee called as a
witness. And there is no evidence that D'Aleo committed perjury

or fabricated evidence to support a claim for denial of the right to a fair trial.

D'Aleo would in any case be entitled to qualified immunity if "no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that [his] actions were objectively unreasonable in light of clearly established law." Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001). Here, the plaintiffs failed to raise a triable issue of fact that D'Aleo fabricated and transmitted evidence to ADA Ruzow. There is no evidence that D'Aleo withheld evidence or that he was objectively unreasonable in providing the investigators with evidence about the Laro contract. Therefore, the claims against D'Aleo would also fail because he is entitled to qualified immunity.

## C. ADAs RUZOW AND SCOTTO

ADAs Ruzow and Scotto now move for summary judgment dismissing all of the plaintiffs' claims.

In Imbler v. Pachtman, the Supreme Court held that a state prosecutor who "acted within the scope of [the prosecutor's] duties in initiating and pursuing a criminal prosecution" is absolutely immune from suit. 424 U.S. 409, 410 (1976). Courts apply a functional approach in determining whether a prosecutor is entitled to qualified or absolute immunity, specifically

focusing on whether the prosecutor acted in the "role as advocate for the State." Buckley v. Fitzsimmons, 509 U.S. 259, 277-78 (1993) (internal quotation marks omitted).

Accordingly, this Court in Bertuglia dismissed all claims related to the use of subpoenas that were part of the grand jury investigations. This Court allowed the plaintiffs' claim for malicious abuse of process and the Chalfy claim against ADAs Ruzow and Scotto and conspiracy to violate civil rights claim against ADA Ruzow to go forward only if the plaintiffs could show that the subpoenas were issued before a grand jury was convened. Bertuglia, 839 F. Supp. 2d at 732-33. This Court also allowed the plaintiffs' stigma plus claim to proceed against ADAs Ruzow and Scotto only to the extent the claim was based on the content of the press release. The plaintiffs' claims against ADA Ruzow and Scotto relating to their use of subpoenas and questioning of witnesses are now dismissed because the ADAs are entitled to absolute immunity. The stigma plus claim is dismissed because ADAs Ruzow and Scotto are protected by qualified immunity.

### (1)

In connection with their malicious abuse of process claim, the plaintiffs contend that ADAs Ruzow and Scotto improperly issued subpoenas and that ADA Ruzow unlawfully compelled

75

witnesses to appear in her office. The plaintiffs' claim fails because the evidence establishes without reasonable dispute that all of the subpoenas were properly issued pursuant to the ongoing grand jury investigation.

The plaintiffs alleged that the ADAs issued subpoenas outside the context of the grand jury investigations, and this Court allowed those claims to proceed only to the extent those allegations could be proved.  If a grand jury case was convened and the evidence was sought for a grand jury, then the ADAs would be protected by absolute immunity. See Bertuglia, 839 F. Supp. 2d at 731-33. The plaintiffs now acknowledge that all subpoenas related to the overbilling investigation were issued after the DA's Office opened a case before the grand jury. See ADA Defs.' 56.1 Stmt. ¶¶ 27, 44; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt ¶¶ 27, 44. The plaintiffs point to no subpoenas that were issued without the number of the appropriate grand jury investigation that had been opened by ADA Ruzow. Because it is now clear that the ADA defendants did not issue subpoenas outside of the grand jury investigations or before a grand jury case was opened, the plaintiffs' claims are barred by absolute immunity.

Moreover, the plaintiffs' arguments that ADA Ruzow used subpoenas improperly because several subpoenas were related to the healthcare fraud investigation and sought information about

the Bertuglias' healthcare and financial information from dozens
of entities are also without merit. ADA Ruzow opened the
healthcare fraud case in 2008 under the case number C2008-
007117. Krasnow Decl., Ex. L. The plaintiffs acknowledge that a
grand jury case was opened to investigate alleged healthcare
fraud by Bertuglia and his immediate family. ADA Defs.' R. 56.1
Stmt. ¶ 76; Pls.' Resp. ¶ 76. As this Court already concluded in
Bertuglia, the ADA defendants' actions during witness interviews
and in issuing subpoenas after the grand jury investigations
were opened are entitled to absolute immunity. Bertuglia, 839 F.
Supp. 2d at 733.

The plaintiffs argue that notwithstanding the well-
established rule of absolute immunity, ADA Ruzow never intended
to indict anyone on healthcare fraud charges and thus abused her
subpoena power.  ADA Ruzow issued subpoenas for documents
related to the healthcare and pension fraud investigations and
interviewed witnesses. ADA Ruzow testified that she ultimately
did not have enough evidence to seek an indictment on those
charges. Norinsberg Decl. 1, Ex. EEE, at 285-87. But whether or
not the DA's Office actually indicted Bertuglia or his family on
the healthcare fraud charges is irrelevant because
"investigative acts reasonably related to decisions whether or
not to begin or to carry on a particular criminal prosecution,
or to defend a conviction, are shielded by absolute immunity

77

when done by prosecutors." See Giraldo v. Kessler, 694 F.3d 161,
166 (2d Cir. 2012). It would be a perverse rule to require
prosecutors to bring charges in order to retain the absolute
immunity that they are afforded in pursuing grand jury
investigations.

The plaintiffs also argue that the ADA defendants' witness
interviews with three Laro employees constitute malicious abuse
of process. Specifically, plaintiffs argue that ADA Ruzow
unlawfully subpoenaed Dina Shillito, Michelle King, and Patricia
Bertell to her office. The record does not show any evidence of
a subpoena compelling Shillito's or King's personal appearance.
The plaintiffs only point to an unsigned subpoena that was not
served on Shillito. Norinsberg Decl. 1, Ex. RR, at 1-2. There is
also a subpoena duces tecum served on Shillito, as the custodian
of Laro's records, but the plaintiffs do not allege any
impropriety in connection with this subpoena. Krasnow Decl., Ex.
M, at 1.


The plaintiffs also complain about the fact that ADA Ruzow
issued subpoenas for Patricia Bertell. Those subpoenas did not,
as the plaintiffs allege, require Ms. Bertell's appearance at
the ADA's office. The first subpoena was issued in connection
with the healthcare grand jury investigation. It was dated
October 25, 2008, and directed a personal appearance before the

78

grand jury on November 10, 1998. It was sent to Ms. Bertell's lawyer with a cover letter that did not require attendance at the prosecutor's office but simply provided contact information for the prosecutor. Norinsberg Decl. 1, Ex. PP, at 20-21; Norinsberg Decl. 1, Ex. RR, at 3. Ms. Bertell did not in fact testify before the grand jury but went to the prosecutor's office at a later point and was interviewed for about an hour, and Ms. Bertell found the interview by ADA Ruzow to be aggressive and hostile. Norinsberg Decl. 1, Ex. CCCC, ¶¶ 9-11.

ADA Ruzow sent another subpoena to Ms. Bertell's lawyer on March 19, 2009, calling for a grand jury appearance on March 25, 2009, in connection with the overbilling investigation. The cover letter did not require an appearance in the prosecutor's office and only provided contact information. Krasnow Decl., Ex. BB, at 7-8. But that appearance did not go forward and Ms. Bertell did not express any concerns about that subpoena. See Norinsberg Decl. 1, Ex. CCCC; ADA Defs.' R. 56.1 Stmt. ¶¶ 95-96; Pls.' Resp. to ADA Defs.' R. 56.1 Stmt. ¶¶ 95-96. There is no indication in the record that Ms. Bertell's counsel moved to quash either subpoena as unreasonable. There is no evidence that the grand jury subpoena process was abused as it relates to Ms. Bertell.

ADA Ruzow's interviews were protected by absolute immunity. See Imbler, 424 U.S. at 431 n.33 (immunity applies to questions

79

of whom to call as a witness as well as "[p]reparation, both for
the initiation of the criminal process and for a trial, [which]
may require the obtaining, reviewing, and evaluating of
evidence."); see also Kanciper v. Lato, 989 F. Supp. 2d 216, 228
(E.D.N.Y. 2013) ("A prosecutor acting in the role of an advocate
in connection with a judicial proceeding is entitled to absolute
immunity for all acts intimately associated with the judicial
phase of the criminal process. These functions include deciding
whether to bring charges and presenting a case to a grand jury
or a court, along with the tasks generally considered adjunct to
those functions, such as witness preparation, witness selection,
and issuing subpoenas." (internal citation and quotation marks
omitted)).

The plaintiffs also argue that because ADA Ruzow
interviewed these witnesses without intending to present them
before the grand jury, Ruzow improperly subpoenaed them. Pls.'
Resp. to ADA Defs.' R. 56.1 Stmt. ¶ 81. "The prosecutorial
function may encompass questioning a witness for a brief period
before presentation to determine whether, in the prosecutor's
judgment, the witness's testimony should still be pursued or
whether the witness should be released without further action."
Simon v. City of New York, 727 F.3d 167, 173 (2d Cir. 2013); see
also Imbler, 424 U.S. at 430 n.33 (the duties of a prosecutor as
an advocate include questions of whether and when to prosecute,

80

which witnesses to call, and what evidence to present). Thus, the fact that the witnesses did not ultimately testify before a grand jury does not raise a triable issue of fact of abuse of the subpoena power because it is within a prosecutor's discretion to decide whether or not to present a witness' testimony to the grand jury. See id. Moreover, there is no evidence that ADA Ruzow exceeded her subpoena power because there is only evidence she conducted in-person interviews. There is no evidence that ADA Ruzow subpoenaed witnesses to appear in her office, which would be contrary to New York law and the DA's policy. Krasnow Decl., Ex. F at 268.

The plaintiffs rely heavily on Rodrigues v. City of New York, 602 N.Y.S.2d 337 (App. Div. 1993) to argue that the ADAs acted improperly. But Rodrigues is readily distinguishable. In Rodrigues, the prosecutors had abused their subpoena power and were not entitled to immunity because they issued subpoenas that were made returnable before a grand jury but no grand jury had been convened and when the witnesses arrived they were directed to the DA's Office. See id. at 339, 341. In this case, there is no evidence to support the plaintiffs' claim that ADA Ruzow and Scotto were manipulating the grand jury process for their own motives by opening sham investigations or that they used subpoenas to lure witnesses to their offices. Thus, absolute

immunity bars claims against ADAs Ruzow and Scotto for the alleged misuse of the subpoena power.

The plaintiffs ascribe malicious motivations to the ADA defendants and charge that they acted over-aggressively and hostilely. But as this Court recognized in dismissing most of the claims against the ADA defendants in the original motion:

> To the extent that the Amended Complaint alleges that the ADA defendants engaged in misconduct through improper lines of questioning or threats while interviewing or evaluating potential grand jury witnesses, that conduct—interviewing potential grand jury witnesses—is plainly within the power of a prosecutor, and is protected by absolute immunity. See, e.g., Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994) ("[A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include . . . allegedly conspiring to present false evidence at a criminal trial."). As the Court of Appeals for the Second Circuit has recognized, even alleged reprehensible prosecutorial conduct is protected by absolute immunity because "there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the performance of their duties." Id.

Bertuglia, 839 F. Supp. 2d at 732-33; see also Green v. Maraio, 722 F.2d 1013, 1018 (2d Cir. 1983)("An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." (internal quotation marks and citation omitted)) Thus, the ADA defendants' motion for summary

judgment dismissing the malicious abuse of process claim is granted.

(2)

The ADA defendants move for summary judgment dismissing the Chalfy claim. The plaintiffs rely on the same evidence and facts to support the Chalfy claim that they relied on to support the malicious abuse of process claim. Because the ADA defendants are entitled to absolute immunity for the issuance of subpoenas and witness interviews, the plaintiffs cannot rely on these activities to substantiate their claims of a pattern of harassment. See Chalfy, 804 F.2d at 22. It is also clear that issuing approximately 35 subpoenas does not clear the high Chalfy threshold for harassment, particularly when the plaintiffs cannot point to individual abuses such as subpoenaing witnesses to appear at the prosecutors' office. Thus, the ADA defendants' motion for summary judgment dismissing the Chalfy claim is granted.

(3)

ADA Ruzow moves to dismiss the conspiracy claim against her. Regardless of the fact that ADA Ruzow and Schaffler were working together to investigate possible wrongdoing by Laro and Bertuglia, the plaintiffs have not pointed to a violation of a constitutional right of the plaintiffs. The plaintiffs only rely on ADA Ruzow's undisputed investigation into Charles Gargano and

83

Vincent Grimaldi, but they do not raise a triable issue of fact as to how the investigation into Gargano and Grimaldi which led to an investigation into Bertuglia's business dealings violates any constitutional right of the plaintiffs. Thus, for the same reasons that the plaintiffs' conspiracy claim against Schaffler failed, ADA Ruzow's motion for summary judgment dismissing the conspiracy claim is granted.

## (4)

The ADA defendants next move to dismiss the stigma plus claims against them. Under Buckley, the ADA defendants are not entitled to absolute immunity for holding a press conference, nor as they did here, issuing a press release. See Buckley, 509 U.S. 277-78. However, they may be entitled to qualified immunity. Flagler v. Trainor, 663 F.3d 543, 549 (2d Cir. 2011) ("[W]hile statements to the press may be an integral part of the prosecutor's job, the duty is no different than that for other executives who deal with the press and enjoy only *qualified immunity.*" (internal quotation marks omitted) (emphasis in the original)). "[P]ublic officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." Weyant, 101 F.3d at 857.

Here, the press release stated that Laro had a contract that required it to purchase approximately $400,000 of new and used equipment and that Laro would be reimbursed for the equipment. Norinsberg Decl. 3, Ex. S. It also stated that invoices submitted charged for over $200,000 worth of equipment that Laro never bought, and that Laro did not purchase a majority of the required equipment. Id. The plaintiffs contend that the statements are false because Laro purchased a majority of the pieces, and that depositions from this litigation show that a majority of the equipment was purchased. But a deposition in 2014 is not the relevant moment in time at which to measure the truthfulness of the press release for the purposes of qualified immunity. Moreover, the test for qualified immunity is an objective one, and ADA Ruzow's subjective beliefs are irrelevant. See Cerrone v. Brown, 246 F.3d 194, 202 (2d Cir. 2001).

On August 7, 2008, the day the press release was issued, the evidence presented before the grand jury and that had been collected in the course of the DA's investigation objectively supported the statements in the press release. For example, ADA Ruzow subpoenaed invoices from Laro before the first grand jury presentation, and Laro produced only two invoices from Tennant: an invoice for $6,116.57 and one for $5,443.35. There was also a check to Tennant in the amount of $ 7,919.97. Krasnow Decl., Ex.

85

M, at 1; Krasnow Decl., Ex. S, at 3-5. The Laro proposal to the Port Authority explicitly set out that a total of $463,479 in equipment would be purchased, and that included two pieces of Tennant equipment for $85,000 and $68,000. Krasnow Decl., Ex. E, at 19. It was objectively reasonable to conclude that the majority of the items were not purchased because the invoices from Tennant failed to show that a majority of the equipment had been purchased, and that approximately $200,000 in equipment had been billed for but not purchased. E.g., Miller Decl. 1, Ex. R, at 233 (Ruzow stating that the statements in the press release were consistent with what was uncovered by the investigation).

Moreover, the ADA defendants simply reported what had been previously stated during the arraignment, and this type of fair reporting is not actionable. See, e.g., N.Y. Civil Rights Law § 74 ("A civil action cannot be maintained against any person, firm or corporation, for the publication of  a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published."); Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co., 399 N.E.2d 1185, 1187 (N.Y. 1979) (noting that under New York Civil Rights Law § 74, a fair report of a legislative or other official proceeding does not give rise to liability in a libel action). The plaintiffs dispute whether the statement was

finalized before or after the arraignment, but in any case, the statement was not published until after the arraignment and the statement tracked what ADA Ruzow said during the arraignment and reported on the content of the indictment. Krasnow Decl., Ex. V, at 7; Norinsberg Decl. 3, Ex. S. Therefore, the publication of the press release is privileged and not actionable.

The stigma plus claim also fails because the plaintiffs failed to show any "plus." As explained in connection with Schaffler's motion, the plaintiffs cannot rely on the loss of any contract with the Port Authority because that loss resulted from the indictment and not the press release. The plaintiffs have failed to show any other "plus" that flowed from the press release and not the indictment.

When the Court denied the motion to dismiss this claim initially, the Court left open the possibility that the plaintiffs could establish a "plus" based on the alleged misuse of subpoenas "that was not protected by absolute immunity." Bertuglia, 839 F. Supp. 2d at 735. However, the plaintiffs have not sustained any such claim and this possibility is thus foreclosed. The plaintiffs therefore have failed to establish the "plus" element of their claim.

Moreover, a reasonable ADA would not conclude that the statements in the press release reporting the return of an indictment would constitute a violation of clearly established

law. The ADA defendants could reasonably conclude that the press release accurately reported the indictment's content and that the evidence available at the time supported the press release's statements. The ADA defendants are thus entitled to qualified immunity.  Their motion for summary judgment dismissing the stigma plus claim is granted.

### D. NEW YORK CITY

New York City now moves for summary judgment dismissing the plaintiffs' Monell claim. Section 1983 provides a cause of action for any person who has been deprived of a right secured by the Constitution or federal law under color of state law. 42 U.S.C. § 1983. To impose Section 1983 liability upon a municipality, a plaintiff must identify a municipal "policy" or "custom" that caused the plaintiff's injuries. See Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978); see also Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997); Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992); Bullard v. City of New York, 240 F. Supp. 2d 292, 299-300 (S.D.N.Y. 2003). The plaintiff must demonstrate that the municipality was the "moving force" behind the injuries alleged. Brown, 520 U.S. at 404; Monell, 436 U.S. at 692. The alleged policy does not need to be contained in an explicitly adopted rule so long as the unlawful practices of city officials are so "persistent and

widespread . . . as to constitute a custom or usage with the
force of law." Sorlucco, 971 F.2d at 870-71 (internal quotations
omitted); see also Munoz v. City of New York, No. 04cv1105
(JGK), 2008 WL 464236, at *3 (S.D.N.Y. Feb. 20, 2008).

     The unconstitutional conduct of a single prosecutor does
not give rise to municipal liability. City of Canton v. Harris,
489 U.S. 378, 386 (1989) ("Nor, without more, would a city
automatically be liable under § 1983 if one of its employees
happened to apply the policy in an unconstitutional manner, for
liability would then rest on respondeat superior."). The
unconstitutional conduct must rise to the level of a custom.
"[A] municipal policy may be inferred from the informal acts or
omissions of supervisory municipal officials" and "municipal
inaction such as the persistent failure to discipline
subordinates who violate [persons'] civil rights could give rise
to an inference of an unlawful municipal policy of ratification
of unconstitutional conduct." Zahra v. Town of Southold, 48 F.3d
674, 685 (2d Cir. 1995)(internal quotation marks and citations
omitted) (alteration in original); Turpin v. Mailet, 619 F.2d
196, 201 (2d Cir. 1980) ("[W]here senior personnel have
knowledge of a pattern of constitutionally offensive acts by
their subordinates but fail to take remedial steps, the
municipality may be held liable for a subsequent violation if

the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts.").

The City moved for summary judgment dismissing the plaintiffs' failure to train and failure to discipline claims, citing evidence of the DA's Office's orientation program and trial advocacy training. However, the plaintiffs contend that there is no guideline for disciplining prosecutors who have committed misconduct. The City contends that the Monell claim fails because the plaintiffs have failed to allege the deprivation of a constitutional right that was allegedly fostered by a failure to train or failure to discipline. The City also contends that the plaintiffs have failed to raise a triable issue of fact that the City was deliberately indifferent to prosecutorial misconduct.

The plaintiffs' Monell claim fails at the outset because it is not based on a constitutional violation. A municipality cannot be held liable under § 1983 in the absence of an underlying constitutional violation. City of L.A. v. Heller, 475 U.S. 796, 799 (1986) ("[N]either Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), nor any other . . . cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.").

In this case, the plaintiffs have failed to survive a motion for summary judgment dismissing all of their substantive claims such as malicious prosecution, malicious abuse of process, and denial of the right to a fair trial. Thus, the plaintiffs cannot rely on any of those alleged constitutional deprivations as providing a basis for Monell liability.

Here, the plaintiffs point to evidence of alleged prosecutorial misconduct that amounts to nothing more than violations of the New York rules of evidence that apply before a state grand jury.[22] They fail to point to an underlying constitutional violation. For example, the plaintiffs argue that the prosecutors introduced "bad act" evidence in violation of the Molineux rules, see People v. Molineux, 61 N.E. 286 (N.Y. 1901), which prohibit admission of evidence of uncharged conduct, subject to several exceptions. The plaintiffs also argue that the prosecutors improperly vouched for evidence and acted as unsworn witnesses.[23]

---

[22] Contrary to the plaintiffs' assertion that this Court already determined there was a constitutional violation, this Court only found that Monell theories as pleaded in the Amended Complaint were viable for the purposes of surviving a Rule 12(b)(6) motion to dismiss. Bertuglia, 839 F. Supp. 2d at 737-38. Those theories included a violation of Brady obligations which is not established in the current record.

[23] Judge Zweibel's findings relied only on New York State cases. Norinsberg Decl. 3, Ex. H, at 29-35. In the summary judgment papers, the plaintiffs never identified the constitutional violation that they contended the City should be responsible for under Monell. When that became obvious at oral argument, the plaintiffs submitted a lengthy supplemental letter dated September 16, 2015, which attempted to identify the constitutional violation. That letter could be rejected because the motion was already fully and extensively briefed, and it is surely too late to identify by supplemental

The only evidence of prosecutorial misconduct pertains to violations of the New York rules of evidence in the course of a grand jury proceeding. The plaintiffs fail to prove a federal constitutional violation. The Constitution does not require state rules of evidence to apply in a state grand jury proceeding. Although the New York State Constitution guarantees indictment by a grand jury for felony charges, see Fields v. Soloff, 920 F.2d 1114, 1118 (2d Cir. 1990), the right to a grand jury indictment in a state proceeding is not a right that the Fifth and Fourteenth Amendments protect. See LanFranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002) (reiterating in the habeas context that the grand jury indictment clause has not been incorporated against the states through the Fourteenth Amendment). Official conduct may violate state law, even state

---

letter the basic constitutional violation upon which the plaintiffs were relying and for which they were attempting to hold the City liable. In any event, the letter still fails to identify an underlying constitutional violation that is the basis for the Monell claim. Many of the cases the plaintiffs cite are cases discussing the federal right to a grand jury which has not been applied against the states. It is true that once a state confers a benefit or right, like indictment by a grand jury, the state cannot arbitrarily deny the liberty interest it created. See Vitek v. Jones, 445 U.S. 480, 488 (1980); Jones v. Keane, 250 F. Supp. 2d 217, 234 (W.D.N.Y. 2002). The September 16, 2015 letter is the first time the plaintiffs framed their Monell claim as based on a procedural due process violation, but the plaintiffs have not explained how the prosecutors' actions arbitrarily denied them of their right to a grand jury indictment under state law. The alleged prosecutorial misconduct is based on violations of the rules of evidence in New York, not on any allegation that the ADAs knowingly presented false testimony to the grand jury or violated federal constitutional rights such as by ignoring Brady obligations. See id. at 233 (analyzing possible due process violations in a state grand jury). The plaintiffs do not point to any case where a violation of the state rules of evidence amounted to a federal due process violation.

constitutional law, but such violations do not rise to the level of a constitutional injury unless a constitutionally protected right is at stake. See, e.g., Estelle v. McGuire, 502 U.S. 62, 71-72 (1991) (noting in a habeas case that a mistake in applying state evidence law does not give rise to a constitutional violation unless the mistake so infected a trial that the resulting conviction violates due process); Ayala v. Leonardo, 20 F.3d 83, 91 (2d Cir. 1994) (a violation of New York state evidentiary law did not rise to the level of a constitutional violation); 5 Borough Pawn, LLC v. City of New York, 640 F. Supp. 2d 268, 288 (S.D.N.Y. 2009); Fluent v. Salamanca Indian Lease Auth., 847 F. Supp. 1046, 1056 (W.D.N.Y. 1994). Indeed, it would be odd to find that the violation of state rules of evidence before a state grand jury constituted a violation of federal constitutional law when the federal rules of evidence do not apply before federal grand juries. See Fed. R. Evid. 1101(d)(2). Thus, the plaintiffs' claim must fail for failure to show the violation of a right protected by the federal Constitution.

To the extent the plaintiffs claim that the prosecutorial misconduct allegedly deprived them of the right to a fair and impartial trial, the plaintiffs' Monell claim also fails on the merits because there is no showing of deliberate indifference. "A pattern of similar constitutional violations by untrained

employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 563 U.S. 51, 131 S. Ct. 1350, 1360 (2011).

The failure to identify the underlying constitutional violation renders it impossible to determine the pattern of cases that would comprise the pattern of constitutional violations. While the plaintiffs list cases of prosecutorial misconduct, they include cases unlike the present case and include cases that would not approach a constitutional violation.

The plaintiffs do not show that the City failed to train the assistant district attorneys or that the City has exhibited deliberate indifference in response to violations. The need for training must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390. "[T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." Id. The plaintiffs contend there is no training for prosecutors to help them avoid vouching for witnesses, introducing bad act evidence, making implied perjury threats, or becoming an unsworn witness. But these practices are not in themselves constitutional violations so that the failure to provide

training in connection with these practices could not have been the cause of a denial of a constitutional right for the plaintiffs.

The record also shows that the plaintiffs' claim fails on its own terms. Materials produced during discovery unequivocally show training materials geared towards each of the alleged misconduct the plaintiffs claimed they suffered. See Krasnow Decl., Ex. KK, at 99-100 (informing prosecutors they have no authority to use a subpoena to compel an appearance in their office); Krasnow Decl., Ex. NN, at 22-23 (guidelines for witness subpoenas for a grand jury presentation and witness interviews); Krasnow Decl., Ex. LL, at 99-111 (explaining restrictions on the use of "bad act" evidence); Krasnow Decl., Ex. MM, at 94 (prohibiting prosecutors from vouching for a witness). The plaintiffs even highlight the existence of a policy that requires a supervisor to be present when an assistant is questioning a defense witness during a grand jury presentation. Pls.' Mem. of Law in Opp. to City's Mot. for Summ. J. at 27; Krasnow Decl., Ex. F, at 89. This requirement, coupled with the training materials, undermines the plaintiffs' deliberate indifference theory. Although the plaintiffs might take issue with the exact procedures of training, there is no dispute that training was available and dealt with the practices the plaintiffs criticize. Thus, the plaintiffs' failure to train

claim fails. See Connick, 131 S. Ct. at 1363 ("But failure-to-train liability is concerned with the substance of the training, not the particular instructional format. The statute does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States.")

With respect to the "lax discipline" claim, the same failure to identify an underlying violation undermines the plaintiffs' claim. The City is liable under Monell for a violation of these plaintiffs' constitutional rights if the lax discipline in the DA's Office caused the violation of the plaintiffs' constitutional rights. When the plaintiffs cannot show the violation of their constitutional rights, there is no liability to be imposed on the City by a claimed lack of discipline.

The plaintiffs argue that the fact that neither ADA Ruzow nor ADA Scotto were disciplined after the indictments against the plaintiffs were dismissed shows there are no disciplinary procedures in the department, but there is no showing that ADAs Ruzow or Scotto violated the plaintiffs' constitutional rights. Judge Zweibel did not find that there was any violation of the plaintiffs' constitutional rights. Moreover, the testimony of Frederick Watts, an Executive Assistant District Attorney at the New York DA's Office during the relevant time period, shows that there were mechanisms in place to deal with possible misconduct

and problems in ADA performance.  Krasnow Decl., Ex. GG, at 14;
ADA Defs.' R. 56.1 Stmt. ¶ 132. There was "a practice and
expectation" that ADAs would report concern about their behavior
and possible prosecutorial misconduct to their supervisors.
Krasnow Decl., Ex. GG, at 39. Watts described several types of
discipline that would apply to an ADA with performance problems,
including forced leave, a letter in one's file, termination, and
not receiving a raise. Id. at 59. Watts recalled one case where
a person had left specifically because of prosecutorial
misconduct and noted that other ADAs were dismissed for
performance reasons. Id. at 61, 65 ("discharged . . . for poorly
handling their cases"), 70. The Appeals Bureau notifies the
trial assistant and a supervisor when a conviction is reversed
on the basis of prosecutorial error. Id. at 76-78. If there were
a disciplinary committee complaint, the matter would be
addressed at the supervisory level and at the executive level.
Id. at 78. Thus, the plaintiffs have failed to raise a triable
issue that the City was deliberately indifferent to potential
constitutional violations because there were informal
disciplinary procedures to ensure that the assistant district
attorneys followed the law. See Wise v. N.Y.C. Police Dep't, 928
F. Supp. 355, 365 (S.D.N.Y. 1996) ("If allegations of liability
are based on inadequate training or the failure to supervise,
the plaintiff must demonstrate that "'the failure to train

amounts to deliberate indifference to the rights' of those with whom the municipal employees will come into contact.'" (quoting Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992)).

The plaintiffs have also failed to raise a triable issue of fact that the alleged lack of training or discipline led to the violation of their constitutional rights. The alleged lack of training and discipline must be the "moving force" behind the constitutional violation, and the alleged prosecutorial misconduct is plainly not a constitutional violation. City of Canton, 489 U.S. at 389; id. at 391 ("[F]or liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury."). "But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." Connick, 131 S. Ct. at 1363.

Thus, the plaintiffs' Monell claims must be dismissed and the City's motion for summary judgment is granted.

## IV. CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, they are either moot or without merit. The defendants' motions for summary judgment are **granted** and the plaintiffs' motion is **denied.** The Clerk is directed to enter judgment dismissing this

case. The Clerk is also directed to close **Docket Nos**. **131, 135,**
**155**, **171,** and **175.**


SO ORDERED.

Dated:     New York, New York
           September 28, 2015        _____/s/_____
                                         John G. Koeltl
                                    United States District Judge